UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA



ARLAINE & GINA ROCKEY, INC.,

                Plaintiff,

v.

CORDIS CORPORATION,

                Defendant.

_____/

CASE NO.: 02-22555-CIV-ALTONAGA
MAGISTRATE JUDGE BANDSTRA


## DEFENDANT CORDIS' MOTIONS *IN LIMINE*

*Of Counsel*:

Eugene M. Gelernter
Scott B. Howard
Laura Storto
Rosa E. Son
PATTERSON, BELKNAP,
   WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
212-336-2000

Eric I. Harris
Tracy Poole
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08543

Dated: September 15, 2003

Rudolph F. Aragon, Florida Bar No. 286249
Kevin C. Kaplan, Florida Bar No. 933848
ARAGON, BURLINGTON, WEIL,
   SCHWIEP, KAPLAN & BLONSKY, P.A.
2699 S. Bayshore Drive
Miami, FL 33133
Telephone: (305) 858-2900

*Attorneys for defendant Cordis Corporation*



## DEFENDANT CORDIS' MOTIONS *IN LIMINE*

Defendant Cordis Corporation hereby moves *in limine* for the following relief:

1.      Motion *in limine* to exclude parol evidence.

2.      Motion *in limine* to exclude arguments by AGRI that Cordis is obligated to pay royalties on products that pratice the Rockey Patents "in whole or in part."

3.      Motion *in limine* to exclude or limit the testimony of AGRI'S patent law expert.

4.      Motion *in limine* to exclude testimony of AGRI's experts on infringement under the doctrine of equivalents

5.      Motion *in limine* to exclude certain testimony by George Widas and Edward F. Leonard under *Daubert*.

The bases for defendant's *in limine* motions are set forth in the briefs attached to

this Motion, following numbered tabs that correspond to the list of *in limine* motions set forth

above, and in the accompanying Appendix in Support of Defendant Cordis' Motions *In Limine*

("Appendix").  Exhibits to the attached briefs appear in the accompanying Appendix.

A Proposed Order concerning the *in limine* motions is attached hereto as Tab 6.

*Of Counsel:*                                          By: _____
Eugene M. Gelernter                          Rudolph F. Aragon, Florida Bar No. 286249
Scott B. Howard                               Kevin C. Kaplan, Florida Bar No. 933848
Laura Storto                                  ARAGON, BURLINGTON, WEIL,
Rosa E. Son                                       SCHWIEP, KAPLAN & BLONSKY, P.A.
PATTERSON, BELKNAP,                          2699 S. Bayshore Drive
    WEBB & TYLER LLP                          Miami, FL  33133
1133 Avenue of the Americas                  Telephone:  (305) 858-2900
New York, NY 10036
212-336-2000                                 *Attorneys for defendant Cordis Corporation*

Eric I. Harris
Tracy Poole
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08543

Dated: September 15, 2003

938586v1

# EXHIBIT

# 1

## CORDIS' MOTION *IN LIMINE* NO. 1:

### TO EXCLUDE PAROL EVIDENCE

**I.**     **INTRODUCTION**

The parties' License Agreement unambiguously defines the "Licensed Products" on which Cordis is required to pay AGRI a 10% royalty. Under the License Agreement, the *only* products on which Cordis must pay royalties are products which are "covered by" a claim of the Rockey patents (see Ex. 1 ¶¶ 3.2 and 1.1.2),[1] i.e., products that "infringe the [Rockey] patent[s]" under federal patent law. Interspiro USA, Inc. v. Figgie Int'l, Inc., 18 F.3d 927, 930 (Fed. Cir. 1994).

Against this background, the parties' supposed "understandings" and intent when they entered into the License Agreement have no bearing on whether Cordis owes AGRI royalties. As a matter of federal patent law, the parties' supposed intent has no bearing on any infringement issue. And under Florida contract law, their unwritten "understandings" have no bearing on interpretation of their written Agreement. That conclusion applies with particular force because the Agreement contains a merger-and-integration clause (Ex. 1 ¶ 14.1), which states that the Agreement supercedes and replaces all of the parties' other agreements or understandings.

AGRI, however, wants to introduce parol evidence on its version of the parties' intent. That evidence has no bearing on any legitimate issue. It is an irrelevant sideshow that could only confuse and distract the jury.

**II.**     **FACTUAL BACKGROUND**

Before Cordis and AGRI entered into their written Agreement, they were involved in negotiations starting in 1994. As part of its effort to interest Cordis in taking a license, AGRI gave Cordis a three-page description of the Rockey patents (Ex. 2), in which AGRI asserted that

---

[1] Exhibits cited in this memorandum are included in the accompanying Appendix.

the patents are broad in scope.  The parties met to discuss terms and later exchanged drafts of a license agreement.

These negotiations culminated in the signing of a written License Agreement in May 1995.  Under the License Agreement, Cordis is required to pay royalties on "Licensed Products." Ex. 1 ¶ 3.2.  A "Licensed Product" is explicitly defined as "a product which is (i) sold, or (ii) used in a medical procedure, in a country where it is *covered by any claim* of the [Rockey Patents." Id. ¶ 1.1.2 (emphasis added).  As the Federal Circuit has held, this language in a patent license requires a licensee to pay royalties only on products that "infringe[] the [licensed] patent." Interspiro, 18 F.3d at 930.

The License Agreement also has a merger-and-integration clause.  Paragraph 14.1 states:

> This Agreement supersedes and replaces all previous agreements between the parties, and sets forth all of the agreements and understandings made between the parties hereto regarding the subject matter hereof.

Ignoring this merger-and-integration clause, AGRI has offered its own version of what the parties supposedly intended in entering into their Agreement.  AGRI provided a preview of its position in opposing Cordis' motion for summary judgment.  For example, in opposing Cordis' motion for summary judgment AGRI argued:

- During a meeting with Cordis' executives prior to execution of the License Agreement, "it was made clear to Mrs. Collias [AGRI's President] that Cordis would be paying royalties on both metal and polymer stents." Mem. in Opp'n to Cordis' Motion for Summary Judgment at 7.

- "[T]here was ... an agreement by everybody that the Rockey patents were very broad." Ex. 3 (Aug. 28, 2003 Tr.) at 19.

- That AGRI understood that it would receive in excess of $100 million in royalties under the License Agreement. Mem. in Opp'n to Cordis' Motion for Summary Judgment at 8.

- That Cordis' "primary reason" for taking a license under the Rockey patents was a desire to "possibly assert these patents against the only other company then in the stent market, Johnson & Johnson." Mem. in Opp'n to Cordis' Motion for Summary Judgment at 2.

2

In addition, AGRI relied on the 3-page description of the patents that AGRI's president prepared as part of an effort to generate interest on the part of potential licensees.  AGRI cited this promotional piece as evidence of what it describes as a shared understanding – which is not mentioned in the parties' written License Agreement – that Cordis would pay royalties on sales of metal stents.  Ex. 3 (Aug. 28, 2003 Tr.) at 16.  AGRI also apparently wants to offer testimony by its president of this supposed understanding.  See Ex. 4 at 196-199.  In the same vein, AGRI argued that a projection of possible future royalties, which Cordis executives gave to AGRI during license negotiations (Ex. 5), somehow shows an understanding that Cordis would be paying royalties on sales of metal as well as polymer stents.[2]

All of this is much in dispute.  But more important for this motion, none of this has any bearing on the issue that is dispositive under the unambiguous terms of the Agreement, see Interspiro USA, 18 F.3d at 930, and under federal patent law, i.e., whether Cordis' stents infringe claim 2 of the Rockey '1,653 patent.  Admission of this parol evidence would violate Florida contract law.  Much of it, including Cordis' intent to assert the Rockey patents against J&J, is also pure speculation.  Under Fed. R. Evid. 401 and 403, such evidence has no probative value and would distract the jury, prolong the trial and invite a decision based on passion and prejudice.  It should be excluded.

## III.   ARGUMENT

### A.   Under Florida Contract Law, the Parties' Extra-Contractual Understandings and Intent Are Not Relevant to Interpretation

---

[2]  In fact, the forecast shows the exact opposite.  It projects royalties to AGRI equal to 10% of the total projected sales of *polymer* stents, not projected sales of *metal* stents.  As a careful reading of the document reveals, the projected AGRI royalties shown in the forecast are equal to 10% of projected sales of what is described as "Cordis Polymer 1 Stent" and "Cordis Polymer 2 Stent."  The forecast does not show any royalties to AGRI on sales of metal stents.  Ex. 5.  And as subsequent events proved, the forecast was wildly optimistic in its projections of future sales of polymer stents.  The stent market is dominated by the sale of stents for coronary applications – no one has sold a polymer coronary stent in this country or even received FDA approval to sell a polymer coronary stent.

### of their Unambiguous Agreement

There is no ambiguity in the parties' License Agreement concerning Cordis' royalty obligations. The Agreement requires Cordis to pay royalties on "Licensed Products," Ex. 1 ¶ 3.2, and it explicitly defines "Licensed Products" as products that are "covered by any claim of the [Rockey] Patents." Id. ¶ 1.1.2. This is standard language in patent licenses. As courts have held, this language requires a licensor to pay royalties *only* on products that would "infringe the [licensed] patent[s]" under federal patent law. Interspiro, 18 F.3d at 930. Judge Huck recognized this early in this case when he ruled that AGRI's claim for royalties under the contract depends for its resolution on a substantial question of federal patent law and accordingly comes within the exclusive jurisdiction of the federal district courts. See Ex. 6 at 5 ("Rockey, Inc. would have to read the patent onto the stents . . . in order to prove its claim for royalties."). Indeed, Judge Huck's recognition that AGRI's claim for royalties turns on an issue of federal patent law is the *only* reason why this case is pending in federal court instead of state court, where it initially was brought.

Where terms of a contract are unambiguous, Florida law is clear that oral statements may not be used to "contradict, add to, or subtract from it, or affect its construction." Carlon, Inc. v. Southland Diversified Co., 381 So. 2d 291, 293 (Fla. App. 4th Dist. 1980). Instead, "the parties' intent must be determined from within the four corners of the document." Barakat v. Broward County Hous. Auth., 771 So. 2d 1193, 1194-95 (Fla. App. 4th Dist. 2000).

Under Florida law, oral statements that are made before the parties sign an unambiguous contract do not deserve "any credit" in interpreting the agreement, which should be enforced "*as written and signed*." Schubot v. McDonalds Corp., 757 F. Supp. 1351, 1358 (S.D. Fla. 1990), aff'd, 963 F.2d 385 (11th Cir. 1992) (emphasis in original); see also Kaplan v. Bayer, 782 So. 2d 417, 418 (Fla. App. 2d Dist. 2001) (affirming exclusion of parol evidence).

4

Moreover, the prohibition against introduction of parol evidence takes on additional force and is "strongly supported" where, as here, the contact contains a merger-and-integration clause. Titusville Assocs., Ltd. v. Barnett Banks Trust Co., 591 So. 2d 609, 611 (Fla. 1991) (affirming exclusion of parol evidence when the contracts at issue included merger and integration clauses); see also In re Yates Development, Inc., 256 F.3d 1285, 1289-90 (11th Cir. 2001) (affirming that parol evidence rule barring admission of extrinsic evidence "is especially true when the contract contains an integration clause"). This is because "[i]t is established in Florida that presentations, negotiations and conversations which precede and accompany the making of a contract are presumed to have merged in the contract." Carlon, 381 So. 2d at 293; see also Johnson Enters. v. FPL Group, Inc., 162 F.3d 1290, 1309 (11th Cir. 1998) ("When a contract contains such a merger clause, the agreement is deemed to be 'integrated,' such that evidence of prior or contemporaneous agreements shall not be admitted to contradict the terms of the contract."); Schubot, 757 F. Supp. at 1358.

AGRI wants to sidestep these established principles. It wants to introduce parol evidence to argue that the parties had an unwritten understanding that Cordis would pay royalties on sales of metal stents, regardless of what the License Agreement says and regardless of the proper construction of the patents themselves. Even if there was a pre-contract understanding to this effect – and there wasn't – it was merged into the written Agreement and superseded by it. Carlon, 381 So.2d at 293. It is the express terms of the License Agreement that are controlling, and the Agreement states that Cordis is obligated to pay royalties only on products that are "covered by" the license patents, i.e., products that "infringe" the licensed patents. Interspiro, 18 F.3d at 930. Evidence of any other "understanding" is inconsistent with the unambiguous terms of the License Agreement and should be excluded.

**B.**   **Under Federal Patent Law, the Parties' Supposed Understandings and Intent are Irrelevant in Determining Whether Cordis' Stents Infringe Claim 2 of the Rockey '1,653 Patent**

Under federal patent law, the question of whether a product infringes a patent presents only two issues: (1) construction of the words used in the patent, and (2) a comparison of the properly construed claim language to the accused device or method.   Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001).

The first issue is a pure question of law for the Court, which should be decided based on the intrinsic evidence, i.e., the claim language, the patent specification and the patent's file history. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996); Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294 (Fed. Cir. 2003).  The second issue depends on a determination of the objective characteristics of the accused device or method as compared to the properly construed claims. IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1429 (Fed. Cir. 2000).

None of AGRI's parol evidence is relevant in determining whether Cordis' stents infringe the Rockey patents.  The parol evidence is not part of the public record in the Patent Office that the public could consult in determining the scope of the Rockey patents.  It could not play any legitimate role in a patent infringement analysis. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996); Bell Atl. Network Servs., Inc. v. Covad Comm. Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001) (intrinsic evidence, i.e., the claim language, the patent specification and the file history, is the "most significant source of the legally operative meaning of disputed claim language").   Indeed, extrinsic evidence, meaning all evidence other than intrinsic evidence, can not be used to alter or change the meaning of patent claim terms, Vitronics, 90 F.3d at 1583, and  reliance on "other testimony to alter the meaning of the claim … is reversible error." Dow Chem. Co. v. United States, 226 F.3d 1334, 1342 (Fed. Cir. 2000).

6

Moreover, claim construction is a matter of law that is "exclusively within the province of the court." Markman, 517 U.S. 370, 372 (1996). Introduction of AGRI's parol evidence, concerning the parties' understanding of the scope of scope of the claims, would be an invitation to the jury to apply the parties' supposed "understandings" instead of the Court's claim construction in deciding the infringement issue. That could only undermine the Court's exclusive responsibility for construing the claim language.

### C.   AGRI's Parol Evidence Should be Excluded Under Fed. R. Evid. 401

As demonstrated above, AGRI's parol evidence cannot be considered under Florida contract law in interpreting the parties' unambiguous Agreement and has no bearing under federal patent law on the dispositive issue of whether Cordis' stents infringe claim 2 of the Rockey '1,653 patent. Because AGRI's parol evidence is not relevant to any legitimate issue in this case, it should be excluded under Fed. R. Evid. 401.[3] See In re Yates Development, Inc., 256 F.3d at 1289-90 (refusing to consider parol evidence in light of merger-and-integration clause); Johnson Enters. v. FPL Group, Inc., 162 F.3d at 1309 (same); Olsen v. Allstate Ins., 759 F. Supp. 782, 786 (M.D. Fla. 1991) (same); Schubot, 757 F. Supp. at 1358 (same); Titusville, 591 So. 2d at 611 (affirming exclusion of parol evidence); Kaplan, 782 So. 2d at 418 (same).

### D.   Alternatively, AGRI's Parol Evidence Should Be Excluded Under Fed. R. Evid. 403

Any minimal relevance that AGRI's parol evidence might have is far outweighed by its potential for causing confusion, prejudice and delay. The evidence should accordingly be excluded under Fed. R. Evid. 403.

---

[3] Fed. R. Evid. 401 states that "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

935383v1

Fed. R. Evid. 403 is entitled "Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time." It states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

As the Court of Appeals for this Circuit has explained, "Rule 403 involves balancing, on the one side, the evidence's probative value and, on the other side, the evidence's dangers," U.S. Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1287 (11th Cir. 2001), including "'the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Id., quoting Fed. R. Evid. 403.

Any minimal relevance of AGRI's parol evidence is far outweighed by the dangers of confusing and misleading the jury. The evidence AGRI seeks to offer would be a blatant invitation to the jury to disregard the Court's claim construction and substitute in its place AGRI's version of the parties' intent. That is completely improper.

AGRI's reliance on a projection of possible future royalties (Ex. 5) is symptomatic of its desire to cause confusion. In opposing Cordis' motion for summary judgment, AGRI argued to this Court (Mem. in Opp'n to Cordis' Motion for Summary Judgment at 7) that the "Income Statement Model: Rockey Technology" that it was given during negotiations reflects a shared understanding that AGRI would receive royalties on sales of metal stents. But in fact, the document shows the opposite – it projects future royalties at 10% of projected sales of "Cordis Polymer 1 Stent" and "Cordis Polymer 2 Stent," and it does not show any royalties to AGRI on sales of metal stents. At the same time, the forecast is wildly optimistic in projecting future sales of polymer stents; it forecasts sales of polymer stents at $242 million in 2000 alone, with AGRI to receive a 10% royalty on those sales in that year and in other years. AGRI's desire to parade

8

these nine-figure dollar numbers in front of a jury is not surprising, but doing so would seriously prejudice Cordis without shedding light on any legitimate issue in this case.

Similarly, AGRI has argued that Cordis' "primary reason" for taking a license under the Rockey patents was a desire to "possibly assert these patents against the only other company then in the stent market, Johnson & Johnson."  Mem. in Opp'n to Cordis' Motion for Summary Judgment at 2.  This argument is made up out of whole cloth.  It is not supported by a shred of evidence.  AGRI's unsupported speculation on this point is part of its ill-founded hypothesis that Cordis "understood" that the Rockey patents cover metal stents when it entered into the License Agreement.  But it is flatly inconsistent with Cordis' undisputed conduct.  In the nine months from May 1995 (when Cordis acquired a license under the Rockey patents) and February 1996 (when Cordis was acquired by Johnson & Johnson ("J&J")), Cordis never asserted the Rockey patents against J&J and it never threatened to do so.

AGRI should not be permitted to explore its unfounded speculation in direct examination of its own witnesses or cross-examination of Cordis' witnesses.   See United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992) (upholding trial court's preclusion of cross-examination of witness where proposed cross-examination involved speculation); United States v. Katsougrakis, 715 F.2d 769, 778-79 (2d Cir. 1983) (upholding trial court's preclusion of cross-examination where defense counsel was unable to show a good faith basis for proposed line of questioning); see also Santrayll v. Burrell, 1998 WL 60924, at *2 (S.D.N.Y. Jan. 21, 1998) (precluding speculative testimony because witness may only testify as to facts witness has first-hand knowledge) (Ex. 7); see also Fed. R. Evid. 602 ("witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter").

9

Moreover, permitting introduction of AGRI's parol evidence would also expand the length of the trial. If AGRI is permitted to offer its parol evidence, Cordis would have to respond by offering testimony from its current and former employees concerning their understanding that the Rockey patents only covered polymer stents. This would "in effect generat[e] a mini-trial on collateral issues which would not relate to the [breach] alleged in [plaintiff's] claim." Anderson v. WBMG-42, 253 F.3d 561, 567 (11th Cir. 2001).

In these circumstances, any minimal relevance that AGRI's parol evidence arguably might have is far outweighed by its potential to: (a) distract the jury with irrelevancies, (b) invite a decision based on passion and prejudice, and (c) unduly lengthen the trial. If AGRI's parol evidence is not excluded under Fed. R. Evid. 401, it accordingly should be excluded under Fed. R. Evid. 403. See Steger v. Gen. Elec. Co., 318 F.3d 1066, 1079 (11th Cir. 2003) (affirming exclusion of evidence under Rule 403 because it was not relevant and potentially prejudicial to other party); United States v. Petrie, 302 F.3d 1280, 1287 (11th Cir. 2002), cert. denied, 123 S. Ct. 1775 (2003) (because evidence would have tended to proven a "non-issue" in the case, exclusion was proper under Rule 403 for its tendency to confuse the jury); Anderson, 253 F.3d at 567 (affirming the exclusion of evidence under Rule 403); Magnivision, Inc. v. The Bonneau Co., 115 F.3d 956, 960-61 (Fed. Cir. 1997) (admitting irrelevant evidence of patent "prosecution irregularities" was error under rules 401, 402 and 403 due to its prejudicial effect).

## **CONCLUSION**

For the reasons set forth above, this Court should exclude parol evidence concerning the

parties' supposed intent as to the scope of the Rockey patents and Cordis' royalty obligations.

Respectfully submitted,

Rudolph F. Aragon, Florida Bar No. 286249
Kevin C. Kaplan, Florida Bar No. 933848
ARAGON, BURLINGTON, WEIL,
   SCHWIEP, KAPLAN & BLONSKY, P.A.
2699 S. Bayshore Drive
Miami, FL  33133
Telephone:  (305) 858-2900
*Attorneys for defendant Cordis Corporation*

*Of Counsel*:
William F. Cavanaugh, Jr.
Eugene M. Gelernter
Scott B. Howard
Rosa Son
Laura Storto
PATTERSON, BELKNAP,
   WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
212-336-2000

Eric I. Harris
Tracy Poole
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08543

Dated:  September 15, 2003

11

# EXHIBIT

# 2

## CORDIS' MOTION *IN LIMINE* NO. 2:

### TO EXCLUDE ARGUMENTS BY AGRI THAT CORDIS IS OBLIGATED TO PAY ROYALTIES ON PRODUCTS THAT PRACTICE THE ROCKEY PATENTS "*IN WHOLE OR IN PART*"

Under the parties' patent License Agreement, Cordis *only* is obligated to pay royalties on sales of "Licensed Products," Ex. 1 ¶ 3.2,[1] and "Licensed Products" are defined in ¶ 1.1.2 as products that are "covered by" a claim of the Rockey patents. Addressing identical contract language, the Federal Circuit has held that such provisions require payment of royalties *only* on products that "infringe the [licensed] patent[s]" under federal patent law. Interspiro USA, Inc. v. Figgie Int'l, Inc., 18 F.3d 927, 930 (Fed. Cir. 1994). And Judge Huck previously held in this case that in order to prevail on its claim for royalties AGRI must prove that Cordis' stents infringe the Rockey patents. Ex. 6 at 5.

AGRI ignores all of this. In opposing Cordis' summary judgment motion, AGRI argued that Cordis is obligated to pay royalties on the sale of any product "that utilized *'in whole <u>or</u> in part'*, the inventions ***disclosed or claimed*** in the Rockey patents." (AGRI Summary Judgment Br. at 1-2) (underlining in original; bold italics added). If summary judgment is not granted, we expect AGRI to offer the same misreading of the parties' Agreement in its arguments to the jury in this case.

There is a crucial difference between the incorrect standard that AGRI advocates and what the Agreement provides. In order to establish Cordis' stents are "covered by" (i.e., "infringe") the Rockey patents, AGRI would need to prove that Cordis stents meet "<u>all</u> of the claim limitations," Techsearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1371 (Fed. Cir. 2002) (emphasis added), of claim 2 of the '1,653 patent. Every claim limitation is essential, and to

---

[1] Exhibits cited in this memorandum are included in the accompanying Appendix.

prove infringement "every limitation set forth in a claim must be found in an accused product ...." Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). There cannot be a finding of infringement if any limitation is absent. Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 951 (Fed. Cir. 1987).

In contrast, under AGRI's incorrect theory, royalties would be payable on products that utilize the inventions disclosed or claimed in the Rockey patents "in whole or in part." In other words, under AGRI's misreading of the Agreement, AGRI could recover royalties simply by showing that Cordis' stents have *some, but not all*, of the features described in the patent specification or recited in the patent claims.

As a matter of law, AGRI's theory is wrong, for at least four reasons:

First, AGRI's theory is at odds with the parties' License Agreement, which makes royalties payable only on sales of "Licensed Products," and defines that term as products "covered by" at least one claim of the Rockey patents.[2] Ex. 1 ¶¶ 3.2 and 1.1.2.

Second, AGRI's theory is at odds with the Federal Circuit's holding in Interspiro, that this language makes royalties owing only on products that "infringe[] the [licensed] patent." Id., 18 F.3d at 930.

Third, AGRI's theory is directly at odds with Judge Huck's decision dated Nov. 12, 2002, in which he held (Ex. 6 at 5):

> [I]t seems obvious that *for Rockey, Inc. to prevail on that claim [i.e., the claim for royalties], Rockey, Inc. will have to prove that the stents sold by Cordis are covered by Dr. Rockey's patents*. Stated in patent terminology, Rockey, Inc. must prove that the stents resulted from Cordis practicing Dr. Rockey's patent ....

---

[2] AGRI bases its argument on ¶ 2.1 of the License Agreement, but that provision has nothing to do with the scope of Cordis' royalty obligations, which is expressly defined elsewhere in the Agreement, at ¶¶ 3.2 and 1.1.2.

> Rockey, Inc. would have to read the patent onto the stents ... in order to prove its claim for royalties.  (Emphasis added).

Judge Huck's holding is "binding at later stages of the same case" under the "law-of-the-case" doctrine.  Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1313 (11th Cir. 2000).

Fourth, AGRI's theory is at odds with numerous Federal Circuit cases, including the cases cited above, which hold that in order to prove infringement "every limitation set forth in a claim must be found in an accused product ...."  Southwall, 54 F.3d at 1575.

AGRI should not be permitted to mislead the jury with an incorrect version of Cordis' contractual obligations.  Under Fed. R. Evid. 403, AGRI should be precluded from making this argument because of its manifest danger of "unfair prejudice, confusion of the issues, or misleading the jury," Fed. R. Evid. 403.  See, e.g., Steger v. General Elec. Co., 318 F.3d 1066, 1079 (11th Cir. 2003) (affirming exclusion of evidence under Rule 403); United States v. Petrie, 302 F.3d 1280, 1287 (11th Cir. 2002) (same); Anderson v. WBMG-42, 253 F.3d 561, 567 (11th Cir. 2001) (same).

## CONCLUSION

For the reasons set forth above, the Court should exclude testimony relating to

AGRI's theory that it is entitled to royalties on products that use the inventions disclosed or

claimed in the Rockey patents "*in whole or in part*."

Respectfully submitted,

*Of Counsel*:
William F. Cavanaugh, Jr.
Eugene M. Gelernter
Scott B. Howard
Rosa Son
Laura Storto
PATTERSON, BELKNAP,
    WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
212-336-2000

Eric I. Harris
Tracy Poole
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08543

Dated:  September 15, 2003

Rudolph F. Aragon, Florida Bar No. 286249
Kevin C. Kaplan, Florida Bar No. 933848
ARAGON, BURLINGTON, WEIL,
    SCHWIEP, KAPLAN & BLONSKY, P.A.
2699 S. Bayshore Drive
Miami, FL  33133
Telephone:  (305) 858-2900
*Attorneys for defendant Cordis Corporation*

# EXHIBIT

# 3

CORDIS' MOTION *IN LIMINE* NO. 3:

**TO EXCLUDE OR LIMIT THE TESTIMONY
OF AGRI'S PATENT LAW EXPERT**

## I.   <u>INTRODUCTION</u>

AGRI has identified a patent attorney, William H. Murray, Esq., to testify at trial as an

expert witness.  A copy of Mr. Murray's expert report under Fed. R. Civ. P. 26(a)(2) is included

in the accompanying Appendix as Exhibit 8.[1]

Although Mr. Murray's expert report states that he has been retained "as an expert on the

issue of United States Patent and Trademark Office procedures in general," Ex. 8 at 1, his report

contains no discussion of that subject.  Instead, it offers opinions on a different subject:

> whether the invention claimed in claim 2 of [the Rockey '1,653
> patent] ... is entitled to the benefit of the June 2, 1978 filing date
> of United States Patent Application Serial Number 05/912,010 [the
> "'010 application"] in accordance with 35 U.S.C. § 120.

The report also states that Mr. Murray intends to respond to opinions offered by Cordis' experts

in materials science and cardiology with respect to the effective filing date of the '1,653 patent.

Testimony by a patent law expert on these issues is improper and unnecessary.  It should

be excluded.

## II.   <u>BACKGROUND</u>

Cordis contends that if claim 2 of the Rockey '1,653 patent were construed so broadly as

to cover metal stents, then as so construed, it would be invalid under section 102(g) of the patent

statute, 35 U.S.C. § 102(g), as anticipated by the prior work of Dr. Julio Palmaz, because Dr.

Palmaz invented the metal balloon-expandable stent first.[2]  Determination of this validity issue

---

[1]  Exhibits cited in this memorandum are included in the accompanying Appendix.

[2]  A broad construction of claim 2 that would cover balloon-expandable stents would violate an
established "canon" of claim construction, "that courts should attempt to construe claims to

935323v1

would require a comparison between (a) Dr. Rockey's "priority date" for the invention recited in claim 2 of the '1,653 patent and (b) the date when Dr. Palmaz conceived his invention and reduced it to practice. This comparison would be needed to determine who invented metal, balloon-expandable stents first – Dr. Palmaz or Dr. Rockey.

Cordis' position is that Dr. Rockey's earliest possible "priority date" is the date when the application for the '1,653 patent was filed – February 19, 1985. Prior to that date, Dr. Palmaz had made prototypes of his balloon-expandable metal stents and he had successfully implanted those stents in animals.

AGRI apparently intends to argue that it is entitled to the benefit of an earlier filing date, in an effort to show that Dr. Rockey invented the claim 2 invention before Dr. Palmaz. In particular, AGRI will try to show that Dr. Rockey is entitled to the benefit of the June 2, 1978 filing date of Dr. Rockey's '010 application. That application was later abandoned, but Application Serial No. 216,989 (the '989 application) was filed on Dec. 16, 1980 as a continuation of the '010 application and issued in 1985 as the '264 patent. The application for the '1,653 patent was filed as a continuation-in-part from the '989 application.

As the Federal Circuit has held, a patentee is <u>only</u> entitled to benefit from the filing date of a parent or grandparent application if the earlier application adequately discloses the subject matter of the later claim:

> To qualify for an earlier filing date, section 120 requires, *inter alia*, that the earlier-filed U.S. patent application contain a disclosure which complies with 35 U.S.C. § 112, ¶ 1 (1994) for each claim in the newly filed application. Thus, this benefit only applies to claims that recite subject matter adequately described in an earlier application, and does not extend to claims with subject matter outside the description in the earlier application. .... In other

---

preserve their validity." <u>Omega Eng'g, Inc. v. Raytek Corp.</u>, 334 F.3d 1314, 1335 n.6 (Fed. Cir. 2003); <u>Modine Mfg Co. v. ITC</u>, 75 F.3d 1545, 1557 (Fed. Cir. 1996).

words, a claim complies with 35 U.S.C. § 120 and acquires an earlier filing date if, and only if, it could have been added to an earlier application without introducing new matter.

**Under 35 U.S.C. § 112, ¶ 1, and consequently under 35 U.S.C. § 120 as well, an applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention."** …. An applicant … [must show] that one of the applications discloses the invention.

Studiengesellschaft Kohle M.B.H. v. Shell Oil Co., 112 F.3d 1561, 1564 (Fed. Cir. 1997) (emphasis added) (citation omitted).  In other words, the earlier application must describe the invention, with all its limitations, "in sufficient detail that *one skilled in the art* can clearly conclude that the inventor invented the claimed invention as of the filing date sought." Lockwood v. American Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir. 1997) (emphasis added); see also Studiengesellschaft Kohle, 112 F.3d at 1564.  Accordingly, Dr. Rockey's '1,653 patent would not enjoy the benefit of the '010 application's 1978 filing date unless the '010 application described every limitation of claim 2 in sufficient detail to one skilled in the art.

The crux of this analysis is:  (a) identifying every limitation of claim 2 of the '1,653 patent, and then (b) reviewing the earlier '010 application to determine whether it discloses every claim limitation of the '1,653 patent, claim 2, to "those skilled in the art," Studiengesellschaft Kohle, 112 F.3d at 1564; i.e., to persons who are skilled in the technology to which the invention is addressed.  See Lockwood, 107 F.3d at 1572.

Here, a person skilled in the art" is an engineer with a degree in materials science and/or a physician who treats occlusive vascular disease.  Mr. Murray is neither.  He is not a materials scientist or a physician.  Instead, he is a patent lawyer.  As such, he is in no position to opine on what the earlier disclosure would convey to "those skilled in the art."  See Buckley v. Airshield Corp., 116 F. Supp. 2d 658, 662 (D. Md. 2000) (excluding testimony regarding legal opinions on claim construction or infringement by patent law expert with no technical expertise).  He is in no

position to opine on whether the '1,653 patent is entitled to the June 2, 1978 filing date of the '010 application.

## III.   DETERMINING THE APPLICABLE LEGAL PRINCIPLES IS THE PROVINCE OF THE JURY, NOT AN EXPERT WITNESS

Legal conclusions are not a proper subject of expert testimony.  Expert testimony is admissible only "to assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Accordingly, courts routinely preclude testimony on legal principles or conclusions because determining the law is the exclusive province of the court.  United States v. Johnson, 223 F.3d 665, 671 (7th Cir. 2000) ("Witnesses testify about fact, not law."); Bammerlin v. Navistar Int'l Transp. Corp., 30 F.3d 898, 900 (7th Cir. 1994).

In patent cases, as elsewhere, "experts may not testify as to what the law is since it is the Court's job to instruct the jury as to what the law is." Donnelly Corp. v. Gentex Corp., 918 F. Supp. 1126, 1137 (W.D. Mich. 1996); see also Ely v. Manbeck, 17 U.S.P.Q.2d 1252, 1254 (D.D.C. 1990) (holding that it is inappropriate to allow expert testimony on legal issues and excluding any "exposition or opinion as to the legal issues in the case or patent law generally."). Courts preclude legal experts from testifying "as to substantive issues of patent law." Revlon Consumer Prods., Corp. v. L'Oreal S.A., No. CIV. A. 96-192, 1997 WL 158281, at *3 (D. Del. Mar. 26, 1997) (Ex. 9); accord Paradigm Sales, Inc. v. Weber Marking Sys., Inc., 880 F. Supp. 1247, 1255 (N.D. Ind. 1995) (refusing to allow a "patent law expert" to opine on legal conclusions, and stating that "[t]he judge, not the witnesses, instructs on the law"). Instead, such experts are limited to explaining the general procedures involved in the patent application process. Buckley, 116 F. Supp. 2d at 662 (D. Md. 2000); Revlon, 1997 WL 158281, at *3 (Ex. 9); see Hon. Sue L. Robinson, Chief Judge, U.S. District Court for the District of Delaware,

Guidelines: Legal Expert Testimony in Patent Cases (standing order that legal experts may only testify about practices and procedures before the PTO) (Ex. 10).

## IV.   MR. MURRAY'S TESTIMONY SHOULD BE PRECLUDED

The acceptable scope of a patent law expert's testimony is limited to the general procedures involved in the patent application process, but AGRI wants Mr. Murray to opine on: (a) the legal requirements for the '1,653 claims to enjoy the benefit of the earlier filing date; and (b) whether the '010 application discloses every limitation of claim 2 of the '1,053 patent.

That is improper.  The question of what an earlier application discloses must be answered by one skilled in the relevant art – a materials scientist or a physician.  See Lockwood, 107 F.3d at 1572.  But Mr. Murray is neither.  He simply is not qualified to present expert testimony on what the '010 application would disclose to persons skilled in the art.  Mr. Murray is a patent lawyer, not a materials scientist or cardiologist.  He is not a person skilled in the relevant art and his opinion on these issues should be barred.  See Buckley, 116 F. Supp. 2d at 662 (precluding legal expert rendering legal opinions on claim construction and infringement).

Having no skill in the relevant art himself, Mr. Murray bases his opinions on the opinion of another expert for AGRI, Dr. Edward F. Leonard.  Dr. Leonard is a chemical engineer.  AGRI intends to call Dr. Leonard to testify, *inter alia*, as to whether the '010 applications disclosed all limitations of claim 2 of the '1,653 patent.  Mr. Murray's testimony would add nothing new.  His testimony would simply be a conclusion of law based on the testimony of another witness.  Such testimony by a legal expert is improper and should be precluded.  See Ely, 17 U.S.P.Q.2d at 1254; Revlon Consumer Prods., Corp. v. L'Oreal S.A., No. CIV. A. 96-192, 1997 WL 158281, at *3 (Ex. 9).

Finally, to the extent Mr. Murray intends to provide testimony regarding the requirements for an invention to receive the benefit of the filing date of an earlier filed patent

application (see Exhibit 8 at 2-3), his testimony is improper.  Instructing the jury on the law is the exclusive province of the Court – not hired patent law experts.  Patent law experts are precluded from providing "exposition or opinion… on patent law generally."  Ely, 17 U.S.P.Q.2d at 1254.

### CONCLUSION

For the reasons set forth above, the Court should exclude testimony by AGRI's patent law expert, William H. Murray, Esq., regarding the effective filing date for the 1'653 patent and the requirements for an invention to receive the benefit of the filing date of an earlier filed patent application.

Respectfully submitted,

Rudolph F. Aragon, Florida Bar No. 286249
Kevin C. Kaplan, Florida Bar No. 933848
ARAGON, BURLINGTON, WEIL,
    SCHWIEP, KAPLAN & BLONSKY, P.A.
2699 S. Bayshore Drive
Miami, FL  33133
Telephone:  (305) 858-2900
*Attorneys for defendant Cordis Corporation*

*Of Counsel*:
William F. Cavanaugh, Jr.
Eugene M. Gelernter
Scott B. Howard
Rosa Son
Laura Storto
PATTERSON, BELKNAP,
    WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
212-336-2000

Eric I. Harris
Tracy Poole
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08543

Dated:  September 15, 2003

# EXHIBIT

# 4

**CORDIS' MOTION *IN LIMINE* NO. 4:**

**TO EXCLUDE TESTIMONY OF AGRI'S EXPERTS ON**
**INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS**

**I.     INTRODUCTION**

AGRI's experts did not disclose any opinions regarding the doctrine of equivalents ("DOE") in their expert reports under Fed. R. Civ. P. 26(a)(2).  Nor did they offer any opinions on the DOE at their depositions.  The first time AGRI's experts provided any opinions on the DOE was after the close of expert discovery, in declarations that AGRI submitted in opposing Cordis' motion for summary judgment.  Even then, their assertions were merely bald conclusions, which parroted the legal standard set forth in a leading case without providing the detailed factual analysis that is necessary to show infringement under the DOE.

Because AGRI's experts did not offer any opinions on the DOE in their expert reports or in depositions, they should be barred from offering opinions on the DOE at trial.

**II.     BACKGROUND**

AGRI asserts that Cordis breached the parties' patent License Agreement by not paying royalties on sales of its stents.  As explained in Cordis' motion for summary judgment and Motion *In Limine* No. 1 (To Exclude Parol Evidence), to prevail on this claim, AGRI must offer proof that Cordis' stents would infringe U.S. Patent No. 4,641,653 (the '1,653 patent).

**A.     The Doctrine of Equivalents**

An infringement analysis involves two steps. First, the court determines the scope and meaning of the patent claims as a matter of law.  Then, the properly construed claims are compared to the allegedly infringing device.  Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998).  "To establish literal infringement, every limitation set forth in a claim must be found in an accused product exactly."  Id.

"A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device." Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1423 (Fed. Cir. 1997). "A claim element is equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device." Id. One way that insubstantial differences may be shown is by demonstrating that an element of the accused device performs substantially the same function, in substantially the same way, to achieve substantially the same result as a limitation of the claim. Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950).

To prove infringement under the DOE, patentees must present "particularized testimony and linking argument." Texas Instruments, Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1567 (Fed. Cir. 1996). This testimony "must be presented on a limitation-by-limitation basis. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." Id. at 1567; see also Hewlett Packard Co. v. Mustek Sys., Inc., __ F.3d __, No. 02-1372, 2003 WL 21804808, at *6 (Fed. Cir. Aug. 7, 2003) (Ex. 11)[1].

**B.    AGRI's Experts' Disclosure**

AGRI submitted expert reports under Fed. R. Civ. P. 26(a)(2) from three experts – Mr. Widas, Dr. Pope, and Dr. Leonard – on whether Cordis' stents infringe the Rockey '1,653 patent. Exs. 12-14. None of these reports discusses infringement under the DOE. None of them provides an analysis that could be the basis for a finding of infringement under the DOE. None of them discusses facts that could be the basis for a finding of infringement under the DOE.

---

[1] Exhibits cited in this memorandum are included in the accompanying Appendix.

935948v3

When Cordis' counsel deposed AGRI's experts, none of them offered any opinions on infringement under the DOE.  See Ex. 16 (Widas Dep.) at 56; Ex. 17 (Leonard Dep.) at 72.  For example, Mr. Widas testified:  (Ex. 16 (Widas Dep.) at 56:12-19):

> Q.  *Do you have any opinion on whether or not Cordis infringes Claim 2 of the Rockey 2 patent under the doctrine of equivalents?*
>
> A.   You would have to explain it to me.  I have heard the term, but *I wouldn't know the significance of it in that context.*

Moreover, AGRI's only rebuttal expert (Dr. Pope) also did not offer any opinions to rebut Cordis' expert's opinion on the reverse doctrine of equivalents.[2]  In his report, Cordis' expert Dr. Campbell Laird explicitly stated his opinion that Cordis' stents do not infringe claim 2 of the Rockey patents under the reverse doctrine of equivalents, and explained in detail the basis for his opinion.  See Ex. 15 (Laird Report at 16-17).  AGRI offered one rebuttal expert on infringement, Dr. David Pope.  The first sentence of Dr. Pope's report limits his "analysis [to] some of the issues related by Prof. Laird."  (Emphasis added).  Dr. Pope did not respond to Dr. Laird's discussion of the reverse doctrine of equivalents.  Nor did he offer any opinions on that subject at his deposition.

After the close of expert discovery, in opposing Cordis' motion for summary judgment, AGRI submitted declarations to this Court from its experts, offering conclusory assertions that Cordis' stents infringe under the DOE.  But they did not provide any basis for that opinion.  The declaration of AGRI expert Edward Leonard is typical.  Its DOE discussion simply states:

> [I]t is my opinion that the accused Cordis products function in substantially the same way to achieve substantially the same result as the device depicted in the specification and drawings of the

---

[2]  Under the "reverse doctrine of equivalents," a device may be found not to infringe, even if it literally meets the claim language, if it "has been so far changed in principle that it performs the same or similar function in a substantially different way" from what the patent claims. Smithkline Diagnostics, Inc. v. Helena Labs. Corp., 859 F.2d 878, 889 (Fed. Cir. 1989).

1'653 Patent.   This is true with respect to all relevant claim elements.

Ex. 18 at ¶ 32.  This simply parrots the legal standard from <u>Graver Tank</u>, 339 U.S. 605, without the explanation or factual analysis that is necessary to show infringement under the DOE. <u>See</u> <u>Hewlett Packard</u>, 2003 WL 21804808 at *6.  AGRI's other expert declarations are just as conclusory. <u>See</u> Ex. 19 (Widas Decl.) at ¶ 36; Ex. 20 (Pope Decl.) at ¶ 33.

**III.   ARGUMENT: FED. R. CIV. P. 26 & 37<br>REQUIRE EXCLUSION OF TESTIMONY<br>BY AGRI'S EXPERTS ON THE DOCTRINE<br>OF EQUIVALENTS AND THE REVERSE DOE**

**A.   <u>Legal Standards for Exclusion Under Rules 26 and 37</u>**

Fed. R. Civ. P. 26(a)(2) is explicit that an expert's report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor ...."  And Rule 26(e)(1) establishes a duty to supplement that report when "the information disclosed is incomplete or incorrect."  The purpose of these requirements is to "minimize unfair surprise and prejudice resulting from 'sketchy and vague' disclosure prior to trial." <u>KW Plastics v. U.S. Can</u> <u>Co.</u>, 199 F.R.D. 687, 690 (M.D. Ala. 2000) (quoting Advisory Committee Notes to Rule 26). The duty to disclose and supplement "will normally be enforced . . . through sanctions imposed by the trial court, including exclusion of evidence."  Adv. Comm. Notes to Subdivision (e), 1970 Amendments; <u>see also</u> <u>Walsh v. McCain Foods Ltd.</u>, 81 F.3d 722, 727 (7th Cir. 1996).

Fed. R. Civ. P. 37(c)(1) provides a remedy applicable to parties such as AGRI, who want to offer opinions that were not set forth in their expert reports under Rule 26(a)(2).  Rule 37(c)(1) states in pertinent part:

> A party that without substantial justification fails to disclose information required by Rule 26(a), 26(e)(1), or 26(e)(2) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

-4-

This Rule creates an "automatic and mandatory" rule requiring exclusion of evidence not disclosed as part of Rule 26(a)(2) "unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless." NutraSweet Co. v. X-L Eng'g Co., 227 F.3d 776, 786 (7th Cir 2000); Fed. R. Civ. P. 37(c)(1); Adv. Comm. Notes (1993 Amendments) to Fed. R. Civ P. 26(a)(2) ("Revised rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed."). Exclusion under Rule 37(c)(1) is the appropriate remedy here.

### B. AGRI's DOE Testimony Should be Excluded

After failing to disclose any opinions on the DOE in their expert reports under Rule 26(a)(2), and after offering no opinions on the DOE in their depositions, AGRI's experts should not be permitted to testify on that subject at trial.

AGRI's experts' reports under Rule 26(a)(2) did not offer any opinions on DOE – let alone a "complete statement of …. the basis and reasons" for such opinions, as Rule 26(a)(2) requires. The reports do not undertake any analysis that would be relevant to the DOE. And when AGRI's experts were deposed, they again did not offer any opinions on the DOE. Nor did they attempt to supplement their disclosure in accordance with Rule 26(e). It was not until AGRI filed its summary judgment papers that Cordis first learned that AGRI's experts intended to rely on the DOE. AGRI can offer no explanation for the omission.[3]

---

[3]  Even AGRI's belated disclosure in opposing summary judgment was woefully inadequate. In fact, AGRI's experts provided the type of conclusory testimony that "falls far short of the long-standing evidentiary requirements for proof of infringement under the doctrine of equivalents." Hewlett Packard Co. v. Mustek Sys., Inc., ___ F.3d ___, No. 02-1372, 2003 WL 21804808, at *6 (Fed. Cir. Aug. 7, 2003) (Ex. 11); Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091, 1113 (Fed. Cir. 2000); Techsearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1372 (Fed. Cir.), cert. denied, 537 U.S. 995 (2002); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1209-10 (Fed. Cir. 2001).

AGRI's failure to disclose this opinion evidence is far from harmless.  Cordis still only has a "sketchy and vague" understanding of AGRI's DOE theory and expert discovery is closed. Cordis would be prejudiced if AGRI's experts could conceal their opinions on the DOE until after expert discovery ends and then seek to offer them at trial.  This is precisely the type of "unfair surprise" that the expert disclosure rules were intended to obviate.  Williams v. Roberts, 202 F.R.D. 294, 296 (M.D. Ala. 2001); 1993 Amendments Av. Comm. Notes to Rule 26(a)(2) ("[Fed. R. Civ. P. 26(a)(2)] imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.").

In similar circumstances, courts routinely exclude non-disclosed expert opinions.  See, e.g., Southern States Rack and Fixture, Inc v. Sherwin-Williams Co., 318 F.3d 592, 599 (4th Cir. 2003) (affirming exclusion of new basis for expert's opinion that was first disclosed at trial under Rules 26 and 37); Walsh, 81 F.3d at 727 (affirming ruling under Rule 26(a)(2)(C) and (e)(1) limiting expert's testimony only to the bases for his opinions disclosed at deposition); Patel v. Gayes, 984 F.2d 214, 220-21 (7th Cir. 1993) (affirming grant of motion in limine to limit expert's testimony only to opinions disclosed in discovery as a violation of the duty to supplement under Rule 26(e)); KW Plastics v. U.S. Can Co, 131 F. Supp. 2d 1289, 1295-96 (M.D. Ala. 2001) (excluding expert's testimony on a new and alternate theory of damages because it was not disclosed in expert report); see also Hancock v. Hobbs, 967 F.2d 462, 467-68 (11th Cir. 1992) (striking expert affidavit submitted in response to summary judgment motion where neither expert or opinions had not been previously identified and expert discovery was closed); Revlon Consumer Prods. Corp. v. Estee Lauder Cos., No. 00 Civ. 5960, 2003 WL

-6-

21751833, at *4 (S.D.N.Y. July 30, 2003) (Ex. 21) (striking affidavit in opposition to summary judgment motion to the extent it went beyond the expert's reports). This Court should do the same here.

## CONCLUSION

For the reasons set forth above, the Court should exclude testimony by AGRI's experts regarding infringement under the doctrine of equivalents and the reverse doctrine of equivalents.

Respectfully submitted,

*Of Counsel*:
William F. Cavanaugh, Jr.
Eugene M. Gelernter
Scott B. Howard
Rosa Son
Laura Storto
PATTERSON, BELKNAP,
   WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
212-336-2000

Eric I. Harris
Tracy Poole
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08543

Dated: September 15, 2003

Rudolph F. Aragon, Florida Bar No. 286249
Kevin C. Kaplan, Florida Bar No. 933848
ARAGON, BURLINGTON, WEIL,
   SCHWIEP, KAPLAN & BLONSKY, P.A.
2699 S. Bayshore Drive
Miami, FL 33133
Telephone: (305) 858-2900
*Attorneys for defendant Cordis Corporation*

935948v3

# EXHIBIT

# 5

## CORDIS' *IN LIMINE* MOTION NO. 5:

### TO EXCLUDE CERTAIN TESTIMONY BY GEORGE WIDAS AND EDWARD F. LEONARD UNDER *DAUBERT*

Cordis moves *in limine* under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to exclude testimony by two of AGRI's experts, George Widas and Edward Leonard, Ph.D., on the subject of whether the stainless steel that makes up Cordis' stents increases in rigidity after expansion of the balloon. One court recently excluded Mr. Widas' testimony on the grounds that his opinions lacked the scientific reliability that Daubert requires. Ebenhoech v. Koppers Indus., Inc., 239 F. Supp. 2d 455 (D.N.J. 2002). This Court should do the same.

Mr. Widas and Dr. Leonard hypothesize that after expansion of the balloon, Cordis' stents increase in rigidity to an infinitesimally small extent – which they have not even tried to measure. Mr. Widas describes the supposed change as too small to measure, Ex. 16 at 122-25, 141, 159,[1] and when Dr. Leonard tried to find the change he hypothesized, what he saw was not "all that convincing to [him] as a physical scientist." Ex. 17 at 217:3-5.

The hypothesis that Mr. Widas and Dr. Leonard offered on this subject is not supported by any scientific tests or experiments, and it is not supported by anything in the scientific literature. It is completely lacking in the scientific reliability that is required for expert testimony under the Supreme Court's decision in Daubert, 509 U.S. 579. It is the kind of "junk science" that Daubert is designed to exclude.

---

[1] Unless otherwise noted, exhibits cited in this memorandum are included in the accompanying Appendix.

## I.   Background

To prevail on its claim for royalties under the parties' License Agreement, AGRI must prove that Cordis' stents have every limitation of claim 2 of the Rockey '1,653 patent.[2]  One of those limitations requires that the claimed sleeve must "increase in rigidity *after* expansion of said balloon."

Cordis' stents are small, lattice-like structures made of stainless steel.  They are inserted in a patient's body and delivered on a balloon catheter through the vasculature to a location to be treated in a body passageway.  After the stent is delivered to the desired location, the doctor inflates the balloon on which the stent is mounted.  This causes the stent to expand.  When the balloon stops expanding, so does the stent.  During expansion, the stent is "plastically deformed" so that it retains its expanded shape after the balloon is withdrawn.[3]

In an effort to meet the claim limitation requiring that the sleeve of Dr. Rockey's invention must "increase in rigidity *after* expansion of said balloon," two of AGRI's experts – Mr. Widas and Dr. Leonard – hypothesized that the stainless steel that makes up Cordis' stents somehow increases in rigidity after expansion of the balloon to an infinitesimally small extent.  This testimony has no scientific validity and should be excluded under Daubert.

AGRI apparently recognizes that this testimony has no validity.  It is noteworthy that AGRI did not cite Mr. Widas' or Dr. Leonard's opinions on this limitation in its brief opposing

---

[2] The License Agreement requires Cordis to pay royalties only on sales of "Licensed Products," a term that is defined in the License Agreement to mean products that are "covered by" any claim of the Rockey patents.  Ex. 1 ¶¶ 3.2 and 1.1.2.  As the Federal Circuit has held, a product is "covered by" a licensed patent if it "infringes" the patent under U.S. patent law.  Interspiro USA, Inc. v. Figgie Int'l, Inc., 18 F.3d 927, 930 (Fed. Cir. 1994).  In order to infringe a claim of a patent, an accused device or method must have every limitation recited in the patent claim.  Canton Bio-Medical, Inc. v. Integrated Liner Techs., Inc., 216 F.3d 1367, 1370 (Fed. Cir. 2000).  In this case, AGRI relies on only one claim of the Rockey patents, i.e., claim 2 of the '1,653 patent.

[3] "Plastic deformation" is a permanent change in the shape of a material caused by the application of a force.  It is different from "elastic deformation," which is a change that reverses itself once a force is removed.

2

Cordis' motion for summary judgment. Instead, AGRI cited testimony by yet another expert, Dr. David Pope, in discussing this claim limitation.[4]

## II.   The Legal Framework for Admissibility of Expert Testimony under *Daubert*

Fed. R. Evid. 702 deals with the subject of expert testimony. It provides that:

> If specialized knowledge will assist the trier of fact . . . a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court held that district courts must "act as 'gatekeepers' to ensure that speculative unreliable expert testimony does not reach the jury." McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2020) (affirming exclusion of expert testimony under Daubert); see also Allison v. McGhan Med. Corp., 184 F.3d 1300, 1310 (11th Cir. 1999) (same).

Under Daubert, the proponent of expert testimony has the burden of establishing by a preponderance of the evidence: (i) that the expert is qualified to testify competently regarding the matters he intends to address; (ii) that the methodology used in reaching his conclusions is scientifically reliable; and (iii) that the testimony would assist the trier of fact. Id., 509 U.S. at 592, n.10, Allison, 184 F.3d at 1306.

In determining whether expert testimony is reliable, the district court must assess whether the reasoning or methodology underlying the testimony is scientifically valid. Daubert, 509 U.S. at 592-93; Haggerty v. The Upjohn Co., 950 F. Supp. 1160, 1162 (S.D. Fla. 1996) (excluding expert testimony under Daubert). In order to be admissible under Daubert, "an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" Haggerty,

---

[4] As Cordis demonstrated in its Reply Brief on its motion for summary judgment (at 8-9), Dr. Pope agreed with Cordis, that any changes in the stainless steel of Cordis' stents take place *during* expansion of the balloon – *not afterwards*.

950 F. Supp. at 1167, quoting Daubert, 509 U.S. at 590.  Daubert lists several non-exclusive factors to guide district courts in deciding whether an expert's opinions are scientifically reliable:

- Testing:  Whether the expert's theory can be and has been tested;
- Peer review:  Whether the theory has been subjected to peer review and publication;
- Rate of error:  Whether the scientific technique has a known or potential rate of error;
- General acceptance:  Whether the theory is generally accepted within the relevant scientific community.

Daubert, 509 U.S. at 593-94; Allison, 184 F.3d at 1312; Haggerty, 950 F. Supp. at 1162.  In addition, the district court must examine the "fit" between the expert testimony and the facts of the case, to determine whether there is a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 592.

As discussed below, opinions offered by two of AGRI's three experts, George Widas and Dr. Edward Leonard, on whether the stainless steel that makes up Cordis' stents increases in rigidity after expansion of the balloon, cannot pass muster under Daubert.

## III.    Mr. Widas' Unsupported Theory

### A.    Mr. Widas' Hypothesis

Mr. Widas has an undergraduate degree in civil engineering. Ex. 22. He is a professional witness, with 100% of his work involving civil or criminal cases.  Id. at 18-19.  For the past decade, he has derived all of his income as a forensic engineer, reconstructing car accidents, industrial accidents and personal injury events for purposes of litigation. Ex. 16 at 17-18.  Prior to this case, he had no familiarity with stents.

In one recent case, the district court excluded expert testimony by Mr. Widas under Daubert on the grounds that his opinions lacked scientific reliability.  See Ebenhoech, 239 F. Supp. 2d 455.

In his expert report, Mr. Widas opined, inter alia, that Cordis' stents increase in rigidity to an infinitesimally small extent after the balloon has been expanded.  See Ex. 12 ¶¶ 32-33.  Mr.

4

Widas' theory is that Cordis' stents undergo a phenomenon called "strain hardening" for an infinitesimal period of time after the balloon stops expanding. According to Mr. Widas, this infinitesimally small amount of strain hardening results in a tiny increase in rigidity after expansion of the balloon.

Mr. Widas did not do <u>anything</u> to test this hypothesis. Moreover, he admitted that: (a) he was not aware of any written materials that discuss his theory, (b) he did not conduct any experiments to test his theory, and (c) he was not aware of any testing conducted by anyone that would support it. Ex. 16 at 132-33, 141-42, 157-59.

In his deposition, Mr. Widas initially cited two paragraphs from "Strength and Structure of Engineering Materials," by Polakowski as supporting his theory. But neither paragraph is applicable here – and when questioned in his deposition, Mr. Widas admitted this. Ex. 16 at 125-27.

For example, the first paragraph from Polakowski that Mr. Widas cited, on p.205, involves a phenomena called "creep." Creep may result when a material that has a constant force pulling it stretches over time. Stainless steel – the material that Cordis' stents are made of – does not undergo creep at room temperature or at body temperature. The scientific literature establishes this, Ex. 23 at 43,[5] Ex. 24 at 205, and Mr. Widas admitted it. Ex. 16 at 127-30. Ultimately, Mr. Widas conceded that he was not relying on the principle of creep. Ex. 16 at 142.

Mr. Widas also admitted that the other paragraph he cited from the Polakowski text (Ex. 24) on p.191, did not support his hypothesis. That paragraph talks about what happens when strain is interrupted. Mr. Widas agreed that does not occur during normal stenting procedures and that the paragraph was not applicable to stents (Ex. 16 at 131:5-11):

> Q.   So would you agree with me that paragraph that you read from 191 that talks about when straining is interrupted doesn't apply; correct?

---

[5] Mr. Widas relied on this page of the Dowling text in his expert report.  <u>See</u> Ex. 16 at 49-50.

923922v2

> A.     As long as there are no other significant forces applied to the stent, correct.

Apart from these two paragraphs from the Polakowski text – which are inapplicable by his own admission – Mr. Widas did not cite <u>anything</u> to support his hypothesis. And by his own admission, the change he hypothesized is too insignificant to measure. Ex. 16 at 159.

If this were not enough, another expert for AGRI, Dr. David Pope, who – unlike Mr. Widas, has a Ph.D. in materials science – categorically rejected Mr. Widas' hypothesis. Dr. Pope is a Professor of Materials Science at the University of Pennsylvania. He testified (Ex. 25 at 95:15-22):

> Q.     …. if Mr. Widas testified that there was an infinitesimal amount of time after the balloon stops expanding during which the stent is still expanding, would you agree with that or disagree with that?
>
> A.     Well, assuming that you characterized the testimony correctly, I would disagree with it.

As Dr. Pope explained, it is the expansion of the balloon that causes the stent to expand. Once the balloon stops expanding, so does the stent (<u>id.</u> at 99:10-21):

> Q.     And when you reached the maximum diameter of the balloon, the stent stops expanding?
>
> A.     I would state it slightly different. I would say that when you stop expanding the balloon, the stent stops expanding.
>
> Q.     …. And at that point, if you are keeping the balloon at that size, the stent is going to neither decrease nor increase in size?
>
> A.     Correct. The stent stays on the balloon.

Since the stent only undergoes strain hardening when it is undergoing plastic deformation and being expanded (Ex. 16 at 124-25), it cannot possibly undergo strain hardening after the balloon is expanded.

## B.     Mr. Widas' Hypothesis is Not Admissible Under _Daubert_

Mr. Widas' unsupported hypothesis does not come close to satisfying the indicia of scientific reliability required by <u>Daubert</u>.

6

As noted above, Mr. Widas did nothing to test his hypothesis. He is not aware of any testing by others that might support it. And no scientific literature supports it. Moreover, that theory is not generally accepted within the scientific community. In fact, the opposite is true. Another expert for AGRI – who, unlike Mr. Widas, has a Ph.D. in materials science – categorically rejected Mr. Widas' theory.

In short, Mr. Widas has offered "only a hypothesis which he had yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 764 (3d Cir. 1994) (affirming exclusion of expert testimony under Daubert). His theory is exactly the kind of "junk science" that Daubert is meant to exclude.

This is not the first time Mr. Widas' opinions have come under fire. In Ebenhoech, 239 F. Supp. 2d 455, the district court excluded testimony by Mr. Widas on the grounds that his "expert" opinions were *scientifically unreliable* under Daubert. The court in Ebenhoech found that Mr. Widas' opinions were supported "only by the personal view of its author and not by reliable, verifiable methodology pertaining to the product at issue" in that case. Id. at 469.

Mr. Widas' opinions here suffer from the same defect. As in Ebenhoech, his opinions should be excluded under Daubert. See, e.g., McCorvey, 298 F.3d 1253 (affirming the exclusion of expert testimony under Daubert); Allison, 184 F.3d at 1322 (same); Haggerty, 950 F. Supp. at 1167 (excluding expert testimony under Daubert); Edwards v. Safety-Kleen Corp., 61 F. Supp. 2d 1354 (S.D. Fla. 1999) (same); Cartwright v. Home Depot U.S.A., Inc., 936 F. Supp. 900, 905-06 (M.D. Fla. 1996) (same); Ebenhoech, 239 F. Supp. 2d at 467-69 (excluding expert testimony by Mr. Widas under Daubert).

## IV.    Dr. Leonard's Unsupported Hypotheses

Another expert for AGRI, Dr. Edward Leonard, offered the same conclusion offered by Mr. Widas. His reasoning differed, but it was just as lacking in scientific support.

Dr. Leonard hypothesized that: (1) the geometric orientation of the tiny metal bars in Cordis' stents somehow changes after balloon expansion, in a way that increases the stent's rigidity; (2) the stainless steel in Cordis' stents undergoes plastic deformation for a brief period of time after the balloon is expanded; and (3) the stent increases in rigidity due to a supposed interaction between the stent and the wall of the artery during the 20-60 seconds that the balloon is maintained in an expanded condition before being deflated and withdrawn.

None of these theories is supported by any experiment or test, or by anything in the scientific literature. In his deposition, Dr. Leonard eventually conceded that he lacked expertise with respect to the second theory and eventually disavowed the third.

First, Dr. Leonard theorized that the stainless steel in Cordis' stents "increases in rigidity" after expansion of the balloon due to a "reorientation" of its tiny metal bars "from an initial, predominantly axial orientation to a final, more circumferential position." Ex. 14 ¶ 33. In other words, Dr. Leonard theorized that <u>after</u> the balloon is fully expanded, the stent continues to expand and during that expansion, the stent's struts change direction to a more circumferential orientation. According to Dr. Leonard, this reorientation "stiffens the stent and enables it to resist compressive stresses ...." <u>Id</u>.

Dr. Leonard provided nothing to support his hypothesis. In his deposition, Dr. Leonard admitted that he had not tested this theory and that he did not know of any scientific evidence that would support it. Ex. 17 at 205-07. And Dr. Leonard agreed that the change after balloon expansion that he hypothesized could not be measured or quantified. As he testified, "I don't believe I can quantify it – [the] change in dimension after the balloon is expanded." <u>Id.</u> at 194:14-16. He was unaware of any testing done by anyone to determine whether the change he hypothesized actually occurs (<u>id.</u> at 195:21-196:4):

> Q:   Have you personally done any analysis of that to determine how much of a change there is and in what direction?

8

A:     No.

Q:     Are you aware of anybody else who has done any mathematical analysis to determine how much the change is or in what direction?

A:     No.

Dr. Leonard's theory on this point is not only untested – it is inconsistent with the testimony of AGRI's other expert Dr. Pope, who is a Professor of Materials Science at the University of Pennsylvania.   As discussed above, Dr. Pope testified that the stent does not continue to expand after the balloon stops expanding.  See Ex. 17 at 99.

Dr. Leonard's second theory is the same as Mr. Widas' theory, and suffers from the same defects.  It is not supported by any scientific tests or anything in the scientific literature.  And in his deposition, Dr. Leonard admitted that he lacks expertise in this subject:

- "I would point out to you that I'm not here primarily to be an expert on the deformation of materials." Ex. 17 at 198:9-11.
- "I'm not in a position to render expert testimony on what will happen, as a result of the plastic deformation, to the intrinsic properties of the struts." Id. at 200:4-7.
- "The change that is due to plastic deformation is beyond my ability to predict.  It could either contribute or could detract from the increase in rigidity which occurs when the stent is expanded." Id. at 208:21-25.
- "As I've explained to you, I have neither the expertise to [opine as to whether plastic deformation contributes to or detracts from the rigidity of the stent], nor do I feel that it is likely to be the principal reason why the stent acquires increased rigidity as the radius is increased." Id. at 210:2-6.

Dr. Leonard's third and last theory was that the stent increases slightly in rigidity due to a supposed interaction between the stent and the vessel wall during the 20-60 seconds that the balloon is maintained in an expanded condition before being deflated and withdrawn.  Ex. 17 at 75-79, 162-66, 194, 211-18.  At his deposition, Dr. Leonard admitted that he was not aware of any tests or scientific studies that would support this theory (id. at 165:9-165:4):

Q:     Have you done any tests to determine how much of this effect happens while the balloon is being expanded as opposed to the brief period of time where the balloon is . . . being maintained in its expanded condition?

A.     No, I have not done tests.

9

> Q.    Are you aware of anyone who has done any tests to determine this?
>
>               *             *             *
>
> A.    I do not now know that.

After offering this theory in his deposition, Dr. Leonard eventually disavowed it. He testified that when he looked for the change he hypothesized using fluoroscopy, he was "not sure that what [he] saw was all that convincing to [him] as a physical scientist." Ex. 17 at 217:3-5.

### A.    Dr. Leonard's Testimony Must Be Excluded As Scientifically Unreliable

As with Mr. Widas, Dr. Leonard's hypothesis – that after expansion of the balloon, there is an unmeasurable increase in the rigidity of the stainless steel that makes up Cordis' stents – is not scientifically reliable and should be excluded under Daubert.

As discussed above, Dr. Leonard admitted that he lacked expertise in the subject. He did not to test his hypothesis. He is not aware of any relevant tests by others. His hypothesis is not supported by anything in the scientific literature. Indeed, another expert for AGRI, who (unlike Dr. Leonard) *does* have expertise in the relevant field, flatly contradicted Dr. Leonard's theory. And when Dr. Leonard used fluoroscopy to try to see the changes he hypothesized, what he saw was not "all that convincing to [him] as a physical scientist." Ex. 17 at 216-17. Like Mr. Widas, Dr. Leonard offered "only a hypothesis which he had yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing." In re Paoli R.R. Yard PCB Litigation, 35 F.3d at 764 (affirming exclusion of expert testimony).

Dr. Leonard's unsupported theories on this subject fail to meet the tests for scientific reliability under Daubert. They should be excluded from evidence. See, e.g., McCorvey, 298 F.3d 1253 (affirming the exclusion of expert testimony under Daubert); Allison, 184 F.3d at 1322 (same); Haggerty, 950 F. Supp. at 1167 (excluding expert testimony under Daubert); Edwards, 61 F. Supp. 2d 1354 (same); Cartwright, 936 F. Supp. at 905-06 (same); Ebenhoech, 239 F. Supp. 2d at 467-69 (excluding expert testimony by Mr. Widas under Daubert).

10

## CONCLUSION

Under <u>Daubert</u>, this Court should exclude testimony of Mr. Widas and Dr. Leonard on the subject of whether the stainless steel that makes up Cordis' stents increases in rigidity after expansion of the balloon.

_____

Rudolph F. Aragon, Florida Bar No. 286249
Kevin C. Kaplan, Florida Bar No. 933848
ARAGON, BURLINGTON, WEIL,
  SCHWIEP, KAPLAN & BLONSKY, P.A.
2699 S. Bayshore Drive
Miami, FL  33133
Telephone:  (305) 858-2900

*Of Counsel:*
William F. Cavanaugh, Jr.
Eugene M. Gelernter
Scott B. Howard
Laura Storto
PATTERSON, BELKNAP, WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
212-336-2000

*Attorneys for defendant Cordis Corporation*

Eric I. Harris
Tracy Poole
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08543

Dated: September 15, 2003

923922v2

# EXHIBIT

# 6

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

ARLAINE & GINA ROCKEY, INC.,

          Plaintiff,

   -against-                         Case No. 02-22555-CIV-ALTONAGA
                                       MAGISTRATE JUDGE BANDSTRA

CORDIS CORPORATION,

          Defendant.

_____

### ORDER ON DEFENDANT CORDIS' MOTIONS *IN LIMINE*

THIS CAUSE, having come before the Court upon motions *in limine* by Cordis
Corporation ("Cordis"), and the Court having considered the record and concluded that good
grounds exist for the requested relief, it is hereby ORDERED AND ADJUDGED that:

Cordis' Motion *In Limine* No. 1 (To Exclude Parol Evidence) is GRANTED;

Cordis' Motion *In Limine* No. 2 (To Exclude Arguments By AGRI That Cordis Is
Obligated To Pay Royalties On Products That Practice The Rockey Patents "In Whole or In
Part") is GRANTED;

Cordis' Motion *In Limine* No. 3 (To Exclude or Limit The Testimony of AGRI's
Patent Law Expert) is GRANTED;

Cordis' Motion *In Limine* No. 4 (To Exclude Testimony of AGRI's Experts On
Infringement Under The Doctrine of Equivalents) is GRANTED; and

Cordis' Motion *In Limine* No. 5 (To Exclude Certain Testimony By George Widas
and Edward F. Leonard Under *Daubert*) is GRANTED.

                                     _____
                                     UNITED STATES DISTRICT JUDGE

                                     Dated: September __, 2003

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via hand

delivery, upon:

Harvey W. Gurland, Jr., Esq.
James A. Weinkle, Esq.
Duane Morris LLP
Suite 3400
200 South Biscayne Boulevard
Miami, Florida 33131
Counsel for Plaintiff

and by Federal Express upon:

Frederick A. Tecce, Esq.                          Thomas J. Duffy, Esq.
Anthony J. DiMarino, III, Esq.                    The Curtis Center, Suite 1150
McShea/Tecce, P.C.                                Independence Square West
The Mellon Bank Center – 16th Floor               Philadelphia, PA 19106
1735 Market Street
Philadelphia, PA 19103

this 15th day of September, 2003.

By: _____
                        Rudolph F. Aragon