NIGHT BOX
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

~~~ 1 ~ 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

| | | |
|---|---|---|
| ARLAINE & GINA ROCKEY, INC. | : | |
| | : | |
| Plaintiff, | : | **CASE NO. 02-22555-CIV-ALTONAGA** |
| | : | **MAGISTRATE JUDGE BANDSTRA** |
| v. | : | |
| | : | |
| CORDIS CORPORATION, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
TO STRIKE THE SUPPLEMENTAL REPORT OF EDWARD LEONARD, Ph.D.**

**I.     INTRODUCTION**

Since receiving the expert reports of plaintiff Arlaine & Gina Rockey Inc. ("AGR") on June 9, 2003, defendant Cordis Corporation ("Cordis") has had notice that AGR's expert will testify at trial to facts and opinions that establish that Cordis' stent products infringe claim 2 of AGR's United States Patent No. 4,641,653 ("'1,653 Patent"), both literally and equivalently.  Cordis received additional notice of this in the depositions of AGR's experts.  Cordis even had its own experts address the issue of "reverse doctrine of equivalence" in their reports.  Despite this notice and preparation of a rebuttal argument through its own experts, Cordis filed a Motion *In Limine* to preclude AGR's experts from testifying about the doctrine of equivalence ("DOE").

Although unnecessary, AGR attempted to appease Cordis' baseless and formalistic concerns by providing it with a supplemental report prepared by Dr. Edward Leonard nearly three months before trial.[1]  Cordis was informed of this in the cover letter sent to its attorneys.  (**Exhibit A** – Leonard Supplemental Report and cover letter). The supplemental report merely addresses

---

[1]The supplemental report of Dr. Edward Leonard was served upon Cordis on October 20, 2003, and the trial of this case is set to begin on January 12, 2004.

more formally what was already disclosed in Dr. Leonard's initial report, certifications and deposition. As such, Cordis' motion to strike the supplemental report of Dr. Leonard should be denied.

## II.     BACKGROUND

On June 9, 2003, plaintiff produced two liability expert reports from Dr. Edward F. Leonard ("Leonard Report" - **Exhibit B**)[2] and George P. Widas ("Widas Report" - **Exhibit C**).  As set forth in those reports, the experts conducted an element-by-element analysis of claim 2 of '1,653 Patent. (*See* Leonard Report at ¶¶ 28-35; Widas Report at ¶¶ 28-35).  Further, a review of the reports reveal that in each and every instance where the experts addressed the respective claim elements, they did not limit their opinions to literal infringement.

Following plaintiff's production of its expert reports, Cordis was provided with the opportunity to depose Mr. Widas and Dr. Leonard.  During those depositions, Cordis' counsel inquired regarding whether the experts had any opinion regarding the legal issue of the "doctrine of equivalents." (Cordis Memorandum in Support of Motion *In Limine* on the Doctrine of Equivalence at p. 3).  Neither witness was prepared to offer legal opinions.   However, throughout the course of the depositions, it was clear that both witnesses had included in their technical analysis and opinions, a recognition that the accused device functions in substantially the same way to achieve substantially the same result as the device set forth in the specification of the '1,653 Patent.

For example, Dr. Leonard testified to the following:

Q.     Do have an opinion on whether or not the Cordis products infringe the claims if they do not have exactly what is called for in the claims?

A.     Yes, I do.  I think that if they have substantially, what is called for in the claims, or – that is sufficient.

---

[2] Dr. Leonard's report is mistakenly dated July 8, 2003.  It was actually signed by Dr. Leonard on June 8, 2003.

> Q.     And how would you go about determining that?

> That is to say the functionality defining the balloon, as an example, ***I know what a balloon does and if something accomplished the same thing that a balloon did, and had a physical resemblance to a balloon, and could replace the balloon, but with no major difference in function,*** I would say that that was – that that was still covered by the original patent and it was infringing if you made something that did that.

(Leonard Dep. Tr. at 68:7-25 - **Exhibit D**) (emphasis added).  In fact, Cordis was provided with additional notice that Dr. Leonard's opinions were not limited to literal infringement approximately two pages later when Cordis' counsel asked the following question:

> Q.     You gave a certain understanding of the law about infringement.  I want to know in that opinion, understanding was, that if it is not exactly what is in the claim there could still be an infringement.  I want to know where that understanding of the law came from.

> A.     I drew it, I think in part from what I thought was logical and from statements of the king that you see in the patent.  For example, the invention is not restricted to the slavish (sic) imitation of each and every detail set forth.  Devices may be provided which change, eliminate and add certain specific details without departing from the scope of the invention.

> Q.     As a legal matter, do you know what effect that sentence has, if any, on the rights of the patent?

> A.     No, I do not.

(Leonard Dep. Tr. at 70:8 - 71:2 - **Exhibit D**).

As such, Cordis was aware that as part of his infringement analysis, Dr. Leonard considered whether aspects of the accused device function in substantially the same way to achieve substantially the same result.[3]

_____

[3]The same is true with respect to the depositions of AGR's other two experts, George Widas and Dr. David Pope.  During his deposition, Mr. Widas testified that he did not know the legal significance of the DOE, but it was his understanding that Cordis' product does not have to "exactly" have the claim elements to infringe.  (Widas Dep. Tr. at 56:8-19 ; 58:14 - 59:6 -- **Exhibit E**).  Counsel never followed up with Mr. Widas regarding whether or not he had an opinion as to whether the sole element which was the subject of his report (*i.e.*, "providing in the sleeve a material which increases in rigidity after expansion of said balloon"), has to be found exactly in the accused device.  Dr. Pope also testified in his deposition regarding the

Thereafter, Cordis produced the reports of its experts.  Cordis produced two expert reports from Dr. Campbell Laird ("Laird Report" - **Exhibit G**) and Dr. Joseph Puma ("Puma Report" - **Exhibit H**).  In both of those reports, Cordis provided testimony regarding their experts' opinion with respect to the reverse doctrine of equivalents.[4]  (Laird Report at ¶¶ 16-17 - **Exhibit G**).  As such, Cordis had every opportunity to, and in fact <u>did</u>, provide expert testimony directly relating to whether the accused device functions in substantially the same way to achieve substantially the same result as the embodiment disclosed in the specification of the '1,653 Patent.  Moreover, the factual information provided during the depositions of AGR's experts is no more or less detailed than the entire factual recitation on the same subject matter provided by Cordis' expert, Dr. Laird.  His entire opinion and analysis regarding the function, way, result test is set forth in just over a single page of his report.  In fact, his factual basis is contained in less than a paragraph.  (Laird Report at 17 - **Exhibit G**).

If that was not enough, on August 7, 2003, plaintiff filed its response to defendant's Motion for Summary Judgment.  Among the exhibits submitted in support of plaintiff's Response to Defendant's Motion for Summary Judgment and Motion *In Limine* to Preclude the Testimony of Dr. Leonard, plaintiff included declarations of its three experts, including three by Dr. Leonard.  (**Exhibits I, J** (attachments omitted) **& K**).  These declarations clearly indicate, consistent with all of the witnesses' reports and deposition testimony, that Dr. Leonard did not limit his infringement opinions to literal infringement.  (*e.g.,* **Exhibit I** at ¶31-32).  Despite that, to date, Cordis has never requested an additional opportunity to depose any of the witnesses, which would have been

---

insubstantial differences between a stent made of metal and one made of polymer in terms of the way they increase in rigidity after expansion of the balloon-catheter.  (Pope Dep. Tr. at 78:16 - 79:11 - **Exhibit F**).

[4]The reverse doctrine of equivalents utilizes virtually the same function, way, result test.  *See* Graver Tank & Manufacturing Company, Inc. v. Linde Air Products Company, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 1102 (1950)

provided. Nor has Cordis requested leave to produce a supplemental report from any of its experts to refute such testimony.

Further, Cordis did not identify any additional experts to refute any of the testimony of the plaintiff's experts until November 4, 2003. (**Exhibit L**). Rather, Cordis sat back and waited to file a motion *in limine* on the DOE. Although completely unnecessary, AGR attempted to appease Cordis' baseless and formalistic concerns by providing it with a supplemental report prepared by Dr. Edward Leonard nearly three months before trial. Cordis was informed of this in the cover letter sent to its attorneys. (**Exhibit A**). The supplemental report merely addresses more formally what was already disclosed in Dr. Leonard's initial report, certifications and deposition. As such, Cordis' motion to strike the supplemental report of Dr. Leonard should be denied.

**III.    ARGUMENT**

      **A.    As Dr. Edward Leonard's Supplemental Report Merely Amplifies His Earlier Reports And Deposition Testimony, It Is Timely And Cordis Has Not Been Prejudiced.**

In its motion, Cordis challenges both the timeliness and adequacy of Dr. Leonard's supplemental report. On both counts, Cordis' challenge fails. The supplemental report of Dr. Leonard is timely. The disclosure of expert testimony is governed by Fed. R. Civ. P. 26(a)(2), (b)(4) & (e)(1). "Rule 26 specifically contemplates that an expert will be able to testify at trial regarding the opinions expressed in both his expert report and his deposition." Saad v. Shimano American Corp., 2000 U.S. Dist. LEXIS 10974 at *66 (N.D. Ill., July 24, 2000)(**Exhibit M**). This is the reason Rule 26(e)(1) requires supplementation of information provided by an expert in both his report and deposition. Fed. R. Civ. P. 26(e)(1). Because Dr. Leonard's supplemental report merely addresses more formally what was already disclosed in Dr. Leonard's initial report, certifications and deposition, Cordis cannot credibly complain about the timing of the disclosure.

Cordis' position regarding the timing of the supplemental report is inconsistent with the court's generally strong "aversion to the exclusion of crucial evidence." ABB Air Preheater, Inc. v. Regenerative Environmental Equip. Co., 167 F.R.D. 668, 673 (D.N.J. 1996), citing, In re: Paoli Railroad Yard TCB Litigation, 35 F.3d 717, 792-793 (3d. Cir. 1994). In determining whether to preclude the testimony of an expert due to the timeliness of the his report, four factors are normally considered: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. See Murphy v. Magnolia Electric Power Assoc., 639 F.2d 232, 235 (5th Cir. 1981); Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 118 F.3d 955, 961 (2d Cir. 1997); see also Brooks v. United States, 837 F.2d 958, 961 (11th Cir. 1988).

Applying these factors to this case, there is no surprise to Cordis given the earlier reports, certifications and deposition testimony of Dr. Leonard.  Second, Cordis has the ability to cure, to the extent that they have not done so already, through its own expert, Dr. Laird, who has already addressed the reverse DOE in his report.  Third, allowing the evidence at this time would not disrupt trial in any way.  Fourth, this evidence is obviously important to AGR.  In addition, there is no evidence that the AGR has acted in bad faith.  AGR provided the supplemental expert report as a good faith response to baseless challenges to Dr. Leonard's earlier disclosures which did not limit his infringement analysis to literal infringement.

**B.    Dr. Edward Leonard's Supplemental Report, Which Incorporates By Reference His Earlier Reports, Adequately Opines Upon The Doctrine Of Equivalence.**

All of Dr. Leonard's reports, certifications and deposition testimony adequately address the DOE in this case.  Dr. Cordis' stents infringe the '1,653 Patent, and AGR's proof of infringement includes, inter alia, the testimony of its experts: Dr. Edward Leonard, Dr. David Pope and George Widas, P.E.  Claim 2 of the '1,653 Patent is for "[a] method of treating an area of a body vessel"

comprising of six steps.[5]  Under the Patent Statute, Title 35 U.S.C., methods are patentable.  See Robert L. Jones and Labrado, Inc. v. Hardy, 727 F.2d 1524, 1528 (Fed. Cir. 1984).  Furthermore, a method claim may be infringed if the accused device is reasonably capable of satisfying the claim limitations, even if the accused device is capable of non-infringing modes of operations.  See Hilgraeve Corporation v. Symantec Corporation, 265 F.3d 1336, 1343 (Fed. Cir. 2001).

An infringement analysis requires a comparison of the properly construed claim to the accused device to determine whether all of the claim limitations are present, either literally or by a substantial equivalent.  See Tech Search, LLC v. Intel Corporation, 286 F.3d 1360, 1371 (Fed. Cir. 2002).  "Infringement, either literally or under the doctrine of equivalence, does not compare the accused device 'with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee.'"  Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 31 Fed. Appx. 727, 731-732, 2002 U.S. App. LEXIS 4448 (Fed. Cir. 2002), quoting SRI International v. Matsushita Electronics Corporation, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).

_____

[5]  Claim 2 of the '1,653 Patent states:

A method of treating an area of body vessel, comprising the steps of:

introducing a catheter with a collapsed inflatable balloon and a collapsed sleeve encircling the balloon on its end into the vessel at a point remote from the area to be treated;

manipulating the catheter axially along the vessel to cause the balloon and sleeve to enter the area to be treated;

inflating the balloon by introducing fluid under pressure into the balloon through a tube of the catheter in a manner wherein the sleeve surrounding the balloon is radially expanded towards the wall of the vessel;

providing in the sleeve a material which increases in rigidity after expansion of said balloon;

maintaining said balloon in an expanded condition in the vessel while said sleeve increases in rigidity; and

thereafter removing the balloon and catheter from the vessel and allowing the sleeve to remain in place in the area to be treated.

The theory on which the DOE is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same work, they are the same, even though they differ in name, form, or shape." Graver Tank & Manufacturing Company, Inc. v. Linde Air Products Company, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 1102 (1950), quoting Machine Company v. Murphy, 97 U.S. 120, 125 (1878). Thus, application of the DOE "is akin to determining literal infringement" and "there is no basis for treating an infringing equivalent any differently than a device that infringes the express terms of the patent." Warner-Jenkinson Company, Inc. v. Hilton Davis Chemical Company, 520 U.S. 17, 35, 117 S. Ct. 1040, 1052, 137 L.Ed. 2d 146, 165 (1997).

"Equivalence, in the patent law, is not a prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect." Graver Tank, 339 U.S. at 609; National Presto Industries, Inc. v. The West Bend Company, 76 F.3d 1185, 1191 (Fed. Cir. 1996). No specific formulation of evidence and argument is required to prove equivalence. National Presto Industries, Inc., 76 F.3d at 1191; Warner-Jenkinson Company, 520 U.S. at 39-40 ("In our view, the particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention? Different linguistic frameworks may be more suitable to different cases, depending on their particular facts."). Instead, a finding of equivalence is a determination of fact, and proof can be made in any form including testimony of experts and others versed in the technology; by documents, including texts and treatises; and by disclosures of the prior art. Graver Tank, 339 U.S. at 609.

In appropriate cases, the function-way-result test offers guidance on the question of equivalence. Under this test, the fact finder determines whether the element in the accused device does substantially the same thing in substantial the same way to get substantially the same result

-8-

as the claim limitation.  The Toro Company v. White Consolidated Industries, Inc., 266 F.3d 1367, 1370 (Fed. Cir. 2001).  Another appropriate test is the "insubstantial differences" test.  Id.  Under this test, equivalency may be found where the difference in the accused device is facially "unimportant and insubstantial."  Id.  Similarly, an accused device may infringe where it lacks an insignificant function of a single claim limitation.  Id. at 1371.

In order to provide the jury with "guiding charts when called upon to determine infringement under the doctrine [of equivalence]," the patentee should present "particularized testimony" of witnesses and "linking argument" by counsel.  Lear Siegler, Inc. v. Sealy Mattress Company of Michigan, Inc., 873 F.2d 1422, 1425-1426 (Fed. Cir. 1989); Nestier Corporation v. Menasha Corporation, 739 F.2d 1576, 1579-1580 (Fed. Cir. 1984).  While generalized testimony as to the overall similarity between the claim and accused device is insufficient, the patentee need only show "how the patented and the accused device were constructed and operated, overall as well as with respect to each claim element."  National Presto Industries, Inc., 76 F.3d 1185, 1191 (Fed. Cir. 1996); compare Texas Instruments, Inc. v. Cypress Semiconductor Corporation, 90 F.3d 1558, 1567 (Fed. Cir. 1996).[6]

Contrary to Cordis' argument, Dr. Leonard's supplemental report adequately addresses the DOE.  Most importantly, Dr. Leonard's supplemental report incorporates by reference his two earlier reports provided in this case.  (Leonard Supplemental Report at ¶1).  In his report misdated July 8, 2003, Dr. Leonard detailed, on an element by element basis, how the Cordis stents are constructed and operate.  (Leonard Report at ¶28-35).  In terms of the "way" the Cordis stents are

---

[6]In its memorandum of law, Cordis relies upon Texas Instruments and Hewlett-Packard Company v. Mustek Systems, Inc., 340 F.3d 1314 (Fed. Cir. 2003) for the assertion that Dr. Leonard's report fails to meet established requirements for proof of infringement under the DOE.  In Texas Instruments, the totality of the expert's trial testimony on the issue of equivalence was that the accused processes and claimed processes were the "same" and performed the "same" function.  90 F.3d at 1567-1568.  In Hewlett-Packard, the totality of the expert's trial testimony was that each element of the accused device performed the same function, to achieve the same result in the same way.  340 F.3d at 1322.  Understandably but quite inoppositely, those courts found such evidence to be insufficient.

used, Dr. Leonard relied upon, *inter alia*, the instructions provided with the medical device. (Id. at

¶30, 35).[7]  Dr. Leonard also explains in his report how the methods set forth in claim 2 of the '1,653

Patent would be understood by one skilled in the art; how the Cordis stents are used and function;

the intended result of their use; and the way in which they achieve those results.  Furthermore, Dr.

Leonard opines that the Cordis stents infringe AGR's method claim, without limiting his opinions

to either literal infringement or by equivalence.

Specifically, Dr. Leonard concludes in his initial report that "the method by which [Cordis'

stents] are specified for their use as described in the instructions provided, and with the devices

furnished for their placement, that the accused device meets every limitation of claim 2 of the

'1,653 Patent." (Leonard Report at ¶35).  On an element by element basis, Dr. Leonard further

explains how each step of the AGR method claim is practiced in the Cordis stents. In terms of their

function, Dr. Leonard explains that the Cordis stents are "used for introducing a catheter with a

collapsed inflatable balloon and a collapsed sleeve or stent encircling the balloon on its end into

a vessel the point remote from the area to be treated.  For instance, the coronary stent is inserted

in the femoral artery which is remote from the coronary arteries, which is the area to be treated."

(Leonard Report at ¶30). Further, the Cordis stents, like AGR's method claim, are designed to

"resist compressive stresses that tend to collapse" stents and "to allow the sleeve and stent to

remain in place in the area to be treated." (Leonard Report at ¶33-34).  Dr. Leonard explains that

the way this is accomplished is by inserting the Cordis stents into a vessel at a point remote from

the area to be treated, and then manipulating the catheter axially along the vessel causing the

balloon and stent to enter the area to be treated.  (Leonard Report at ¶30-31). He further explains

_____

[7]Regarding the function-way-result test, the only part of the test that Cordis challenges
in its motion is the "way" issue.  (Cords memorandum of law at 5-6).  This is not surprising.
Cordis cannot credibly argue that the function and result of AGR's method claim and Cordis'
stents differ substantially. Both function and achieve the same result by placing a device
(sleeve/stent) in an area of a body vessel to be treated that, when deployed, holds the vessel
open.

that the balloon is then inflated by introducing fluid under pressure into the balloon through a tube of the catheter in a manner where the Cordis stent surrounding the balloon is radially expanded toward the wall of the vessel. (Leonard Report at ¶32). After being expanded in the area to be treated, the "way" in which the Cordis stents are able to remain in place and resist compressive stresses is that they "have a material in the sleeve which increases in rigidity after expansion of the balloon." (Leonard Report at ¶33). In particular, Dr. Leonard explains that "the stainless steel utilized in the stent or sleeve is internally strengthen by plastic deformation within each of its elements" and "is also strengthened in its entirety by reorientation of its elements with respect to each other from an internal, predominantly axial orientation to a final, more circumferential position." (Leonard Report at ¶33). Finally, the method for using the Cordis stents requires that the balloon and catheter be removed, leaving the stent in place in the area to be treated. (Leonard Report at ¶34).

Dr. Leonard also states in his initial report that all of the above described methods for using the Cordis stents are within the limitations of claim 2 of the '1,653 Patent. (Leonard Report at ¶35). He also explains, or interprets, claim 2 of the '1,653 Patent. (Leonard Report at ¶23-27). As was previously mentioned, Dr. Leonard made it clear during his deposition that the Cordis stents function in substantially the same way and achieve substantially the same result as the methods set forth in claim 2 of the '1,653 Patent. (Leonard Dep. Tr. at 68: 7-25; 70: 8-71: 2 - - **Exhibit D**). Dr. Leonard testified about his understanding that the Cordis stents would infringe AGR's claims "if they have substantially, what is called for in the claims, or - that is sufficient." (Leonard Dep. Tr. at 68: 7-13). He also provided an example of how the DOE applied. (Leonard Dep. Tr. at 68: 14-25).

In his supplemental report, Dr. Leonard merely restates his earlier opinions in the more formalistic context of the DOE. In particular, if claim 2 of the '1,653 Patent were construed to be

-11-

limited to polymer stents, Dr. Leonard explains that a polymer stent functions in substantially the same way to achieve substantially the same result as the Cordis stents made of 316L stainless steel.  (Leonard Supplemental Report at ¶5 – **Exhibit A**).  Dr. Leonard further details, on an element by element basis, that there are insubstantial differences between polymer and metal stents in their "functions, ways and results."  For example, both type of stents employ the same "way" of resisting compressive forces after expansion in the area to be treated by having a material in the stent which increases in rigidity after expansion of the balloon.  (Leonard Supplemental Report at ¶9).  The insubstantial difference is that the material in a polymer stent is a polymer and the material in the Cordis stents is 316L stainless steel, both of which share the physical property of increasing in rigidity after expansion of the balloon.

Accordingly, Dr. Leonard more than adequately establishes the proof of infringement under the DOE, and Cordis' motion to strike his supplemental report should be denied.

## IV.    CONCLUSION

Based upon the foregoing arguments and authority, plaintiff Arlaine & Gina Rockey, Inc. respectfully request that this Honorable Court deny defendant Cordis Corporation's motion to strike the supplemental report of Edward Leonard, Ph.D.

Respectfully submitted,

DUFFY & KEENAN

BY:_____

THOMAS J, DUFFY, ESQUIRE
PATRICK J. KEENAN, ESQUIRE
The Curtis Center - Suite 1150
Philadelphia, PA 19106
(215) 238-8700

Attorneys for Plaintiff,
Arlaine & Gina Rockey, Inc.

-12-

OF COUNSEL:
Frederick A. Tecce, Esquire
Anthony J. DiMarino, III, Esquire
McSHEA/TECCE, P.C.
The Mellon Bank Center - 16th Floor
1735 Market Street
Philadelphia, PA 19103
(215) 599-0800

Harvey W. Gurland, Jr., P.A.
Florida Bar Number 284033
James A. Wienkle
Florida Bar Number 710891
Duane, Morris & Heckscher, LLP
200 South Biscayne Boulevard, Suite 3410
Miami, Florida 33131

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

ARLAINE & GINA ROCKEY, INC.     :
     :
            **Plaintiff,**    :    **CASE NO. 02-22555-CIV-ALTONAGA**
     :    **MAGISTRATE JUDGE BANDSTRA**
    **v.**     :
     :
**CORDIS CORPORATION,**     :
     :
          **Defendant.**    :

## ORDER

AND NOW, this _____ day of _____, 2003, upon consideration of the Defendant Cordis Corporation's Motion to Strike Supplemental Report of Edward Leonard, Ph.D., and the response thereto by Plaintiff Arlaine & Gina Rockey, Inc., it is hereby **ORDERED** that Defendant's Motion is **DENIED**.

BY THE COURT:

_____
                                        J.

## CERTIFICATE OF SERVICE

This is to hereby certify that on this 13th day of November, 2003, I caused a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Strike Supplemental Report of Edward Leonard, Ph.D. to be served by overnight delivery, upon the following:

Rudolph F. Aragon, Esq.
Kevin C. Kaplan, Esq.
Aragon, Burlington, Weil & Crockett, P.A.
2699 S. Bayshore Drive, Penthouse
Miami, FL 33133

Eugene M. Gelernter, Esquire
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, New York 10036

Counsel for Defendant,
Cordis Corporation

DUFFY & KEENAN

BY:_____
THOMAS J. DUFFY, ESQUIRE
PATRICK J. KEENAN, ESQUIRE
The Curtis Center - Suite 1150
Philadelphia, PA 19106
(215) 238-8700
Attorneys for Plaintiff,
Arlaine & Gina Rockey, Inc.

**OF COUNSEL:**
Frederick A. Tecce, Esquire
Anthony J. DiMarino, III, Esquire
McSHEA/TECCE, P.C.
The Mellon Bank Center - 16th Floor
1735 Market Street
Philadelphia, PA 19103
(215) 599-0800

Harvey W. Gurland, Jr., P.A.
Florida Bar Number 284033
James A. Wienkle
Florida Bar Number 710891
Duane Morris LLP
200 South Biscayne Boulevard
Suite 3410
Miami, Florida 33131



McShea\Tecce
Counselors at Law

October 20, 2003

***VIA FACSIMILE & REGULAR MAIL***

Scott Howard, Esq.
Paterson, Belknap, Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Re:   ***Arlaine & Gina Rockey, Inc. v. Cordis Corp.***
      ***Case No. 02-22555***

Dear Scott:

As we have previously stated, plaintiff's experts' reports clearly indicate that their opinions were not limited to literal infringement. (*See* AGR's response to Cordis' motion regarding testimony on the doctrine of equivalents). In addition, Cordis had the opportunity to depose plaintiff's experts concerning their opinions regarding the function, way, result test relevant to the doctrine of equivalents analysis.

As early as August, Cordis was on notice that plaintiff's experts intended to testify at trial regarding the doctrine of equivalents. Despite that, Cordis continues to place form over substance. Accordingly, though completely unnecessary, enclosed please find a Supplemental Expert Report for Dr. Edward Leonard. In connection with the pending deposition of Dr. Leonard, if you wish to depose Dr. Leonard concerning the opinions expressed herein, please feel free to do so.

Very truly yours,

Frederick A. Tecce

FAT/plr
Enclosure
cc:   Thomas F. Duffy, Esq.
      Harvey W. Gurland, Jr., Esq.

ATTACHMENT / EXHIBIT

McShea Tecce P.C.
Mellon Bank Center, 14th Floor
1735 Market Street
Philadelphia PA 19103
215.599.0800 (tel)   215.599.0888 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

ARLAINE & GINA ROCKEY, INC.          :
                                     :
            Plaintiff,               :        CASE NO. 02-22555-CIV-ALTONAGA
                                     :        MAGISTRATE JUDGE BANDSTRA
      v.                             :
                                     :
CORDIS CORPORATION,          :
                                     :
            Defendant.               :

## SUPPLEMENTAL REPORT OF EDWARD LEONARD

Edward Leonard hereby provides this supplemental expert report.

1.      I adopt and incorporate by reference the two earlier reports provided in this case.

2.      In my original expert report I rendered an opinion regarding my element-by-element analysis of claim 2 of United States Patent No. 4,641,653 ("'1,653 Patent).

3.      At no time was my report limited to an analysis based upon the literal meaning of the words of the claims. This was confirmed during my first deposition.

4.      Specifically, my analysis included a determination that each element of the claim of the '1,653 Patent could be found in the accused Cordis device even if the element was limited to a polymer stent as argued by defendant Cordis.

5.      On an element-by-element basis, a polymer stent functions in substantially the same way to achieve substantially the same result as a stent made of 316L stainless steel.

6.      A polymer stent functions in substantially the same way to achieve substantially the same result as a stent made of 316L stainless steel in that both can be made small so as to be able to be inserted into the body at a point remote from the area to be treated.

7.      A polymer stent functions in substantially the same way to achieve substantially the same result as a stent made of 316L stainless steel so that when in a collapsed condition, it is

OCT-20-2003 MON 03:37 PM   MCSHEA-TECCE, PC          FAX NO. 2155990888          P. 04/04

flexible and can be manipulated to the area to be treated.

8.    A polymer stent functions in substantially the same way to achieve substantially the same result as a stent made of 316L stainless steel in that both can be expanded to varying sizes by a balloon mounted catheter.

9.    A polymer stent functions in substantially the same way to achieve substantially the same result as a stent made of 316L stainless steel in that both are made to increase in rigidity during and after expansion of the balloon.

10.    A polymer stent functions in substantially the same way to achieve substantially the same result as a stent made of 316L stainless steel in that both radially expand towards the wall of the vessel when the balloon is inflated.

11.    A polymer stent functions in substantially the same way to achieve substantially the same result as a stent made of 316L stainless steel in that both increase in rigidity while the balloon is maintained in an expanded condition.

12.    A polymer stent functions in substantially the same way to achieve substantially the same result as a stent made of 316L stainless steel in that both remain in place in the area to be treated after the balloon and catheter are removed from the vessel.

13.    As they are set forth herein and in my original report, these opinions are to a reasonable degree of engineering certainty.

EDWARD F. LEONARD

Dated:  October 17, 2003

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

ARLAINE & GINA ROCKEY, INC.            :
                                       :
                 Plaintiff,            :        CASE NO. 02-22555-CIV
                                       :
         v.                            :
                                       :
CORDIS CORPORATION,          :
                                       :
                 Defendant.            :

### EXPERT REPORT OF EDWARD F. LEONARD

In accordance with Rule 26 of the Federal Rules of Civil Procedure, I, Edward F. Leonard, Ph.D. hereby provide the following expert report for use in connection with any issues which may arise regarding patent infringement

1.      I have been asked to provide expert testimony and opinion regarding infringement of the claims of United States Patent No. 4,501,264, issued February 26, 1985; United States Patent No. 4,641,653, issued February 10, 1987 ('1,653 Patent"); and, United States Patent No. 4,763,653 ("'3,653"), issued on August 16, 1988 (hereafter collectively "Patents" or "Rockey Patents"). In connection with my opinions regarding patent infringement, I intend to provide opinions and offer testimony regarding claim construction.

2.      My background is set forth in the attached curriculum vitae. In addition to the experiences set forth therein, I have been involved with the review and interpretation of patents, filed and prosecuted my own patents, one of which relates to catheter technology.

3.      I have been involved in biomedical engineering for approximately forty six years as consultant, teacher and researcher. I have concentrated on artificial organs, cardiovascular devices, and quantitative cardiovascular physiology (the quantitative explanation of normal and


ATTACHMENT / EXHIBIT

abnormal behavior in the cardiovascular system, with and without the presence of implants and devices attached to the cardiovascular system.) I have consulted for a company (then known as Interventional Technologies, Inc., now a part of Boston Scientific Inc.) that manufactures stents and other devices for interventional cardiology. I have also consulted for the Sci-Med division of Boston Scientific Inc. on the development of a device designed for use in interventional cardiology. I have conducted research with stents, including their placement, in-vivo performance measurement, and their analysis after removal.

4.      In the past 10 years, I have only served as an expert witness on one occasion in connection with a matter involving breast implants.

5.      I am generally familiar with stents manufactured and sold by Cordis Corporation and Johnson & Johnson Corporation representing the accused devices ("Accused Products").

6.      I have also reviewed various documents produced by Cordis Corporation regarding their stent products, including product packaging and product inserts.

7.      In connection with this task, I have reviewed the Rockey Patents including all claims as well as the specification for each of the Rockey Patents. I have also reviewed the Expert Witness Report of George P. Widas, which I adopt and incorporate by reference as if fully set forth herein.

8.      I have reviewed various portions of the file histories of the Rockey Patents including U.S. Patent Application Serial Nos. 912,010 filed June 2, 1978; Application Serial No. 216,989 filed December 16, 1980; Application Serial No. 702,828, filed February 19, 1985; Application Serial No. 011,335, filed February 5, 1987.

10.      I have been advised that the Patent, its Specification and its file history are referred to as the intrinsic record.

2

11.     The focus of my analysis began and remained centered on the language of the claims themselves.

12.     I understand that it is this language which the inventor chose to use to particularly point out and distinctly claim the subject matter which the inventor regarded as his invention.

13.     the terms used in the claims bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those words by a person skilled in the relevant art of building medical devices.

14.     It is my understanding that unless compelled otherwise, each word or term in the claims is to be afforded the full range of its ordinary meaning as understood by persons skilled in the relevant art.

15.     I further understand that to the extent necessary, dictionaries, encyclopedias and treatises are particularly useful resources to assist in determining the ordinary and customary meaning of claim terms.  I have considered definitions from a number of dictionaries identified in the attached List of Claim Term Definitions.  These included:  The Random House College Dictionary, Revised Edition (1988) and Webster's Ninth New Collegiate Dictionary (1983).

16.     Technical dictionaries and treatises may also be a good sources for determining the meaning of the terms in the claims as well as the use of those terms in the patent specification and file history.  With the exception of the term "balloon," none of the terms utilized in the relevant claim of the Rockey Patents has a specialized technical meaning sufficient to require resort to a technical dictionary.  However, the standard dictionaries of the English language do not provide an applicable definition for the term balloon.  Based upon my forty six years experience in this field, I would define the term balloon to mean:  An elastomeric membrane completely enclosing a space which expands when the volume of the fluid occupying that space

3

or volume is increased.

17.      If there were any instances where the dictionary definition of a word or term included multiple definitions, some having no relation to the claimed invention, I also consulted the intrinsic record to identify which of the possible dictionary meanings of the claim terms in issue was the most consistent with the use of the words by the inventor.

18.      If more than one dictionary definition was consistent with the use of the words in the intrinsic record, I construed the claim terms to encompass all such consistent meanings.

19.      I also examined the intrinsic record to determine whether the presumption of ordinary and customary meaning was rebutted. In so doing, I looked to see if the Specification used the words of the claims in a manner clearly inconsistent with the ordinary meaning reflected in a dictionary definition. Had I found such an instance, which I did not, I would have rejected the inconsistent dictionary definition.

20.      I further examined the intrinsic evidence to see if the inventor, acting as his own lexicographer, clearly set forth an explicit definition of a claim term different from its ordinary meaning.

21.      I also examined the intrinsic record to determine if the inventor had expressly disavowed or disclaimed scope of coverage by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.

22.      Utilizing theses contours of claim construction, I first sought to determine the ordinary and customary meaning of the words in the claims of the Rockey Patents. In connection with this task, I did not in any way rely upon any Cordis document or my review of the Accused Products or associated written materials.

23.      It is my opinion that the words in the claims terms should be given their ordinary

4

and customary meaning. A list of those meanings or definitions is set forth in the attached List of Claim Term Definitions. To the extent necessary, I expect to testify concerning the ordinary and customary meaning of the terms in the claims of the Rockey Patents.

24.     It is my further opinion that there is no evidence in the specifications or intrinsic record of an explicit definition of a claim term different from its ordinary meaning.

25.     In connection with my review of the patent file history, it is my opinion that there is no evidence of a clear, express, unambiguous disclaimer of claim scope sufficient to rebut the heavy presumption that the terms in the claims are to be given their ordinary and customary meaning.

26.     It is further my opinion that the invention described in the claims is readily understandable from the terms and words used in the claims.

27.     Claim 2 of the 1'653 Patent provides:

A method of treating an area of a body vessel, comprising the steps of:

> introducing a catheter with a collapsed inflatable balloon and a collapsed sleeve encircling the balloon on its end into the vessel at a point remote from the area to be treated;
>
> manipulating the catheter axially along the vessel to cause the balloon and sleeve to enter the area to be treated;
>
> inflating the balloon by introducing fluid under pressure into the balloon through a tube of the catheter in a manner wherein the sleeve surrounding the balloon is radially expanded towards the wall of the vessel;
>
> providing in the sleeve a material which increases in rigidity after expansion of said balloon;
>
> maintaining said balloon in an expanded condition in the vessel while said sleeve increases in rigidity; and
>
> thereafter removing the balloon and catheter from the vessel and allowing the sleeve to remain in place in the area to be treated.

28.     I understand that in order to infringe the claims of a United States Patent, each element of the claim must be found in the accused device.

29.     I further understand that in order to infringe a method claim, each step of the claim must be practiced in connection with the Accused Product.

30.     Reviewing the Cordis documents, products and product inserts, it is clear that the Accused Product is to be used for introducing a catheter with a collapsed inflatable balloon and a collapsed sleeve or stent encircling the balloon on its end into a vessel at a point remote from the area to be treated.  For instance, the coronary stent is inserted in the femoral artery which is remote from the coronary arteries, which is the area to be treated.

31.     The device and its instructions further provide for manipulating the catheter axially along the vessel to cause the balloon and sleeve to enter the area to be treated.

32.     The instructions clearly provide for inflating the balloon by introducing fluid under pressure into the balloon through a tube of the catheter in a manner where the sleeve surrounding the balloon is radially expanded towards the wall of the vessel.  A review of the Accused Product clearly provides for radial expansion of the sleeve or stent through the inflation of the balloon.

33.     Further, the Cordis Accused Products have a material in the sleeve which increases in rigidity after expansion of the balloon.  That is, the stainless steel utilized in the stent or sleeve is internally strengthened by plastic deformation within each of its elements.  It is also strengthened in its entirety by reorientation of its elements with respect to each other from an initial, predominantly axial orientation to a final, more circumferential position.  This reorientation stiffens the stent and enables it to resist compressive stresses that tend to collapse

6

it. Both changes result in an increase in rigidity over a period of time that includes the time during which the stent is freely expanding and an interval of time thereafter when the stent is accommodating to the blood vessel wall.

34.     Subsequently, the balloon is removed and the catheter is removed from the vessel to allow the sleeve and stent to remain in place in the area to be treated.

35.     It is my opinion to a reasonable degree of engineering certainty that based upon my review of the Accused Products and the method by which those products are specified for their use as described in the instructions provided, and with the devices furnished for their placement, that the accused device meets every limitation of claim 2 of the '1,653 Patent.

36.     My compensation is $200.00 per hour in the course of preparation and $400 per hour in testimony and deposition.


EDWARD F. LEONARD

Dated:   Vienna, Austria, July 8, 2003


7

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

ARLAINE & GINA ROCKEY, INC.        :
                                   :
        Plaintiff,          :        CASE NO. 02-22555-CIV
                                   :
      v.                       :
                                   :
CORDIS CORPORATION,                :
                                   :
        Defendant.          :

## EXPERT REPORT OF GEORGE P. WIDAS

In accordance with Rule 26 of the Federal Rules of Civil Procedure, I,

George P. Widas, PE, hereby provide the following expert report for use in

connection with any issues which may arise regarding patent infringement.

1.      I have been asked to provide expert testimony and opinion regarding

infringement of the claims of United States Patent No. 4,501,264, issued February

26, 1985; United States Patent No. 4,641,653, issued February 10, 1987 ('1,653

Patent"); and, United States Patent No. 4,763,653 ("'3,653"), issued on August 16,

1988 (hereafter collectively "Patents" or "Rockey Patents").  In connection with my

opinions regarding patent infringement, to the extent necessary, I intend to provide

opinions and offer testimony regarding claim construction.  I undertook my claim

construction analysis before engaging in my analysis regarding the comparison of

the asserted claim with the accused products.

ATTACHMENT / EXHIBIT C

2.    My background is set forth in the attached curriculum vitae.  In addition to the training and experiences set forth generally therein, I have been involved with the review and interpretation of patents; filed and prosecuted my own patent; designed, specified, and analyzed mechanical devices, systems and structures that were comprised of various materials for use in various applications; and have otherwise applied the relevant physical sciences including materials, mechanics, structures, and fluid mechanics, among others.

3.    The list of cases in which I have testified over the last four years is also attached.

4.    I connection with my opinions set forth herein, I have reviewed portions of the file histories of the Rockey Patents including U.S. Patent Application Serial Nos. 912,010 filed June 2, 1978; Application Serial No. 216,989 filed December 16, 1980; Application Serial No. 702,828, filed February 19, 1985; Application Serial No. 011,335, filed February 5, 1987.

5.    I have also reviewed the Rockey Patents including all claims as well as the specification for each of the Rockey Patents.

6.    I have examined exemplar stents manufactured and sold by Cordis Corporation and Johnson & Johnson representing the accused devices, as well as the product packaging and product inserts.  Although I relied upon these devices

2

and the identified information for the purposes of my infringement analysis, I did not rely upon them in connection with my claim construction analysis.

7.      I have also reviewed various documents produced by Cordis Corporation regarding the material utilized by Cordis in all of the examined Cordis metal stent products ("Accused Products"). Based upon the documents produced by Cordis, the same material is used as the sleeve in each and every stent product sold by Cordis. This material is the Cordis Material Specification M-S013, Type 316L seamless stainless steel tubing.

8.      I have also reviewed the Expert Witness Report of Dr. Edward F. Leonard. I relied upon his report to the extent that it addressed the use of the specific medical devices at issue as well as the specific function of the Accused Products. I also relied upon his report to the extent that he provided a definition of the term "balloon."

9.      I have been advised that the Patent, its Specification and its file history are referred to as the intrinsic record.

10.      The focus of my claim construction analysis began and remained centered on the language of the claims in the Rockey Patents themselves.

11.      I understand that it is this language that the inventor chose to use to particularly point out and distinctly claim the subject matter which the inventor

3

regarded as his invention.

12.     It is my understanding that the terms used in the claims bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those words by a person skilled in the relevant art of the application of the physical sciences to the design, manufacture and function of mechanical devices.

13.     Unless compelled otherwise, each word or term in the claims is to be afforded the *full range* of its ordinary meaning as understood by persons skilled in the relevant art.

14.     I further understand that to the extent necessary, dictionaries, encyclopedias and treatises are particularly useful resources to assist in determining the ordinary and customary meaning of claim terms.  I also consulted a number of dictionaries.  These included:  Webster's Seventh New Collegiate Dictionary (1965); The Grosset Webster Dictionary (1966); Webster's Ninth New Collegiate Dictionary (1983 and 1986); Webster's New World Dictionary, Third College Edition (1988); The American Heritage Dictionary, Second College Edition (1982); The Random House College Dictionary, Revised Edition (1988); and American Heritage Dictionary of the English Language (1980)

15.     Technical dictionaries and treatises may also be a good source for

4

determining the meaning of the terms in the claims as well as the use of those terms in the patent specification and file history. In this instance, I consulted the following technical sources to determine the meaning of certain terms in the claims as well as in the specification: Strength and Structure of Engineering Materials (1966); Mechanical Behavior of Materials Second Edition (1999); Elementary Structural Mechanics (1963); Handbook of Engineering Fundamentals Third Edition (1975); and the CRC Handbook of Chemistry and Physics Seventy-seventh Edition (1996).

16. If there were any instances where the dictionary or treatise definition of a word or term included multiple definitions, some having no relation to the claimed invention, I also consulted the intrinsic record to identify which of the possible dictionary and treatise meanings of the claim terms in issue was the most consistent with the use of the words by the inventor.

If more than one dictionary or treatise definition was consistent with the use of the words in the intrinsic record, I construed the claim terms to encompass all such consistent meanings.

18. I also examined the intrinsic record to determine whether the presumption of ordinary and customary meaning was rebutted. In so doing, I looked to see if the specification used the words of the claims in a manner clearly

5

inconsistent with the ordinary meaning reflected in a dictionary definition. Had I found such an instance, which I did not, I would have rejected the inconsistent dictionary definition.

19.   I further examined the intrinsic evidence to see if the inventor, acting as his own lexicographer, clearly set forth an explicit definition of a claim term different from its ordinary meaning.

20.   I also examined the intrinsic record to determine if the inventor had expressly disavowed or disclaimed scope of coverage by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.

21.   Utilizing theses contours of claim construction, I first sought to determine the ordinary and customary meaning of the words in the claims of the Rockey Patents.

22.   It is my opinion that the words in the claims terms relative to my opinion should be given their ordinary and customary meaning. A list of those meanings or definitions is set forth in the attached List of Claim Term Definitions. To the extent necessarily in connection with my opinion, I expect to testify concerning the ordinary and customary meaning of the terms in the claims of the Rockey Patents.

23.   With respect to the claim terms which are the subject of my report and opinion, it is further my opinion that there is no evidence in the Specification or intrinsic record of an explicit definition of a claim term different from its ordinary meaning.

24.   In connection with my review of the patent file history, it is my opinion that there is no evidence of a clear, express, unambiguous disclaimer of claim scope sufficient to rebut the heavy presumption that the terms in the claims which are the subject of my opinion and report are to be given their ordinary and customary meaning.

25.   It is further my opinion that the aspect of the invention which is the subject of my report, as described in the claims, is readily understandable from the terms and words used in the claims.

26.   In reaching my conclusions regarding infringement, I utilized the Contours of Claim Construction set forth above.  A list of the ordinary and customary definitions of the relevant terms is attached hereto as Exhibit A.

27.   Claim 2 of the 1'653 Patent provides:

A method of treating an area of a body vessel, comprising the steps of:

> introducing a catheter with a collapsed inflatable balloon and a collapsed sleeve encircling the balloon on its end into the vessel at a point remote from the area to be treated;

7

manipulating the catheter axially along the vessel to cause the balloon and sleeve to enter the area to be treated;

inflating the balloon by introducing fluid under pressure into the balloon through a tube of the catheter in a manner wherein the sleeve surrounding the balloon is radially expanded towards the wall of the vessel;

providing in the sleeve a material which increases in rigidity after expansion of said balloon;

maintaining said balloon in an expanded condition in the vessel while said sleeve increases in rigidity; and

thereafter removing the balloon and catheter from the vessel and allowing the sleeve to remain in place in the area to be treated.

28.     I understand that in order to infringe the claims of a United States Patent, each element of the claim must be found in the accused device.

29.     I further understand that in order to infringe a method claim, each step of the claim must be practiced in connection with the Accused Product.

30.     Based upon my review of the accused products, as well as my review of Dr. Leonard's report, the first two elements of this claim are found in the Accused Products.

31.     As found in Dr. Leonard's report, as well as my review of the Accused Products, the instructions provide for inflating the balloon by introducing fluid under pressure into the balloon through a tube of the catheter in a manner where the

8

sleeve surrounding the balloon is radially expanded towards the wall of the vessel. A review of the Accused Product reveals radial expansion of the sleeve or stent through the inflation of the balloon.

32.    It is my opinion that the Cordis Accused Products have a material in the sleeve which increases in rigidity after expansion of the balloon. That is, the stainless steel material utilized in the stent or sleeve is strain-hardened by changing the shape and by expansion of the substance into its range of plastic deformation, between its yield strength and its ultimate strength, where the ultimate strength is greater than the yield strength, thus increasing the rigidity.

33.    Further, the balloon is maintained in an expanded condition while the sleeve increases in rigidity, in the above-described process, which is time dependent.

34.    Thereafter, the balloon is removed and the catheter is removed from the vessel and allows the sleeve and stent to remain in place in the area to be treated.

35.    Based upon my review of the products, it is clearly my opinion that based upon a review of the operation of the device, as well as the material provided in the sleeve or stent itself, that it meets every limitation of claim 2 of the patent.

9

36.    My compensation is $295.00 per hour.


Dated: June 9, 2003

George P. Widas, PE

Page 1

1

2     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF FLORIDA
3     ---------------------------------------x

4       ARLAINE & GINA ROCKEY, INC.

5                          Plaintiffs,

6            -against-

7        CORDIS CORPORATION,

8                          Defendant.

9     CASE # 02-22555-CIV
      ---------------------------------------x
10

11                      1133 Avenue of the Americas
                        New York, New York
12
                        June 21, 2003
13                      4:13 o'clock p.m.

14

15            Examination Before Trial of DR. EDWARD

16    F. LEONARD, pursuant to Notice, before Richard W.

17    Barry, a Notary Public of the State of New York.

18

19

20

21

22

23

24

25    Job No. 150101

ATTACHMENT / EXHIBIT

Page 66

Howard - Direct - Leonard

1    this one here.
2    A.   Yes.
3    Q.   Which is the patent that you are-- you
4    currently have an opinion on?
5    A.   Okay.
6    Q.   And, your opinion is that Cordis
7    infringes claim two, of this patent, correct?
8    A.   Right.
9    Q.   Turning back to your expert report, you
10   have attached to it, an exhibit A, which is a list
11   of dictionary definitions. Did you prepare that
12   list?
13   A.   No, I reviewed it, I didn't prepare it.
14   Q.   Were you involved at all in the
15   preparation of this exhibit?
16   A.   Yes. In fact, one point I in one draft
17   of this, at least, probably in this draft, I
18   created one of the definitions which we were not
19   able to find-- definition for a balloon. I think
20   subsequently we did find one.
21        But whether my little creation is here.
22        But, we had-- I had numerous long
23   distance phone conversations with Mr. Tecce who had
24   more dictionaries available to him here than I had

Page 67

Howard - Direct - Leonard

1    in Vienna.
2        And, yeah, I was certainly active in
3    this material. But Mr. Tecce drafted this and
4    certainly provided to me a large number of the
5    definitions to consider.
6    Q.   And, do you agree that the definitions
7    that are given are the appropriate definitions to
8    be used in interpreting the claims of the Rockey II
9    patent?
10   A.   Yes. In fact, the definition of
11   "balloon" here is the first sentence in the
12   definition of balloon is the definition that I felt
13   was appropriate in the case. And then,
14   subsequently we found, just a very short definition
15   of this Gosset dictionary, a rubber sack maybe
16   inflated.
17   Q.   If you can turn to paragraph 28 of your
18   report.
19   A.   Yes.
20   Q.   Also look at paragraph 29. Paragraph 28
21   states: I understand that in order to infringe the
22   claims of a United States patent, each element of
23   the claim must be found in the accused device.
24        And it goes on to say, that I further

Page 68

Howard - Direct - Leonard

1    understand that in order to infringe a method
2    claim, each step of the claim must be practiced in
3    connection with the accused product.
4        Do you see that?
5    A.   Yes.
6    Q.   Do you have any opinions on whether or
7    not the Cordis products infringe the claims if they
8    do not have exactly what is called for in the
9    claims?
10   A.   Yes, I do. I think that if they have
11   substantially, what is called for in the claims,
12   or-- that is sufficient.
13   Q.   And how would you go about determining
14   that?
15   A.   Functionally, to a large degree.
16        That is to say that using the definition
17   of a balloon, as an example, I know what a balloon
18   does and if something accomplished the same thing
19   that a balloon did, and had a physical resemblance
20   to a balloon, and could replace the balloon, but
21   with no major difference in function, I would say
22   that that was-- that that was still covered by the
23   original patent and it was infringing if you made
24   something that did that.

Page 69

Howard - Direct - Leonard

1    Q.   And where did you obtain that
2    understanding from?
3    A.   From the definitions and my knowledge of
4    the way that people speak in the field.
5    Q.   No, I'm sorry.
6        When talking about the substantial or
7    functional test that you have been talking about,
8    where did your understanding of that come from?
9    A.   It is my-- I am not sure that I
10   understand your question. Are you asking where did
11   my understanding of that sentence come from or
12   where is my understanding of what constitutes
13   function in a given case come from?
14   Q.   Well, I don't see that sentence in your
15   report, so we will get to that in a minute.
16        But, where did your understanding come
17   that if you do not have exactly what is set forth
18   in the claim, you can still infringe.
19   A.   Well, for example --
20   Q.   I am not asking for an example. You
21   have an understanding, I want to know where your
22   understanding of the law --
23   A.   One place.
24   Q.   Excuse me, if I can please finish my

Page 70

Howard - Direct - Leonard

1 question, the Court Reporter, cannot type both of
2 us at the same time.
3
4      And, if you start speaking before I
5 finish, I will not be able-- you wouldn't know what
6 my question is, and you won't be able to answer it
7 and I will have to ask it again when you are done.
8      You gave a certain understanding of the
9 law about infringement. I want to know in that
10 opinion, understanding was, that if it is not
11 exactly what is in the claim there could still be
12 an infringement. I want to know where that
13 understanding of the law came from.
14     A.   I drew it, I think in part from what I
15 thought was logical and from statements of the kind
16 that you see in the patent.
17     For example, the invention is not
18 restricted to the Slavin imitation of each and
19 every detail set forth. Devices maybe provided
20 which change, which modify and add certain specific
21 details without departing from the scope of the
22 invention.
23     Q.   As a legal matter, do you know what
24 effect that sentence has, if any, on the rights of
25 the patent?

Page 71

Howard - Direct - Leonard

1
2     A.   No, I do not.
3     Q.   Do you have any legal understanding
4 about whether or not there can be infringement if a
5 limitation is not exactly met by the accused
6 product?
7     A.   No, I don't.
8     Q.   Did you give any opinions in your report
9 about whether there can be infringement even though
10 one of the limitations was not exactly met?
11    A.   I guess I have trouble with the word
12 "exactly". Maybe it is being a professor or
13 something. I don't think there are two things that
14 are exactly identical in the world.
15    Q.   Well, in doing your infringement
16 analysis, did you go and attempt to determine what
17 the claims covered?
18    A.   Yes.
19    Q.   And, you determined that by the use of
20 the definitions that were attached as exhibit A?
21    A.   Yes.
22    Q.   And, in your opinion, if I understand
23 it, the Cordis product had each of those
24 limitations exactly as you defined them; is that
25 correct?

Page 72

Howard - Direct - Leonard

1
2     A.   I would prefer to say, within the
3 definitions that I provided, rather than exactly,
4 maybe just a syntax.
5     Q.   That is fine. I will use your-- you
6 know, so you talk about within the definitions you
7 provided?
8     A.   Yes.
9     Q.   Do you have an opinion about whether or
10 not there can be infringement even if the accused
11 product is not within the definition that you used?
12    A.   It must be within one at least of the
13 definitions that I used, yes.
14    Q.   And, do you have any opinions about
15 whether or not Cordis products infringe, if they do
16 not fall within one of the definitions you used?
17    A.   I think they then do not-- my opinion is
18 that they do not infringe.
19    Q.   What is your understanding about how the
20 Cordis stents are made?
21    A.   I don't know how the Cordis stents are
22 made.
23    Q.   Do you know what metal the Cordis stents
24 are made out of?
25    A.   They are made of 316 stainless steel.

Page 73

Howard - Direct - Leonard

1
2 316 low carbon stainless steel.
3     Q.   Would you describe your understanding of
4 a coronary stenting procedure?
5     A.   Yes.
6     One has to put in a catheter.
7     Q.   When-- just so my question is clear.
8 Can we start from the point where they make the-- I
9 guess start with how they get into the artery in
10 the first place and work from there.
11    Let's assume it is going in from the
12 femoral artery. Can you explain how it is done?
13    A.   So one has to incise the artery and put
14 in a catheter and one normally will guide, use a
15 guidewire and position the guidewire so that it
16 goes to and beyond the point where you are going to
17 place the stent.
18    And then, depending on the design of the
19 system, frequently one will use over the wire
20 system or other systems. But you will use the
21 guidewire to guide a catheter with a balloon at the
22 end of the catheter and the stent on top of the
23 balloon to the site.
24    And then -- I haven't done one in
25 awhile.

Esquire Deposition Services
1-800-944-9454

Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
 2
 3   ARLAINE & GINA ROCKEY,
     INC.,
 4       Plaintiff
 5                    vs.    Case No.
                            02-22555-CIV
 6
     CORDIS CORPORATION,
 7       Defendant
 8
                        - - - - - -
 9              June 16, 2003
                        - - - - - -
10
                 Oral Deposition of GEORGE P.
11   WIDAS, P.E., held in the law offices of
     McShea/Tecce, 1735 Market Street, 19th
12   Floor, Philadelphia, Pennsylvania 19103,
     beginning at approximately 1:12 p.m.,
13   before Ann V. Kaufmann, a Registered
     Professional Reporter, Certified
14   Realtime Reporter, Approved Reporter of
     the U.S. District Court, and a Notary
15   Public of the Commonwealth of
     Pennsylvania.
16
17                      - - - - - -
18
19
20
21
22       ESQUIRE DEPOSITION SERVICES
         1800 John F. Kennedy Boulevard
23              15th Floor
         Philadelphia, Pennsylvania  19103
24              (215) 988-9191
25
         ESQUIRE DEPOSITION SERVICES
```

ATTACHMENT / EXHIBIT 2

George P. Widas, P.E.

Page 54

1    (Below-described documents
2    marked as Cordis Exhibits 1, 2, and 3.)
3    BY MR. HOWARD:
4        Q.   Are Cordis Exhibits 1, 2,
5    and 3 the three Rockey patents that you
6    considered?
7        A.   Yes.
8        Q.   When you began working on
9    this case, were you directed to any
10   specific claims of any of these patents?
11       A.   I don't know about in the
12   start. It's possible that Claim 2 was
13   highlighted as the one that Mr. Tecce
14   was litigating.
15       Q.   You were asked to form an
16   opinion about whether or not Cordis
17   stents infringed any of the claims of at
18   least one of these patents?
19       A.   Correct.
20       Q.   When you were given that
21   assignment, were you told which claims
22   to consider?
23       A.   I was to consider
24   everything, but I understood the focus

Page 55

1    of the litigation to be Claim 2 of
2    what's referred to as Rockey 2, which is
3    the '653 1987 date of patent.
4        Q.   Let's look first at the
5    first Rockey patent. Do you have any
6    opinion on whether Cordis infringes any
7    of the claims of that patent?
8        A.   I don't know. That was not
9    an area of my study.
10       Q.   So you have no opinion one
11   way or the other?
12       A.   In other words, yes, I
13   don't know if Cordis has a product of
14   method which is a method of controlling
15   obesity.
16       Q.   And turn to the second
17   Rockey patent. You gave an opinion on
18   Claim 2 of that patent. I want to focus
19   in on Claim 1. Do you have any opinion
20   about whether or not Cordis infringes
21   that claim?
22       A.   I have no opinion on that.
23       Q.   Were you asked to form an
24   opinion on that claim?

Page 56

1        A.   No.
2        Q.   You can skip to the Cordis
3    3, third Rockey patent. Do you have any
4    opinions on whether or not Cordis
5    practices what is claimed in the Rockey
6    3 patent?
7        A.   I have no opinion.
8        Q.   In your work in patent
9    cases have you ever heard of the
10   doctrine of equivalents?
11       A.   I have heard those words.
12       Q.   Do you have any opinion on
13   whether or not Cordis infringes Claim 2
14   of the Rockey 2 patent under the
15   doctrine of equivalents?
16       A.   You would have to explain
17   it to me. I have heard the term, but I
18   wouldn't know the significance of it in
19   that context.
20       Q.   And if you don't understand
21   what it is, then I would assume
22   naturally you don't have an opinion
23   about it?
24       MR. TECCE:  Objection to the

Page 57

1    form.
2        THE WITNESS:  Not
3    necessarily. If you explained it in
4    terms that an engineer would understand,
5    I probably could answer your question.
6    BY MR. HOWARD:
7        Q.   Let's go about this a
8    different way then. You have an opinion
9    that Cordis practices Claim 2 of the
10   Rockey 2 patent; correct?
11       THE WITNESS:  Can you read
12   that back, please.
13       (The court reporter read the
14   record as follows:
15       "QUESTION: Let's go about
16   this a different way then. You have an
17   opinion that Cordis practices Claim 2 of
18   the Rockey 2 patent; correct?")
19   BY MR. HOWARD:
20       Q.   Let me strike that. It was
21   a bad question.
22       If you can turn to your
23   report in Paragraph 28; and Paragraph 28
24   says: "I understand that in order to

ESQUIRE DEPOSITION SERVICES

George P. Widas, P.E.

Page 58

```
 1    infringe the claims of United States
 2    Patent, each element of the claim must
 3    be found in the accused device."
 4        A.   Yes.
 5        Q.   That's your understanding?
 6        A.   Yes.
 7        Q.   And it is your
 8    understanding that the accused device
 9    has to have exactly what is in the
10    claim?
11        A.   Each element of the claim
12    must be found in the accused device, I
13    understand that.
14        Q.   So if the Cordis device
15    lacks one of the elements of the claim,
16    then it does not infringe; is that
17    correct?
18        A.   Yes.
19        Q.   Do you have any opinions on
20    whether or not Cordis infringes the
21    Rockey 2 patent if somebody determines
22    that Cordis does not have exactly one of
23    the elements?
24        A.   Your word "exactly" is the
```

Page 59

```
 1    only one that causes me hesitation.
 2        Q.   Okay.
 3        A.   I don't know and it is my
 4    understanding that it doesn't have to be
 5    exactly.  That it has to be what it
 6    says.
 7        Q.   Do you have an opinion if
 8    in some way Cordis can infringe Claim 2
 9    even if it does not have one of the
10    elements that is stated in the claim?
11        MR. TECCE:  Object to the
12    form.
13        THE WITNESS:  I have no such
14    understanding, that if the Cordis device
15    does not have all of the elements of the
16    claim in Rockey 2, Claim 2, that it
17    infringes.
18        I would like a short break
19    if that's okay.
20        MR. HOWARD:  Sure.
21        (Recess.)
22    BY MR. HOWARD:
23        Q.   I forgot my normal intro.
24    If at any point during the deposition
```

Page 60

```
 1    you need a break, just let me know and
 2    as soon as we finish the question ,we
 3    will head on out for one; okay?
 4        A.   Thank you.
 5        Q.   Do you know how stents are
 6    made?
 7        A.   From an engineering
 8    perspective, yes.
 9        Q.   And how is that?
10        A.   A specification is
11    developed, sent to a manufacturer,
12    components are made and assembled, the
13    device is packaged and distributed.
14        Q.   I was speaking more on the
15    actual how the metal becomes a stent or
16    how the actual stent is manufactured.
17    Are you aware of how it is?
18        A.   You mean whether it is
19    forged or cast or extruded?  I don't
20    recall from the materials exactly what
21    the manufacturing process was.
22        Q.   Do you know by what process
23    the stents are placed onto the balloon?
24        A.   Not specifically.
```

Page 61

```
 1        Q.   Do you have any general
 2    understanding of it?
 3        A.   That the stainless steel
 4    tubing that is the sleeve or sheath of
 5    the stent is pressure-fit on the polymer
 6    catheter and balloon.
 7        Q.   And do you know the
 8    process?  Do you know the process by how
 9    that's accomplished?
10        A.   Not specifically.
11        Q.   Do you know if anything is
12    further done to the stent and balloon
13    once the stent is placed on the balloon
14    to help keep it in place and prevent it
15    from moving?
16        A.   No.
17        Q.   When the stent is pressure-
18    fit, placed onto the balloon, does the
19    metal that makes up the struts of the
20    stent touch each other?
21        A.   Make the struts of the
22    stent?
23        Q.   Are you aware of the term
24    "strut" as it is used to describe
```

16 (Pages 58 to 61)

ESQUIRE DEPOSITION SERVICES

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3                    MIAMI DIVISION

 4                      * * *

 5   ARLAINE & GINA ROCKEY, INC.  :  CASE NO.
                                   :
 6         vs.                     :
                                   :  02-22555-CIV-
 7   CORDIS CORPORATION            :  ALTONAGA

 8                      * * *

 9                 JULY 11, 2003

10                      * * *

11           Oral deposition of DAVID P. POPE,

12   Ph.D., taken pursuant to notice, was held at the law

13   offices of McSHEA TECCE P.C., Mellon Bank Center,

14   14th Floor, 1735 Market Street, Philadelphia,

15   Pennsylvania 19103, beginning at 2:45 p.m., before

16   McKinley Wise, a Registered Professional Reporter

17   and an approved Reporter of the United States

18   District Court.

19

20                      * * *

21

22

23

24   Job No. 150741
```

ATTACHMENT / EXHIBIT

Page 78

1  catalyst is introduced and then it then
2  polymerizes and then it's the -- it's the rigidity
3  of that polymerized material and it's the extent
4  to which it resists collapsing back to its
5  original dimension. So that we've already talked.
6     Q.   And in that case, we were talking
7  about doing the first test of the three tests that
8  you had mentioned?
9     A.   No. I said back to its original
10  dimensions. So I would have called that the third
11  test.
12     Q.   Where you would measure the force to
13  move it back to the original stent?
14     A.   Yes.
15     Q.   Okay.
16     A.   In the case of the metallic stent,
17  the plastic deformation serves precisely the same
18  function as the polymerization. That is to say,
19  when the polymeric material is in its unmixed
20  state, it has a resistance to change of
21  essentially zero. That is to say, it's a liquid,
22  so it deforms very easily. Then when it
23  polymerizes and it becomes elastomeric, it becomes
24  .very resistant to shrinkage, and so you are

Page 79

1  comparing the resistance to shrinkage of the
2  polymerized material to the liquid.
3     In the case of the plastic material,
4  you're comparing the resistance of expansion of
5  the plastically deforming material to the
6  contraction of the now elastically deforming
7  material, and while that difference isn't the
8  difference between a liquid and a solid, it is a
9  change of resistance of some factors of hundred
10  and therefore is a huge difference in the rigidity
11  of the two.
12     Q.   Have you done anything to measure
13  that for stents?
14     A.   No.
15     Q.   Have you done any calculations on
16  that?
17     A.   Well, calculations involving simply
18  knowing the properties of the 316L stainless
19  steel, yes.
20     Q.   No. I mean as in calculations as in
21  something that's on paper where you go and figure
22  out how much force is needed to expand the
23  balloon -- the stent originally as opposed to
24  calculating how much force would be necessary to

Page 80

1  collapse an expand stent. I strike that because
2  my questions was wrong.
3     Did you do any calculations as to
4  the amount of force that would be necessary to
5  expand an unexpanded stent?
6     A.   The calculation I did was the
7  calculation to expand an unexpanded stent versus
8  the pressure necessary to contract an unexpanded
9  stent -- excuse me, contract an expanded stent.
10     Q.   Okay. And what did you -- well,
11  which specific balloon-expandable stent did you do
12  these calculations on?
13     A.   A stent in which the expansion is
14  accomplished by the deformation of 316L stainless
15  steel.
16     Q.   Did you actually do any calculations
17  for any Cordis products as to how much force would
18  be necessary to begin the expansion of an
19  unexpanded stent?
20     A.   To begin the expansion?
21     Q.   Yes.
22     A.   No.
23     Q.   Did you do any calculations for any
24  Cordis products as to how much force is required

Page 81

1  to expand a stent?
2     A.   No. I calculated the ratio of the
3  expansion versus the contraction.
4     Q.   Did you do anything to calculate for
5  any balloon-expandable stent the amount of force
6  that would be necessary to contract a stent?
7     A.   Again, only that ratio.
8     Q.   Did you examine any of the Cordis
9  documents that talks about how much force would be
10  necessary to contract a stent?
11     A.   The document that I reviewed is the
12  one or the ones in Laird's deposition exhibits.
13     Q.   And did you use the numbers from
14  those exhibits in doing your ratio?
15     A.   No.
16     Q.   Where in your report does it mention
17  you doing this calculation?
18     A.   It doesn't say that.
19     Q.   So this is something that you're
20  relying on that's not discussed in your report?
21     A.   No. The conclusion is in the report
22  and it's based on this calculation that I made.
23     Q.   I'd like to request -- the
24  calculation was done on paper?

Pages 78 to 81

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ARLAINE & GINA ROCKEY, INC.,
Plaintiff,

        CASE NO. 02-22555-CIV-
        ALTONAGA

    v.

       MAGISTRATE JUDGE BANDSTRA

CORDIS CORPORATION,
Defendant.

## EXPERT REPORT OF CAMPBELL LAIRD, PH.D.

I am submitting this expert report at the request of counsel for Cordis Corporation
("Cordis") in response to the expert reports of Edward F. Leonard and George P. Widas relating
to whether Cordis' balloon expandable stent products are covered by claim 2 of U.S. Patent No.
4,641,653 to Rockey ('1,653 patent). It is my opinion that none of Cordis' balloon expandable
stents are covered by Claim 2 of the Rockey patent. It is also my opinion that the disclosure in
Application No. 912,010 does not support claim 2 of the Rockey patent and that accordingly,
those claims are not entitled to claim a filing date in 1978 or 1980. It is also my opinion that if
construed to cover Cordis' balloon expandable stent products, then the work of Dr. Julio Palmaz
contains each and every limitation of claim 2 of the '1,653 patent and therefore that claim is
invalid.

## I. QUALIFICATIONS

I was trained at a very young age as an officer of military engineers. During my
subsequent education at Christ's College, Cambridge University, I specialized in Physics,
Chemistry and Mathematics and focused on Materials Science and Engineering, in which

ATTACHMENT / EXHIBIT

discipline I have practiced for 44 years. The focus of my research and professional activities has been fracture and deformation, especially fatigue and cyclic deformation, and the inter-relationship of these phenomena with static fracture and deformation. My curriculum vitae is attached as Exhibit A to this report.

## II.    MATERIALS RELIED UPON AND EXHIBITS TO BE USED

In reaching the conclusions stated in this report, I have relied upon my experience and training as a materials scientist. I have also considered the list of materials attached as Exhibit B to this report and any additional documents cited herein.

I reserve the right to rely upon any additional information or materials that may be provided to me, that may be relied upon by plaintiff's expert(s), or that may be developed prior to trial.

## III.    STATEMENTS OF OPINIONS TO BE EXPRESSED AND BASES THEREFORE

### A.    Principles of Materials

I expect to testify regarding the general principles of materials science, including explaining the concepts of stress and strain, elastic and plastic deformation, Hooke's law, flow stress, cold working, the Bauschinger effect, and cyclic softening. These basic principles are described in, for example, F.H. Newman & V.H.L. Searle, The General Properties of Matter (5th ed.), Michael F. Ashby & David R.H. Jones, Engineering Materials: An Introduction to the Properties and Applications, and Norman E. Dowling, Mechanical Behavior of Materials (2d ed. 1999).

Stress is defined as the ratio of the force applied to a body versus the area on which the force acts. The direction in which the force acts in relation to the body is important in differentiating the kinds of stress: If the force pulls on the area, the stress is tensile, if the force

2

presses on the area, it is compressive, and if the force acts tangential to the area, the action is termed shear stress. Stress is usually designated by the Greek letter σ.

Strain describes the deformational response of a body to a stress, and is defined as the ratio of the change in dimension to the original dimension of the body before the stress was applied. Just as with stress, there are tensile, compressive, and shear strains. All of these stresses and strains operate on Cordis' balloon expandable stents when they are crimped onto and later deformed by expansion of the balloon. Stress is usually designated by the Greek letter ε.

The relationship between stress and strain for a material is conventionally depicted on a stress-strain curve, shown below:



Source: CRD 038279

Elastic deformation is the term applied to the strain by which all bodies respond to stresses that are low in relation to the bodies' strength. In this deformation, the atoms everywhere in the body stretch (or compress) their interatomic bonds in proportion to the

3

magnitude of the stress. When the stress is relieved, the elastic deformation reverses, and the strain recovers to the original dimension of the specimen.

Plastic deformation describes the irreversible strain shown by many kinds of material after the stress reaches a certain threshold, and the strain can no longer be borne purely elastically. In this deformation, the strain applied creates dislocations, or small imperfections, in the lattice structure of the atoms in the material. These dislocations permit the atoms to slip past one another, as opposed to making small adjustments in their interatomic distances. The slipping of the atoms changes the structure of the material and creates permanent deformation. In other words, after a material has been stressed into is region of plastic deformation, when the stress is relieved, the strain does not fully recover to the original dimension of the specimen.

Hooke's law states that there is a linear relationship between stress and strain in the region of elastic deformation. The constant of proportionality is termed Young's Modulus (E) for tensile or compressive stress/strain, the Modulus of Rigidity for shear stress and strain, and the Bulk Modulus for "hydrostatic" stress and strain.

For example, in the elastic deformation region, $\sigma = E\epsilon$. This means that for a given amount of stress $\sigma$, a certain amount of strain $\epsilon$ takes place. The higher the value for the modulus E, the greater the stress that is required to strain a body in the same distance ratio in the elastic range.

Flow stress is the threshold stress for the transition from purely elastic strain to elastic plus plastic strain. Since this parameter depends on the resolution of the equipment used to measure the flow stress, it is customary to define the flow stress at some specified level of strain, often 0.2% of strain. The flow stress depends on the history of the specimen and

4

particularly on its degree of cold working.  The initial flow stress of 316L stainless steel is the same in both tension and compression.

Cold working is the term given to the increase of the flow stress produced by plastic strain.  Cold working is caused by interaction between the so-called "dislocations," or linear alterations of the crystalline structure of the body during plastic strain.  As the atoms of a body slip past one another in plastic strain, the dislocations interact.  These interactions increase the friction associated with moving the dislocations (to create further plastic strain), as well as altering the elastic interactions between them. Those mechanisms have given rise to the concept of the "friction stress" and the "back stress."  The flow stress is the sum of these stresses.

The result of cold working is that in the region of plastic deformation, increased stress is required to further deform a material in the direction of its strain.  Cold working is also referred to as stress hardening or work hardening.

The Bauschinger Effect is the term applied to the phenomenon by which a specimen, first work-hardened in tension, is subsequently stressed in compression, and shows a flow stress significantly less than that in the previous tensile stroke.  See, e.g., N.H. Polakowski & E.J. Ripling, Strength and Structure of Engineering Materials 144-46 (1966).  For example, if a bar of 316L stainless steel is plastically deformed in tension, unloaded, and then reloaded in tension, then a greater stress will be required to further plastically deform it.  However, if a bar is plastically deformed in tension, unloaded, and then reloaded in compression, less stress will be required to plastically deform the material in compression than would be required to further plastically deform the material in tension.  In addition, the stress required to deform the bar in compression will be less than if the bar had never been deformed.  This decrease in the flow stress is what is called the Bauschinger effect. The Bauschinger effect is caused by the "back"

5

stress aiding the stress applied in the opposite direction to overcome the "friction" stress of the dislocations, which does not depend on the direction of stress application.

Cyclic Softening occurs when a metallic specimen, initially deformed monotonically (that is, in one direction, e.g., tension), is subsequently stress or strain-cycled, which causes a reduction in the work-hardening of the specimen. Over many cycles of strain, both elastic and plastic, dislocations created by an initial plastic deformation have an opportunity to interact with each other and trap one another. This will result in a decreased yield stress in both tension and compression.

**B.     Claim 2 of the Rockey Patent**

It has been explained to me by counsel for Cordis that in order for a device to be covered or infringe a patent claim, it must contain each and every limitation of that claim. If one limitation is absent, then there is no infringement.

It is my opinion that claim 2 of the Rockey patent does not cover Cordis' balloon expandable stents. Cordis does not provide in a sleeve a material separate and distinct from the sleeve itself. It is also my opinion that the material of which the stent is composed does not increase in rigidity when it is plastically deformed. Even if rigidity were to be considered synonymous with the increase in flow stress associated with cold working, it is my opinion that (a) the flow stress for the operative stresses subjected to a stent when it is in the body, namely compressive stresses, is actually decreased by the tensile plastic deformation; (b) any increases in the flow stress occur during expansion of the balloon, not after or while the balloon is maintained in an expanded condition; and (c) if anything, the material will decrease in rigidity after expansion of the balloon due to a phenomenon called "cyclic softening."

6

1.    **"Providing in the sleeve a material . . ."**

It is my opinion that Cordis' balloon expandable stents do not meet the limitation "providing in the sleeve a material." In forming this opinion, I have been asked to assume that a stent is a "sleeve." It is my opinion that material is not "provided in" a stent.

In their reports, AGRI's experts define the term "provid[ing]" as meaning "supply[ing] or mak[ing] available; ... furnish[ing], supply[ing] or equip[ing]."[1] These definitions are consistent with other definitions of "providing" as meaning "supply[ing] for use," Webster's at 1827; it is synonymous with "supply[ing]" and "furnish[ing]." Id. AGRI's experts have not attempted to define the word "in." However, the word "in" "indicate[s] location or position in space or in some materially bounded object." Webster's Third at 1139.

The specification uses the phrase "providing in the sleeve a material that increases in rigidity after expansion of said balloon" in a manner that is consistent with its ordinary meaning. The specification only describes embodiments where a separate material is provided inside the sleeve. The sleeve described in the specification has "inner and outer walls 61, 62," and "[a]n interior space 63 between the walls 61, 62." Col. 6, lines 10-13. It states that the sleeve's inner and outer walls can be made of Teflon and Dacron, respectively. The specification also describes suitable materials "for filling the sleeve space 63 ...." Col. 6, lines 25. In addition, the specification states that "[p]referably, the components of the material 66 are thoroughly mixed and subsequently introduced into the sleeve space 63 just prior to the catheterization operation ...." Col. 6, lines 35-38. The specification states that "[a]nother alternative is to introduce the settable material 66, including a mixed catalyst, into the sleeve

---

[1] Ex. A to Leonard Report dated July [sic] 8, 2003, No. 9; Ex. A to Widas Report dated June 9, 2003, No. 9.

920642v3

space 63 through the tube 64 after the sleeve 51 has been manipulated into position." Col. 7, lines 7-11.

I have been asked to assume that the ordinary meaning of "providing in the sleeve a material that increases in rigidity" includes furnishing in a location in a materially bounded object (i.e., the sleeve) a material that is separate and distinct from the sleeve.

Cordis does not "provide in the sleeve a material" because it does not furnish 316L stainless steel into a previously bounded object. I have been informed that Cordis' stents are manufactured by starting with a 316L stainless steel tube. Slots are cut in the tube by electro-discharge machining or laser cutting to form the stent. The stents are then finished by electropolishing. The 316L stainless steel that composes the sleeve is not separate and distinct from the sleeve. Instead, when the sleeve is created, it already contains the material within it.

As a materials scientist, I would not refer to, and I have not heard others refer to, an object that is composed of a material as material "provided in" that object.

### 2.    ". . . which increases in rigidity . . ."

It is my opinion that Cordis' balloon expandable stents do not increase in rigidity when expanded by a balloon.

In their reports, AGRI's experts define "rigidity" as "the quality or state of being rigid." They further define the word "rigid" as: (a) deficient or void of flexibility; (b) stiff or unyielding; (c) not pliant or flexible; and (d) firmly fixed or set.

As a materials scientist, I define the stiffness of a material as is its ability to resist deformation under stress. In other words, the stiffness of a material describes how difficult it is to strain a material. The criterion for stiffness has traditionally been regarded by mechanical engineers and materials scientists as the modulus of elasticity. See, for example, an orthodox definition of stiffness given in the "Mechanics of Deformable Bodies," p. 494, in the Handbook

8

of Engineering Fundamentals by O.W. Eshbach and M. Souders, John Wiley & Sons, New York, 3rd Edition. The modulus of elasticity, as discussed earlier, describes a proportional relationship between stress and strain in the elastic region of a material's stress/strain curve.

It is my opinion that the stiffness of Cordis' balloon expandable stents does not increase upon expansion by a balloon. The changes that occur to a material during cold-working do not increase a body's resistance to deformation under stress. The elastic modulus is not altered by plastic deformation. Instead, what is increased is the flow stress, or the amount of stress required to cause additional permanent deformation. After a material is plastically deformed and unloaded, although greater force will be required than before plastic deformation to continue permanent deformation, the stress-strain curve follows the same slope as before the deformation. See, e.g., James M. Gere, Mechanics of Materials (5th ed. 2001), pp. 21-22. My own experience with 316L stainless steel has shown this to be true. Accordingly, the changes to the material of the stent in cold-working do not affect the stent's stiffness. Using that definition of rigidity, the stent's material does not increase in rigidity as a result of the expansion of the stent.

As a materials scientist, I also consider "rigidity" to mean the rigidity modulus of a material. Standard dictionaries of the English language also define it as such. Webster's Third at 1957. As mentioned above, the rigidity modulus is the proportion of stress to strain required for elongation in shear in the elastic region of the stress/strain curve.

I think this definition is particularly appropriate to apply in this instance. In the '1,653 patent, Dr. Rockey describes supplying a "fluid plastic material," such as Silastic 382, into the expanded sleeve. This materials then sets into a semirigid state. 6:22-24; 6:26; 6:53-54. Fluids cannot sustain tangential stress and therefore have a rigidity modulus of zero. Newman

9

and Searle, <u>The General Properties of Matter</u>, at 143.  After the fluid Silastic has polymerized, it is a rubbery material and is highly elastic.  In other words, after the material is set, it has a rigidity modulus greater than zero.  Rockey thus describes a material whose rigidity modulus increases after expansion of the balloon (the same is true with regards to the elastic modulus).

Using this definition of rigidity, Cordis' stents are not covered by the Rockey patent.  The rigidity modulus of 316L stainless steel does not increase either during manufacture or during or after deployment of the stent.  Indeed, Mr. Widas agreed at his deposition that the rigidity modulus of 316L does not change.  Widas Tr. 83.

It is also my opinion that any work hardening [or cold working] of the stents during expansion does not increase their rigidity.

I understand from the expert report of Dr. Puma, and from reading the specification of the '1,653 patent, that one of the purposes of a stent and of Dr. Rockey's invention is to is to support the vessel wall after expansion.  Dr. Rockey teaches that the increase in rigidity of his method is intended to prevent collapse of the vessel. 6:60-62.  Accordingly, the important stress to resist is a compressive radial stress.

The changes in the material in a 316L stent do not increase either the material or the stent's ability to withstand compressive force; in fact the opposite is true.  After a material has been cold worked, or expanded beyond its flow stress, in a positive or elongate direction, less stress is required to compress the material for any strain than was required before the positive deformation.  In other words, after a material has been elongated and strain hardened, it will be easier to compress the material than it was prior to the work hardening.  As described earlier, this effect is known as the Bauschinger effect.

10

Tests performed at my direction confirm that this effect is operative in 316L stainless steel. To test the operation of the Bauschinger effect, I directed that a 316L stainless steel bar be placed under compression and tension to simulate the effects on a stent in its manufacturing and deployment process. I understand from discussions with an engineer for Cordis, David Majercak, that after a stent is cut from a tube and polished, it is crimped onto an angioplasty balloon. For example, the six-cell Bx Velocity stent is cut from a tube with a diameter of .058" and is then crimped onto the balloon to a diameter of approximately .042". After the stent is crimped onto the balloon, it undergoes a nesting process, during which heat of approximately 100° C is applied. When the stent is delivered to an artery, it is expanded radially by the balloon. To prepare my protocol, I also reviewed photographs of the unexpanded and expanded Bx Velocity stents provided in the Handbook of Coronary Stents, 4th Ed.

I directed that a bar of 316L stainless steel be first deformed in compression by 10% to simulate the crimping process. After five minutes of rest, the rod was then deformed in tension by 30% to simulate deployment in the artery. The rod was then subjected to a compressive force sufficient to determine its flow stress. The result of this test (termed "Test 1") was that the yield stress after compression was less than the yield stress of the compressive stroke. In addition, less stress was required to deform the bar to a strain in compression after the tensile stroke as compared to the stress previously measured at the onset of tension.

I repeated this procedure but added one element to the protocol. The bar was submersed in 100° C water after the initial compression to mimic the heat setting process in nesting. The bar was then left overnight and expanded and compressed in the same way as described above. The results of this test (termed "Test 2") were not significantly different from the test that did not include the heating procedure, and the Bauschinger effect was also operative.

11

920642v3

Three graphs showing the results for Tests 1 and 2 separately and for Tests 1 and 2 superimposed are attached as Exhibit M.

Mr. Widas appears to have equated an increase in rigidity with work hardening and has concluded that because the stainless steel material composing the stent may work harden, the material increases in rigidity. Widas Expert Report ¶ 32, Widas Tr. 133. For the reasons stated above, I disagree with this opinion.

Additionally, as shown in the slope of the stress-strain curve for 316 L stainless steel, when a material enters the range of plastic deformation, a smaller increase in stress is required to cause a deformation than is required in the elastic region. See also Dowling, Mechanical Behavior of Materials, p.3. Thus, in the plastic range, it becomes relatively easier to increase the deformation of a material than in the elastic region.

Dr. Leonard additionally argues that the stents increase in rigidity after expansion of the balloon due to "reorientation of [the stent's] elements with respect to each other from an initial, predominantly axial orientation to a final, more circumferential position." Leonard ¶ 33. He opines that the reorientation "stiffens the stents and enables it to resist compressive stresses that tend to collapse it." Id. Dr. Leonard has stated that the differences in the specific geometries and lengths of Cordis' stents do not affect his opinion in this regard. Leonard Tr. 80.

If this were the case, I would expect, and Dr. Leonard opined, Leonard Tr. 204-205, that increases in stent diameter would increase the stent's ability to withstand radial collapse. However, Cordis' own tests demonstrate that for the Palmaz Genesis stent, it is increasingly less resistant to radial collapse at larger expansion diameters. CRD 078759 - CRD 078760, CRD068633 - CRD068636, CRD068655 - CRD068656, CRD069512, CRD069516, CRD069320, CRD078419-CRD078423. This phenomenon has been demonstrated to a degree

12

of statistical confidence. CRD078416-CRD078424. The same phenomenon is observed for the Palmaz, CRD023238 - CRD023239, Palmaz Schatz, CRD030404 & CRD192311, Corinthian IQ, CRD068997, and Crown, CRD153799, stents.

Accordingly, neither the material of which a Cordis stent is composed, nor the stent as a whole, increases in rigidity after expansion of the balloon, because it is easier, not more difficult, to compress the material and the stent after expansion.

3.  " . . . after expansion of the balloon"; "Maintaining said balloon in an expanded condition . . . while said sleeve increases in rigidity"

Even if the changes in the material due to plastic deformation are interpreted as an increase in its "rigidity," it is my opinion that Claim 2 does not cover Cordis' balloon expandable stents because those changes occur during expansion of the balloon. Accordingly, Cordis' balloon expandable stents do not increase in rigidity "after expansion of the balloon" or "while the balloon is maintained in an expanded condition." For the purposes of my opinion, I have been asked to assume that "after expansion" means after the expansion of the balloon is complete.[2] I have also been asked to assume that "maintaining" means "to keep in an existing state" and that "maintaining said balloon in an expanded condition" means to keep the balloon inflated at a constant pressure after the balloon has finished expansion.

Well-established principles of work-hardening suggests that there would be no work hardening except when the balloon is being expanded. In 316L stainless steel, increasing force must be applied to a body to multiply the dislocations in the material and increase the material's flow stress. The only radially outward force applied to Cordis' stents is supplied by

---

[2] Mr. Widas and Dr. Leonard do not define "after." Webster's Third defines it as "following in time or place: afterward." Mr. Widas and Dr. Leonard define "expansion" as "the act or process of expanding" and "the quality or state of being expanded."

13

the balloon. Once the balloon stops increasing in size, there is no increase in the amount of force applied and there will be no increase in work hardening.

I understand that Mr. Widas postulates that there is an "infinitesimal amount of time" after expansion of the balloon in which the stent work hardens, resulting from the fact that the materials used are "real" and not "ideal." Mr. Widas's contention is not supported by any recognized theory or test results. I am aware of no publications discussing or measuring this infinitesimal amount of time. Nor has Mr. Widas conducted any tests of his own to confirm this hypothesis. Widas Tr. 131. Mr. Widas himself has stated that this effect is not measurable. Widas Tr. 122-125.

To the extent that Mr. Widas relies on the concept of strain aging, as discussed on Polakowski & Ripling, Strength and Structure of Materials, at 191, see Widas Tr. 126, that phenomenon certainly does not occur in an infinitesimal amount of time and further is insignificant for 316L at body temperature. See the papers listed in # 22 in exhibit B and, for example, Figure 2 from Kim et. al (1998) (reproduced below). Additionally, the results of the tests performed at my direction described above also confirm that strain aging is not operative in the conditions in which Cordis' balloon expandable stents are manufactured and delivered into a body vessel.

14



*Figure 2* Typical flow curves of the N01 sample tested at a strain rate of 2 × 10⁻³ s⁻¹ and temperatures of (a) R.T., (b) 373 K, (c) 473 K, (d) 573 K, (e) 673 K, (f) 773 K, (g) 883 K and (h) 973 K.

To the extent that Mr. Widas relies on the concept of creep, as discussed on Polakowski & Ripling, <u>Strength and Structure of Materials</u>, at 205, see Widas Tr. 207, this phenomenon is nonexistent in 316L stainless steel at body temperature. Creep refers to deformation that may occur over time during the application of a constant stress. Creep is highly temperature dependent, usually only occurring at temperatures that are roughly 50% of the melting temperature of the material. Body temperatures are a very small fraction of the melting temperature of 316L stainless steel and thus creep is not operative in the conditions under which Cordis' stents are implanted. See also Polakowski & Ripling at 427-28 ("In many practical cases the time scale exerts such a modest effect that it can be ignored, e.g., in stainless steel at room temperatures.")

15

920642v3

## C.    Reverse Doctrine of Equivalents

I have also been informed by counsel for Cordis that even if a device may literally contain all of the elements of a claim, it may still not be covered by that claim if the device performs the function of the invention in a substantially different way.  It is my opinion that if the plastic deformation of Cordis' balloon expandable stents is found to literally meet the limitations of "providing in the sleeve a material which increases in rigidity after expansion of the balloon" and "maintaining said balloon in an expanded condition . . . while said sleeve increases in rigidity," they would do so in a substantially different way from the from the invention disclosed and described in the '1,653 patent.

The '1,653 patent describes providing in a separate and distinct sleeve a polymeric substance that then hardens within the sleeve over time.  The material within Cordis' stents is provided in a substantially different way, by being cut from a pre-existing stainless steel tube by either laser cutting or electro-discharge machining.

The '1,653 patent describes a material that increases in rigidity by the setting of a substance such as Silastic 382 from a liquid to a solid.  This is an entirely different process than the plastic deformation of 316L stainless steel.  The setting of Silastic 382 results from a chemical reaction between a catalyst added to the basic polymer to produce polymerization and an elastomeric solid.  In contrast, cold working results from the physical interaction of dislocations without creating any changes in overall chemical composition or crystal structure in the 316L stainless steel.  Moreover, any increase in rigidity that is alleged to result from the geometric reorientation of the slots in the stent is an entirely different phenomenon from that which is described in the Rockey patents.

16

The '1,653 patent also describes a sleeve that increases in rigidity after the balloon has been fully expanded.  As discussed above, Cordis' stents behave in a substantially different way because the changes that occur to the 316L stainless steel are coterminous with the expansion of the balloon and do not occur after expansion is complete.

Thus, it is my opinion that if claim 2 of the '1,653 patent is construed to cover Cordis' balloon expandable stents, then those stents perform the function of claim 2, to increase in rigidity, in an entirely different way from the invention disclosed and described in the '1,653 patent, and Cordis' stents are not covered by Claim 2 of that patent.

### D.    Dr. Rockey's U.S. Patent No. 4,641,653 Does Not Enjoy the Benefit of a 1978 or 1980 Filing Date

I also have been asked to consider the priority date for Dr. Rockey's U.S. Patent No. 4,641,653.

The application for the '653 patent was filed on Feb. 19, 1985 as a continuation-in-part of Application Serial No. 216,989 (the '989 application), which was filed on Dec. 16, 1980 and issued in 1985 as the '264 patent.  The '989 application in turn was filed as a continuation of Application Serial No. 912,010 (the '010 application), which was filed on June 2, 1978 and later abandoned.

It has been explained to me that in order for a patent claim to be entitled to the priority date of an earlier-filed application from which the patent descends, each and every limitation of the claim must have been present in the earlier application.  Accordingly, in order for claim 2 of Dr. Rockey's '1,653 patent to enjoy the benefit of the '989 application's 1980 filing date or the '010 application's 1978 filing date, the '989 and/or '010 applications must have disclosed every limitation of claim 2.  With that understanding in mind, I reviewed the '989

17

application and the '010 application to consider whether they disclose every limitation of claim 2 of the '1,653 patent.

It is my conclusion based on that review that neither of those applications disclose every limitation of claim 2 of the '1,653 patent. The claims of the '1,653 patent are addressed to a method of treating a body passageway that involves, *inter alia*, the steps of introducing a "catheter with a collapsed balloon" into the vessel to be treated and thereafter "removing the balloon and catheter from the vessel." Dr. Rockey's '989 and '010 applications do not disclose these steps. They do not disclose a catheter with a collapsed balloon that is both introduced and later removed from the body, as recited in claim 2 of the '1,653 patent.

The method of Claim 2 also requires the step of providing in a sleeve a material that "increases in rigidity after expansion" of a balloon. Dr. Rockey's '989 and '010 applications do not disclose this step. The applications nowhere disclose a material that increases in rigidity after expansion of the balloon, as required by claim 2 of the '1,653 patent.

It is therefore my conclusion that claim 2 of the '1,653 patent is not entitled to the benefit of the 1980 filing date of the '989 application or the 1978 filing date of the '010 application.

E.    **If Construed to Cover Cordis' Balloon-Expandable Stents, Claim 2 of the '1,653 Patent is Invalid Because it is Anticipated by the Work of Dr. Palmaz**

Counsel for Cordis has explained to me that in order for an invention to anticipate a patent claim, it must contain each and every limitation of the claimed invention in a single reference. It is my opinion that if claim 2 of the '1,653 is construed to cover Cordis' balloon expandable stents, then the work of Dr. Palmaz, as described in Palmaz, et al., Expandable Intraluminal Graft: A Preliminary Study, Radiology 1985; 156: 73-77 and in U.S. Patent No. 4,733,665 to Palmaz contains each and every limitation of claim 2 of the '1,653 patent, and

18

therefore that claim is invalid. For the purposes of this conclusion, I have been asked to assume that the work of Dr. Julio Palmaz is prior art to the '1,653 patent. I have no opinion on whether that work is prior art to the '1,653 patent.

I have included the language of claim 2 here:

*2. A method of treating an area of a body vessel, comprising the steps of:*

*introducing a catheter with a collapsed inflatable balloon and a collapsed sleeve encircling the balloon on its end into the vessel at a point remote from the area to be treated;*

*manipulating the catheter axially along the vessel to cause the balloon and sleeve to enter the area to be treated;*

*inflating the balloon by introducing fluid under pressure into the balloon through a tube of the catheter in a manner wherein the sleeve surrounding the balloon is radially expanded towards the wall of the vessel;*

*providing in the sleeve a material which increases in rigidity after expansion of said balloon;*

*maintaining said balloon in an expanded condition in the vessel while said sleeve increases in rigidity;*

*and thereafter removing the balloon and catheter from the vessel and allowing the sleeve to remain in place in the area to be treated.*

I understand from the report of Dr. Puma that if the method of claim 2 is construed to cover Cordis' balloon expandable stents, then the work of Dr. Palmaz is a method of treating a body vessel comprising the steps of introducing a catheter with a collapsed inflatable balloon as claimed, manipulating the catheter as claimed, inflating the balloon as claimed, and removing the balloon as claimed.

As discussed above, it is my opinion that the Cordis' stents are not covered by Claim 2 of the '1,653 patent. However, if claim 2 was construed so broadly as to cover the Cordis' balloon-expandable stents, then it is my opinion that the elements of claim 2 related to rigidity would be met by Dr. Palmaz's early work with stents.

19

I have been told that Dr. Palmaz made a wire mesh stent which is described in Palmaz, et al., Expandable Intraluminal Graft: A Preliminary Study, Radiology 1985; 156: 73-77 and in U.S. Patent No. 4,733,665 to Palmaz. I also understand that Dr. Palmaz made a second embodiment of his invention, a slotted tube, depicted in Figures 2a and 2b of the '665 patent and Palmaz et al., Atherosclerotic Rabbit Aortas: Expandable Intraluminal Grafting, Radiology, September 1986, Vol. 160, No. 3, pp- 723-726.

It is my opinion that if the claims of the Rockey patent are construed to cover Cordis' balloon expandable stents, then the work of Dr. Palmaz, as described in these publications, anticipates the claim elements of the '1,653 patent on which I have opined in this report.

The 1985 Palmaz article describes a mesh graft that is "made of continuous, woven, stainless steel wire" with cross points that are soldered with silver. Id. at 73. The article also explains that "after maximal inflation, the balloon can immediately be deflated because the mesh opposed elastic recoil." Id. at 75.

This graft disclosed in the 1985 Palmaz article as well as the slotted tube embodiment described in the 1986 Palmaz article would undergo plastic deformation and stress hardening in the same way as Cordis' currently sold balloon expandable stents. Dr. Palmaz described a wire mesh stent composed of a material whose flow stress is less than its ultimate stress and which would undergo plastic deformation upon expansion of the balloon described in the article. The slotted tube design was made of stainless steel and would undergo plastic deformation and work hardening in the same way as Cordis' currently sold balloon expandable stents. They also undergo the same type of geometric changes relied upon by Dr. Leonard for his opinion that the Cordis stents increase in rigidity. The struts of the wire mesh and slotted

20

tube embodiments would reorient to a more circumferential position when expanded.  See, e.g.
'665 patent Figs. 1B & 2B.

Accordingly, assuming that the work of Dr. Palmaz is prior art, if Claim 2 is construed to cover Cordis' balloon expandable stents, then the work of Dr. Palmaz discloses each and every limitation of that claim in a single reference, and claim 2 is invalid.

## IV.    COMPENSATION

I am compensated at the rates of $300 per hour for investigation in my office; $325 per hour for investigation out of my office; and $350 per hour for time spent in deposition or trial testimony.  Expenses are charged at cost.

## V.    LIST OF OTHER CASES

A list of cases in which I have testified as an expert at trial or by deposition within the last four years is attached to this report as Exhibit C.

Dated: June 30, 2003

Campbell Laird, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

PLAINTIFF'S DEPOSITION
EXHIBIT
1  Puma
7/2/03
PENGAD-Bayonne, N.J.

ARLAINE & GINA ROCKEY, INC.,    )
    )
    Plaintiff,    )
    )
    v.    )    Case No. 02-22555-CIV
    )
CORDIS CORPORATION,    )
    )
    Defendant.    )

## EXPERT REPORT OF JOSEPH A. PUMA, D.O.

I am submitting this expert report in the above action on behalf of Cordis
Corporation ("Cordis").

I.    **Qualifications**

I am an interventional cardiologist practicing in Winston-Salem, North
Carolina. I have been using balloon-expandable stents such as the Palmaz-Schatz stent
for almost a decade. I conduct at least 200-400 stenting procedures per year. A copy of
my *curriculum vitae* is attached to this report as Exhibit A.

II.    **Materials Relied Upon**

In reaching the conclusions stated in this report, I have relied upon my
knowledge and experience as an interventional cardiologist, including my experience
with Cordis' balloon-expandable stents such as the BX Velocity stent and the Palmaz-
Schatz stent. I have also considered the following materials:

    a.     U.S. Patent No. 4,501,264 (Rockey) (the '264 patent).

    b.     U.S. Patent No. 4,641,653 (Rockey) (the '1,653 patent).

    c.     U.S. Patent No. 4,763,653 (Rockey) (the '3,653 patent).

    d.     The file histories of the Rockey patents.



ATTACHMENT / EXHIBIT A

   e.  U.S. Patent Nos. 4,733,665 (Palmaz) and 4,739,762 (Palmaz).

   f.  <u>Webster's Third New International Dictionary</u> (1993) (excerpts discussed below).

   g.  Serruys, et al., *A comparison of balloon-expandable-stent implantation with balloon angioplasty in patients with coronary artery disease,* New Engl.J.Med. 331:489-495 (1994).

   h.  Fischman, et al., *A randomized comparison of coronary-stent placement and balloon angioplasty in the treatment of coronary artery disease*, New Engl.J.Med. 331:496-501 (1994).

   i.  Roubin et al., <u>Interventional Cardiology Medicine, Principles and Practice</u> (excerpts).

   j.  Herrmann et al., <u>Clinical Use of the Palmaz Schatz Intracoronary Stent</u> (excerpts).

   k.  Sigwart, Endoluminal Stenting; J.B. Kutryk and P. Serruys, <u>Coronary Stenting: Current Perspectives</u> (1999) (excerpts).

   l.  Ruygrok and Serruys, *From Bench to Bedside, Intracoronary Stenting, From Concept to Custom*, Circulation 1994:882-890 (1994).

   m.  Cordis' stents and photographs of Cordis' stents.

   n.  "10 Patents that Changed the World," <u>IP Worldwide</u> (August 2002) at 26-36.

I have also reviewed and considered the Expert Reports of George P. Widas and Edward F. Leonard, which have been submitted on behalf of the plaintiff in this case.

- 2 -

I reserve the right to rely upon any additional information or materials that me be provided to me or that may be relied upon by plaintiff's expert(s) or developed prior to trial.

**III.**   **Summary of Opinions to be Expressed and Bases for Those Opinions**

    **A.**   **Background**

        **1.**   **Treatment of Ischemic Heart Disease**

Ischemia is localized tissue hypoxia due to obstruction of the inflow of arterial blood. Ischemic heart disease is cardiac heart disease resulting from ischemia of the heart muscle. It is caused by the narrowing (stenosis) of the coronary arteries due to a build-up of fatty deposits (or plaque), which may subsequently become calcified and harden. This process is called atherosclerosis. Stenosis occurs progressively over long periods of time and can lead to complete or partial occlusion of the coronary arteries. This prevents the normal flow of blood to cardiac muscle, and may eventually result in chest pain (angina) and, more seriously, heart attack (myocardial infarction).

For many decades, ischemic heart disease has been the major cause of death in Europe and the United States.

        **2.**   **CABG**

Until 1977, there were only two treatments for ischemic heart disease: surgical coronary artery bypass grafting (discussed below), and drug therapy (which is not discussed further in this Report).

Surgery usually took (and takes) the form of open heart coronary artery bypass grafting (CABG). In this operation, a graft is sutured across the site of the occlusion, providing an alternative pathway for blood flow. The graft usually consists of a blood vessel taken from another part of the body, preferably an artery rather than a vein.

- 3 -

This procedure is major surgery. It is costly and involves general anesthesia and major trauma for the patient.

     3.     **PTCA**

An important development in the treatment of ischemic heart diseases was percutaneous transluminal coronary angioplasty (PTCA). This procedure, which was first performed by Dr. Andreas Grüntzig in 1977, involved the introduction under X-ray control of a small, deflated balloon inserted peripherally through a catheter and guided through the circulatory system and into the diseased portion of the coronary artery. Once in place, the balloon was inflated. This forced open the occluded artery, primarily by pushing back the plaque and by a non-elastic deformation of the arterial wall. The balloon was then deflated and removed. Although some elastic recoil of the arterial wall was common, the patency of the lumen was generally improved. PTCA usually improved stenosed coronary arteries, but is often associated with serious complications: acute occlusion and restenosis.

Occlusion (partial or complete blocking of the lumen) sometimes occurs immediately after an angioplasty procedure is performed, due to tearing of the endothelium (the lining of the artery) and consequent dissection (or separation of a portion of the endothelium from the underlying muscle). Blood is then able to enter between these layers, and in extreme cases a flap of endothelium is produced which could block off the coronary artery completely, requiring immediate surgical intervention. Because of the risk of acute occlusion, a surgical team has to be on hand whenever this procedure is performed, entailing extra expense and tying up valuable resources.

The other major complication associated with PTCA procedures is restenosis. Restenosis is a gradual re-narrowing of the lumen at the site of a PTCA

- 4 -

916972v1

procedure. This takes place over a period of several months and is caused by a combination of elastic recoil, remodeling and ingrowth of the smooth muscle cells. It has been reported that restenosis occurs within 6 months in about 25%-50% of cases following PTCA.

The general view, therefore, was that PTCA had some benefit, but that it carried a significant risk and a high complication rate, and consequently increased expense (due to the need for surgical back-up and repeat procedures) and that developments in treatment were highly desirable.

4.    **Early Work with Stents**

In the 1960s, Dr. Charles Dotter tried implanting simple metal spirals in animal arteries. This work was plagued with complications, particularly thrombosis, and was not pursued. See the introductory paragraphs of Ruygrok and Serruys, *From Bench to Bedside, Intracoronary Stenting, From Concept to Custom*, Circulation 1994:882-890 (1994).

In the 1970s and 1980s, several researchers experimented with different expandable stent designs to treat obstructions within body passageways. These devices can be divided into two basic categories: self-expanding stents and Dr. Palmaz's concept of a controllably expandable stent.

a.    **Self-expanding stents**

Several designs for self-expanding stent were proposed. Dr. Cesare Gianturco and researchers working with him experimented with a zig-zag or Z-stent design. This design featured a metal wire that was bent to form a spring-type tubular zig-zag pattern that sprung open and expanded upon release from the delivery catheter.

- 5 -

Another early self-expanding design, the Wallstent, was constructed of an elastic woven wire mesh. The Wallstent effectively acted as a spring pressed together and held in an elongated tubular conformation by a membrane (acting as a sheath). When the membrane is withdrawn the stent opens.

For both of these designs the correct size of stent must be selected in advance. If the stent used is incorrectly sized it will be ineffective and dangerous to the patient. An undersized stent will not embed against the body passageway and could migrate. If the stent is too large it may damage or even rupture the wall of the body passageway when released.

A number of the Wallstent devices were implanted in humans in Europe in the mid-1980s. An open-ended feasibility study was begun to assess the Wallstent. The results in 105 patients were summarized by Serruys and a co-author in a later article: "[T]he results were daunting, with complete occlusion of 27 stents occurring in 25 patients, resulting in controversy and a diversity of anticoagulation regiments." Serruys, *From Bench to Bedside, Intracoronary Stenting, From Concept to Custom*, p. 883. The Wallstent is still occasionally used, but few other self-expanding stents have ever been put on the market for coronary artery use.

An alternative type of self-expanding stent was the temporary stent, which was removed hours or days after implantation. Several designs were proposed in 1980s and early 1990s, including stents made of memory metal. In general terms, memory metals function by taking two different shapes at specified temperatures. The expanded dimension of these stents, like the other self-expanding stents, cannot be controlled once they have been manufactured. Although procedural successes were reported, this concept

- 6 -

was not taken forward by clinical practitioners, due to a high rate of complications and a lack of demonstrable benefit to patients.

### b.   Dr. Palmaz's Controllable, Plastically Deformable Stent Designs

Dr. Julio Palmaz recognized the inherent limitations and dangers of the self-expanding stent designs and proposed a controllable, plastically deformable stent that could be used to treat existing or threatened obstruction within a body passageway. Dr. Palmaz also recognized that his new concept of stent design could be combined with conventional balloon angioplasty to both dilate and support a narrowed blood vessel in a single procedure. Dr. Palmaz's preferred embodiment was initially a woven wire mesh design. Later, he developed a different design with uniform wall thickness and slots formed in the stent's wall surface bounded completely or partly by metal that is integrally formed. Both of these designs were fundamentally different from those proposed by other teams in that they were not self-expanding, but expanded under radial outward pressure applied by inflation of an angioplasty balloon within the stent. Moreover, both the woven wire mesh and the slotted tube design deformed plastically in response to this pressure and retained their expanded dimensions.

The balloon-expandable stents developed by Dr. Palmaz have great advantages over prior designs. Prior self-expanding stents could migrate if their predetermined expanded diameter was too small or they could cause damage to an artery wall if their predetermined expanded diameter was too large. In contrast, Dr. Palmaz's balloon-expandable stents could be expanded to the extent desired by the physician. Moreover, self-expanding stents could continue to expand after being put in place. In

- 7 -

contrast, Dr. Palmaz's balloon-expandable stents undergo plastic deformation upon expansion and then remain constant in diameter.

The stents shown in Dr. Palmaz's '665 patent have openings in their wall surface. These openings are advantageous for several reasons. First, the openings allow the cells in the artery wall to have access to the bloodstream for nutrients. If these openings were not present, the cells would be deprived of that nutrient source, leading to cell necrosis. In addition, the cells of the vessel wall can grow through the openings and cover the stent's metal surface, a process called endothelialization. This reduces the risk of thrombosis. If these openings were not present, endotheliazation could not occur and there would be a greater danger of thrombosis. This concern was raised by at least two of the people or companies that AGRI approached about a possible license in the Rockey patent. See AGR1209-10 (setting forth JJIS' comments) and AGR1280-87 at 1282; AGR1242 (setting forth Dr. King's comments).

The stent described Dr. Palmaz's patents were pioneering inventions. They changed the way cardiology and other medical fields are practiced.

## 5.    Early Skepticism Concerning Stents

The early proponents of the use of stents in cardiology faced considerable skepticism and even overt criticism. It was well-known that metal is inherently thrombogenic and it was thought that the permanent placement of metal devices inside coronary arteries was unjustifiably dangerous. These fears were further reinforced by the earlier disastrous experience with prosthetic materials used for CABG. This attitude continued into the early 1990s among some commentators and contributed to great skepticism about the use of metal stents to treat coronary artery disease. For example, an article published in The New England Journal of Medicine in 1991 predicted that "these

- 8 -

new devices will be of passing interest only.  The development of mechanical

interventions (such as stents) that attempt to overcome the response to injury caused by

intravascular therapeutic interventions (such as balloon angioplasty) is probably futile."

P.C. Block, *Coronary-artery stents and other endoluminal devices*, New Engl.J.Med.

324:52-3 (1991).  In the context of this skepticism, stents were not generally accepted

until the early- to mid-1990s.

### 6.      The STRESS and BENESTENT Trials

In the 1990s, two major, randomized clinical trials — the BENESTENT

and the STRESS trials — were conducted to assess the effectiveness of the Palmaz-

Schatz stent in comparison with simple balloon coronary angioplasty.  These studies were

conducted at multiple centers and on large numbers of patients.  The STRESS study was

conducted in the United States; the BENESTENT study was conducted in Europe.  I

participated in the STRESS study while working as an attending cardiologist at the Duke

University Medical Center.

The results of the BENESTENT and STRESS trials were published in

August 1994 in The New England Journal of Medicine.  See Serruys, et al., *A*

*comparison of balloon-expandable-stent implantation with balloon angioplasty in*

*patients with coronary artery disease,* New Engl.J.Med. 331:489-495 (1994); Fischman,

et al., *A randomized comparison of coronary-stent placement and balloon angioplasty in*

*the treatment of coronary artery disease*, New Engl.J.Med. 331:496-501 (1994).  These

studies showed that the Palmaz-Schatz stent significantly reduced the rate of restenosis

by 25-30% as compared to PTCA and also significantly reduced the need for subsequent

revascularization.  In addition, the Palmaz-Schatz stent was shown to significantly reduce

the need for emergency surgical procedures due to acute occlusion.

- 9 -

### 7.     The Eventual Acceptance of Balloon-Expandable Stents

After the STRESS and BENESTENT trials demonstrated the efficacy of the Palmaz-Schatz stent, a "frenzy of activity ... pervaded the stent development industry." Ruygrok, et al., *From Bench to Bedside, Intracoronary Stenting, From Concept to Custom*, Circulation 1994:882-890 at 886 (1994). Researchers and medical device companies hurried to bring balloon-expandable stents to the market. In addition, cardiologists came to accept the use of balloon-expandable stents as an effective method of treating coronary artery disease. Today, balloon-expandable stents are used in at least 80% of coronary angioplasty treatments.

### 8.     Drug Eluting Stents

Drug-eluting stents are coated with polymers that contains a drug which is eluted after the stent is implanted. Cordis' drug-eluting stent, the Cypher stent, was the first drug-eluting stent approved by the FDA. It was introduced in the United States in April 2003. I am familiar with and use the Cypher stent and I have used it in my practice.

Clinical trials show that the Cypher stent's drug elution properties significantly reduce the rate of restenosis as compared to prior, "bare" stents. See Morice, et al., *A Randomized Comparison of a Sirolimus-Eluting Stent with a standard Stent for Coronary Revascularization*, N. Engl. J. Med. 346:1773 (2002). As such, the Cypher stent represents a significant breakthrough over prior, bare metal stents.

### 9.     Use of Cordis' Balloon-expandable Stents

In my testimony, I may describe how interventional cardiologists use Cordis' balloon expandable stents in treating patients. Among other things, I may explain that Cordis' balloon expandable stents are delivered to the body passageway to be treated by catheter delivery from an incision in a remote location, such as the femoral artery.

- 10 -

916972v1

Prior to insertion of the stent, the area to be treated may be expanded by an angioplasty balloon. Alternatively, the physician may insert the stent without predilating. The stent is threaded through the body passageways along a guidewire to the desired location. As the treating physician is doing this, the patient is under fluoroscopy and the treating physician is watching the procedure on a monitor in the operating room.

Once the stent reaches the desired location, the physician inflates the balloon on which the stent is mounted. Once the stent is in place and the balloon is fully expanded, the balloon is deflated and withdrawn, leaving the stent in place in the desired location. My practice, which I believe to be typical, is to allow approximately 30 seconds to elapse from the time I begin inflating the balloon until the time the balloon is deflated and withdrawn.

**B. Cordis' Balloon-expandable Stents are Not Covered by the Claims of the Rockey Patents**

I have used Cordis' Cypher, BX Velocity, BX Sonic, BX Velocity Hepacoat, BX Sonic Hepacoat and Palmaz-Schatz stents in numerous stenting procedures, and I have read descriptions of those stents in Cordis' marketing literature. Cordis' Cypher stent was introduced in April 2003 and I am using it increasingly in my practice. I am familiar with these stents and how they are used. I have also examined other Cordis balloon-expandable stents, including the Palmaz stent, the Crown, the MiniCrown, the Crossflex LC, the Corinthian, the Corinthian IQ, the Perflex, and the Genesis stent. Attached as Exhibit B to this Report are photographs of several of these stents mounted on the balloons on which they are sold.

It is my opinion that Cordis' balloon-expandable stents are not covered by any claim of the Rockey patents. I reserve the right to supplement and amend my

- 11 -

opinions based on fact discovery, positions taken by AGRI and its experts and any rulings by the Court.  I also reserve the right to respond in rebuttal to any positions taken by AGRI or its experts to the opinions I set forth herein.

### 1.    The Rockey '1,653 Patent

I have been informed that AGRI claims in this action that Cordis' balloon-expandable stents are covered by one claim of one of the Rockey patents, that is, claim 2 of the '1,653 patent.  That claim is addressed to a particular method of treating an area of a body vessel.  Cordis' balloon-expandable stents are not covered by the claims of that patent.

I have identified below limitations of claim 2 of the '1,653 patent that the Cordis stents do not satisfy.  I have not addressed claim 1 of the Rockey '1,653 patent in this report because AGRI's experts have not asserted that any of the Cordis stents are covered by that claim.  For the same reason, I have not addressed the claims of the Rockey '264 patent or the claims of the Rockey '3,653 patent.

### a.    a "collapsed sleeve"

I have been asked to assume that in the context of the claims of the '1,653 patent, the term "sleeve" refers to a liner for isolating the internal walls of a body vessel from the materials in that vessel.  The specification of the '1,653 patent describes the invention as "a method and means for isolating the internal walls of hollow viscera or other body vessels from contact with materials, both fluids and solids, occurring naturally, ingested or otherwise introduced in a body vessel.  Isolation of a body vessel, according to the invention, is achieved by positioning an anchoring sleeve, impervious to materials sought to be isolated within the vessel, in such a manner that the sleeve, at least adjacent its upstream end, is in sealing engagement with the surrounding interior tissue of

- 12 -

916972v1

the vessel." Col. 1, lines 54-64; see also Abstract ("A method and article for medical diagnosis and/or treatment of body disorders, comprising a sleeve unit insertable in a natural body vessel to isolate material flowing into the vessel from direct contact with the interior surface o the vessel.").

Cordis' balloon-expandable stents are not liners for isolating the internal walls of a body vessel from the materials in that vessel. For that reason, Cordis' stents are not "sleeves" within the meaning of claim 2 of the '1,653 patent.

In their reports, AGRI's experts define the term "collapsed" as meaning "fold[ed] compactly."[1] That definition is consistent with other definitions of "collapse[d]" as meaning "fold[ed] down into a more compact shape," as in "a telescope that [collapses]." Webster's Third New International Dictionary (1993) ("Webster's") at 443. "Fold" means "to reduce the ... bulk of by doubling over"; "to lay one part over another part of: double upon itself." Webster's at 882.

The use of the term "collapsed" in the claims – to describe the sleeve and the uninflated balloon – is consistent with these definitions. Moreover, the specification's use of the term "collapsed" is consistent with these definitions. The specification states that:

> When being manipulated along the vessel, the balloon 50 and sleeve 51 encircling it are in an uninflated, collapsed state. The collapsed state can be maintained by wrapping the sleeve 51 on itself and superficially heat-bonding it at appropriate folds. (Col. 6, lines 41-45).

Similarly, the specification states that in one embodiment "the sleeve unit is folded on itself accordion fashion to reduce its length and diameter." Col. 4, lines 11-12.

---

[1] Ex. A to Leonard Report dated July [sic] 8, 2003, No. 3; Ex. A to Widas Report dated June 9, 2003, No. 3.

- 13 -

I have been asked to assume that in the context of the claims of the '1,653 patent, a "collapsed sleeve" is a sleeve that has been reduced in bulk by being folded (that is, doubled over) into a more compact space.

This claim term, as so construed, accurately describes the collapsed sleeve of the '1,653 patent's Fig. 9 embodiment, but it is not an accurate description of Cordis' stents. Cordis' stents are not "collapsed." They are not "folded," that is, no part of the stent is laid over another part. The stent is never doubled upon itself.

Cordis does not instruct physicians to fold the stent. Moreover, in using Cordis' stents, physicians do not fold the stent. For this reason, Cordis' stents are not "collapsed" sleeves within the meaning of '1,653 patent.

**b.    "encircling the balloon on its end"**

In their reports, AGRI's experts define the term "end" as meaning "the part of an area that lies at the boundary; the extreme or last part lengthwise ....; either extremity of something that has a length; the outside or extreme ... limit of a space or area; a boundary."[2] These definitions are consistent with other definitions of "end" as meaning "the extreme or last part lengthwise"; "the extreme, ultimate or most remote section." Webster's at 747-48.

The specification describes "a catheter 54 having a dilator annular balloon 50 at its free end and the sleeve 51 surrounding the balloon ...." Col. 5, lines 63-65. Fig. 9 of the patent illustrates the sleeve 51 encircling the balloon 50 on its end.

I have been asked to assume that in the context of the claims of the '1,653 patent, the term "end" means meaning "the extreme or last part lengthwise"; "the

---

[2] See Ex. A to Leonard Report dated July [sic] 8, 2003, No. 9; Ex. A to Widas Report dated June 9, 2003, No. 9.

916972v1

extreme, ultimate or most remote section"; "the part of an area that lies at the boundary; the extreme or last part lengthwise ….; either extremity of something that has a length; the outside or extreme … limit of a space or area," and that the claims require the claimed sleeve to encircle the balloon on its extreme or last part lengthwise.

The embodiment of the '1,653 patent that is shown in Fig. 9 of the patent has a "encircling the balloon *on its end*." However, Cordis' stents do not encircle the balloon on its end. Rather, they are mounted in the middle of the balloon, with balloon material on either side of the stent. This can be seen in photographs of Cordis' stents, which are attached to this Report as Exhibit B. By positioning the stent so that there is balloon material on either side of the stent, Cordis lessens the danger that the stent could slide off the balloon during delivery

I understand that during their depositions, AGRI's experts took the position that the "on its end" limitation in claim 2 of the '1,653 patent should be understood as referring to the end *of the catheter*, rather than the end *of the balloon*. That is not how I read claim 2 of the '1,653 patent. However, even if one assumes that the "on its end" limitation in claim 2 of the '1,653 patent should be understood as referring to the end of the catheter, rather than the end of the balloon, Cordis' balloon-expandable stents still do not meet this claim limitation.

Cordis' stents are not positioned at the end of the catheter. Rather, there is a distance between the stent and the distal end of the catheter. This distance can be seen in photographs of Cordis' stents that are attached to this Report as Exhibit B. Positioning the stent at a distance from the catheter's distal end, as in Cordis' balloon-expandable stents, serves to facilitate delivery of the catheter through curved body passageways such

as the coronary arteries.  It allows for a low profile at the catheter's distal end and makes it easier to deliver the stent through tortuous passageways.  If the stent were positioned at the catheter's distal end, if would be harder or impossible to manipulate the catheter through curved passageways for delivery of the stent.

<p style="text-align:center;">c.    <strong>"providing in the sleeve a material that increases<br>in rigidity after expansion of said balloon"</strong></p>

In their reports, AGRI's experts define the term "provid[ing]" as meaning "supply[ing] or mak[ing] available; ... furnish[ing], supply[ing] or equip[ing]."[3]  These definitions are consistent with other definitions of "providing" as meaning "supply[ing] for use," <u>Webster's</u> at 1827; it is synonymous with "supply[ing]" and "furnish[ing]."  <u>Id.</u>

AGRI's experts have not attempted to define the word "in."  However, the word "in" "indicate[s] location or position in space or in some materially bounded object," <u>id.</u> at 1139.

The specification uses the phrase "providing in the sleeve a material that increases in rigidity after expansion of said balloon" in a manner that is consistent with its ordinary meaning.  The specification only describes embodiments where a separate material is provided inside the sleeve.  The sleeve described in the specification has "inner and outer walls 61, 62," and "[a]n interior space 63 between the walls 61, 62."  Col. 6, lines 10-13.  It states that the sleeve's inner and outer walls can be made of Teflon and Dacron, respectively.  The specification also describes suitable materials "for filling the sleeve space 63 ...."  Col. 6, lines 25.  In addition, the specification states that "[p]referably, the components of the material 66 are thoroughly mixed and subsequently introduced into the sleeve space 63 just prior to the catheterization operation ...."  Col. 6,

---

[3] Ex. A to Leonard Report dated July [sic] 8, 2003, No. 9; Ex. A to Widas Report dated June 9, 2003, No. 9.

916972v1

lines 35-38.  The specification states that "[a]nother alternative is to introduce the settable material 66, including a mixed catalyst, into the sleeve space 63 through the tube 64 after the sleeve 51 has been manipulated into position."  Col. 7, lines 7-11.

I have been asked to assume that in the context of the '1,653 patent, "providing in the sleeve a material that increases in rigidity" means furnishing in a location in a materially bounded object (i.e., the sleeve) a material that is separate and distinct from the sleeve.

Neither Cordis nor physicians perform the step of providing in the Cordis' stents a material that is separate and distinct from the stent itself.  Cordis' balloon-expandable stents are made of stainless steel.  They do not include a material that is separate and distinct from the stent itself.  Moreover, Cordis does not instruct physicians to provide in Cordis' balloon-expandable stents a material that is separate and distinct from the stent itself.  In using Cordis' stents, physicians do not provide in the stent a material that is separate and distinct from the stent itself.

### C.   Dr. Rockey's '1,653 Patent Does Not Enjoy the Benefit of a 1978 or 1980 Filing Date

I also have been asked to consider the priority date for Dr. Rockey's '1,653 patent.

The application for the '1,653 patent was filed on Feb. 19, 1985 as a continuation-in-part of Application Serial No. 216,989 (the '989 application), which was filed on Dec. 16, 1980 and issued in 1985 as the '264 patent.  The '989 application in turn was filed as a continuation of Application Serial No. 912,010 (the '010 application), which was filed on June 2, 1978 and later abandoned.

- 17 -

916972v1

I have been asked to assume that Dr. Rockey's '1,653 patent would not enjoy the benefit of the '989 application's 1980 filing date or the '010 application's 1978 filing date unless the '989 and/or '010 applications disclosed every limitation of the invention that is the subject of the asserted claims of the '1,653 patent. With that assumption in mind, I reviewed the '989 application and the '010 application to consider whether they disclose every limitation of the claims of the '653 patent.

It is my conclusion based on that review that neither of those applications disclose every limitation of claim 2 of the '1,653 patent. The claims of the '1,653 patent are addressed to a method of treating a body passageway that involves, *inter alia*, the steps of introducing a "catheter with a collapsed balloon" into the vessel to be treated and thereafter "removing the balloon and catheter from the vessel." Dr. Rockey's '989 and '010 applications do not disclose these steps. They do not disclose a catheter with a collapsed balloon that is both introduced and later removed from the body, as recited in claim 2 of the '1,653 patent. It is therefore my conclusion that the '653 patent is not entitled to the benefit of the 1980 filing date of the '989 application or the 1978 filing date of the '010 application.

In addition, the claims of the '1,653 patent require the step of providing in the sleeve a material that "increases in rigidity" after expansion of the balloon. Dr. Rockey's '989 and '010 applications do not disclose this step.

It is my conclusion that the '1,653 patent is not entitled to the benefit of the 1980 filing date of the '989 application or the 1978 filing date of the '010 application.

- 18 -

D.   **The Claims of the Rockey '1,653 Patent Would be Anticipated or Obvious in Light of Palmaz's Work if Construed to Cover Cordis' Balloon-expandable Stents**

I have been asked to assume that the terms n the patent claims must be construed the same way for purposes of considering validity and infringement. With that assumption in mind, I have been asked to consider whether claim 2 of the '1,653 patent is anticipated by Dr. Palmaz's early work on balloon-expandable stents. I have been asked to assume that prior art would "anticipate" the '1,653 claims if the prior art has every limitation of the claimed invention.

I have been told that Dr. Palmaz made a wire mesh stent which is described in Palmaz, et al., Expandable Intraluminal Graft: A Preliminary Study, Radiology 1985; 156: 73-77 and in U.S. Patent No. 4,733,665 to Palmaz. I also understand that Dr. Palmaz made a second embodiment of his invention, a slotted tube, depicted in Figures 2a and 2b of the '665 patent and Palmaz et al., Atherosclerotic Rabbit Aortas: Expandable Intraluminal Grafting, Radiology, September 1986, Vol. 160, No. 3, pp- 723-726.

If the claims of the Rockey patents were construed so broadly as to cover the Cordis' stents, then it is my opinion that the claims of the Rockey patents would be anticipated by Dr. Palmaz's early work with stents or obvious in light of Dr. Palmaz's work. In particular, it is my opinion that if Cordis' balloon-expandable stents have every limitation of the '1,653, claim 2 invention, then so does Dr. Palmaz's prior work with stents. Specifically, Dr. Palmaz's work teaches the use of a stent mounted on a balloon catheter that was introduced at a point remote from the area to be treated (like the current Cordis stents); it also teaches manipulating the catheter along a vessel to the area to be treated (like the Cordis stents), introducing fluid to inflate the balloon and expand the

- 19 -

stents (like the Cordis stents), providing a stent made out of metal (like the Cordis stents), which undergoes plastic deformation and geometric changes (like the Cordis stents), and deflating the balloon and removed it after the stent is expanded (like the Cordis stents). In rendering this opinion, I have been asked to assume that Dr. Palmaz is entitled to a priority date earlier than the filing date of Dr. Rockey's '1,653 patent.

Dr. Palmaz has been acclaimed worldwide as being the inventor of the balloon-expandable stent.  See Roubin et al., Interventional Cardiology Medicine, Principles and Practice;  Herrmann et al., Clinical Use of the Palmaz Schatz Intracoronary Stent; Sigwart, Endoluminal Stenting; J.B. Kutryk and P. Serruys, Coronary Stenting: Current Perspectives (1999); "10 Patents that Changed the World," IP Worldwide (August 2002) at 26-36.

## IV.    Prior Expert Testimony

I have not testified as an expert in any prior case.

## V.    Compensation

I am being compensated for my work in this matter at the rate of $300 per hour.

Dated:        June 30, 2003

Joseph A. Puma, D.O.

916972v1

EXHIBIT A

**EXHIBIT B**

















IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ARLAINE & GINA ROCKEY, INC.

        Plaintiff,                          CASE NO. 02-22555-CIV-ALTONAGA
                                                MAGISTRATE JUDGE BANDSTRA

vs.

CORDIS CORPORATION,

        Defendant.

_____/

## DECLARATION OF EDWARD F. LEONARD PURSUANT TO 28 U.S.C. § 1746

    1.    I hereby submit this Declaration in support of the opposition to summary judgment filed by plaintiff Arlaine & Gina Rockey, Inc., and for use in connection with any issues which may arise regarding patent infringement.

    2.    It is my opinion that each of the elements of claim 2 of U.S. Patent No. 4,641,653 are found in the metal stent products sold by Cordis. In support of this opinion, I have reviewed United States Patent No. 4,501,264, issued February 26, 1985; United States Patent No. 4,641,653, issued February 10, 1987 ('1,653 Patent"); and, United States Patent No. 4,763,653 ("'3,653"), issued on August 16, 1988 (hereafter collectively "Patents" or "Rockey Patents").

    3.    My background is set forth in the attached curriculum vitae.

    4.    I am familiar with stents manufactured and sold by Cordis Corporation and Johnson & Johnson representing the accused devices ("Accused Products").

    5.    I have reviewed various portions of the file histories of the Rockey Patents including U.S. Patent Application Serial Nos. 912,010 filed June 2, 1978; Application Serial No. 216,989 filed December 16, 1980; Application Serial No. 702,828, filed February 19, 1985; Application Serial No. 011,335, filed February 5, 1987.



6.      I have been advised that the Patent, its Specification and its file history are referred to as the intrinsic record.

7.      The focus of my analysis began and remained centered on the language of the claims themselves. This language is what the inventor chose to use to particularly point out and distinctly claim the subject matter which the inventor regarded as his invention.

8.      The terms used in the claims bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those words by a person skilled in the relevant art of building medical devices.

9.      Unless compelled otherwise, each word or term in the claims is to be afforded the *full range* of its ordinary meaning as understood by persons skilled in the relevant art.

10.     To the extent necessary, dictionaries, encyclopedias and treatises are particularly useful resources to assist in determining the ordinary and customary meaning of claim terms. I have considered definitions from a number of dictionaries. Other dictionaries are also applicable.

11.     Technical dictionaries and treatises may also be a good sources for determining the meaning of the terms in the claims as well as the use of those terms in the patent specification and file history. With the exception of the term "balloon," none of the terms utilized in the relevant claim of the Rockey Patents has a specialized technical meaning sufficient to require resort to a technical dictionary. However, the standard dictionaries of the English language do not provide an applicable definition for the term balloon. Based upon my forty-six years' experience in this field, I would define the term balloon to mean: An elastomeric membrane completely enclosing a volume which expands when the volume of the fluid occupying that space or volume is increased.

CASE NO. 02-22555-CIV-ALTONAGA
MAGISTRATE JUDGE BANDSTRA

12.    If there were any instances where the dictionary definition of a word or term included multiple definitions, some having no relation to the claimed invention, I also consulted the intrinsic record to identify which of the possible dictionary meanings of the claim terms in issue was the most consistent with the use of the words by the inventor.

13.    If more than one dictionary definition was consistent with the use of the words in the intrinsic record, I construed the claim terms to encompass all such consistent meanings.

14.    I also examined the intrinsic record to determine whether the presumption of ordinary and customary meaning was rebutted.  In so doing, I looked to see if the specification of the Rockey Patents used the words of the claims in a manner clearly inconsistent with the ordinary meaning reflected in a dictionary definition.  Had I found such an instance, which I did not, I would have rejected the inconsistent dictionary definition.

15.    I further examined the intrinsic evidence to see if the inventor, acting as his own lexicographer, clearly set forth an explicit definition of a claim term different from its ordinary meaning.

16.    I also examined the intrinsic record to determine if the inventor had expressly disavowed or disclaimed scope of coverage by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.

17.    Utilizing theses contours of claim construction, I first sought to determine the ordinary and customary meaning of the words in the claims of the Rockey Patents.   In connection with this task, I did not in any way rely upon any Cordis document or my review of the Accused Products or associated written materials.

18.    It is my opinion that the words in the claim terms should be afforded all of their ordinary and customary meanings.  The definitions are set forth in various dictionary reprints

CASE NO. 02-22555-CIV-ALTONAGA
MAGISTRATE JUDGE BANDSTRA

submitted by plaintiff. These definitions, as well as others, provide the ordinary and customary meaning of the claim terms in the Rockey Patents.

19.     There is no evidence in the specifications or intrinsic record of an explicit definition of a claim term different from its ordinary meaning.

20.     In connection with my review of the patent file history, it is my opinion that there is no evidence of a clear, express, unambiguous disclaimer of claim scope sufficient to rebut the heavy presumption that the terms in the claims are to be given their ordinary and customary meaning.

21.     It is further my opinion that the invention described in the claims is readily understandable from the terms and words used in the claims.

22.     Claim 2 of the 1'653 Patent provides:

A method of treating an area of a body vessel, comprising the steps of:

> introducing a catheter with a collapsed inflatable balloon and a collapsed sleeve encircling the balloon on its end into the vessel at a point remote from the area to be treated;
>
> manipulating the catheter axially along the vessel to cause the balloon and sleeve to enter the area to be treated;
>
> inflating the balloon by introducing fluid under pressure into the balloon through a tube of the catheter in a manner wherein the sleeve surrounding the balloon is radially expanded towards the wall of the vessel;
>
> providing in the sleeve a material which increases in rigidity after expansion of said balloon;
>
> maintaining said balloon in an expanded condition in the vessel while said sleeve increases in rigidity; and
>
> thereafter removing the balloon and catheter from the vessel and allowing the sleeve to remain in place in the area to be treated.

CASE NO. 02-22555-CIV-ALTONAGA
MAGISTRATE JUDGE BANDSTRA

23.     I understand that in order to infringe the claims of a United States Patent, each element of the claim must be found in the accused device.

24.     I further understand that in order to infringe a method claim, each step of the claim must be practiced in connection with the Accused Product.

25.     Reviewing the Cordis documents, products and product inserts, it is clear that the Accused Products are to be used for introducing a catheter with a collapsed inflatable balloon and a collapsed sleeve or stent encircling the balloon on its end into a vessel at a point remote from the area to be treated. For instance, the coronary stent is inserted in the femoral artery which is remote from the coronary arteries, which is the area to be treated.

26.     The device and its instructions further provide for manipulating the catheter axially along the vessel to cause the balloon and sleeve to enter the area to be treated.

27.     The instructions clearly provide for inflating the balloon by introducing fluid under pressure into the balloon through a tube of the catheter in a manner where the sleeve surrounding the balloon is radially expanded towards the wall of the vessel. A review of the Accused Products clearly provides for radial expansion of the sleeve or stent through the inflation of the balloon.

28.     Further, the Cordis Accused Products have a material in the sleeve which increases in rigidity after expansion of the balloon. That is, the stainless steel utilized in the stent or sleeve is internally strengthened by plastic deformation within each of its elements. It is also strengthened in its entirety by reorientation of its elements with respect to each other from an initial, predominantly axial orientation to a final, more circumferential position. This reorientation stiffens the stent and enables it to resist compressive stresses that tend to collapse it. Both changes result in an increase in rigidity over a period of time that includes the time during

CASE NO. 02-22555-CIV-ALTONAGA
MAGISTRATE JUDGE BANDSTRA

which the stent is freely expanding and an interval of time thereafter when the stent is accommodating to the blood vessel wall.

29.     Subsequently, the balloon is removed and the catheter is removed from the vessel to allow the sleeve and stent to remain in place in the area to be treated.

30.     It is my opinion to a reasonable degree of engineering certainty that based upon my review of the Accused Products and the method by which those products are specified for their use as described in the instructions provided, and with the devices furnished for their placement, that the accused devices meet every limitation of claim 2 of the '1,653 Patent.

31.     During my deposition in this matter, I was asked questions regarding the doctrine of equivalents.  The term doctrine of equivalents has no meaning to me as an engineer.  As set forth in my report, I intend to offer opinions regarding any issues of infringement.

32.     I further understand that from a scientific or engineering standpoint, the element of a patent claim will be found in the accused device if the accused products function in substantially the same way to achieve substantially the same result.  In accordance with the infringement opinions set forth in my report, it is my opinion that the accused Cordis products function in substantially the same way to achieve substantially the same result as the device depicted in the specification and drawings of 1'653 Patent.  This is true with respect to all relevant claim elements.

33.     Had Cordis' counsel asked me, I would have clearly indicated to him that my infringement opinions included this type of engineering or scientific analysis.  However, his questions regarding the legal term "doctrine of equivalents" has no engineering or scientific meaning to me.

CASE NO. 02-22555-CIV-ALTONAGA
MAGISTRATE JUDGE BANDSTRA

I declare under penalty of perjury of the laws of the United States that the foregoing is

true and correct to the best of my knowledge

Dated: August 6, 2003 _____

_____
Edward F. Leonard

MIA\112344.1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA


ARLAINE & GINA ROCKEY, INC.                    :
                                               :
                    Plaintiff,                 :          CASE NO. 02-22555-CIV-ALTONAGA
                                               :          MAGISTRATE JUDGE BANDSTRA
          v.                                   :
                                               :
CORDIS CORPORATION,                            :
                                               :
                    Defendant.                 :

## CERTIFICATION OF EDWARD F. LEONARD, Ph.D.

I, Edward F. Leonard, Ph.D., do state herein subject to the penalty of perjury the following:

1. I have been asked to provide expert testimony and opinion regarding interpretation of the claims of United States Patent No. 4,501,264, issued February 26, 1985; United States Patent No. 4,641,653, issued February 10, 1987; and, United States Patent No. 4,763,653 , issued on August 16, 1988, to Dr. Arthur Rockey.

2. I have issued two reports in this matter, which are attached hereto as Exhibits "1" and "2" respectfully.

3.    One of the opinions that I have offered in this matter is that the balloon expandable stents manufactured and sold by Cordis Corporation increase in rigidity upon the expansion of the stent on the balloon.

4. I understand that Cordis Corporation is challenging my ability to testify regarding that opinion, claiming that the opinion lacks validation and reliability.

5. As is set forth in my reports and deposition testimony, there are two bases upon which I rely in support of my opinion that the Cordis stents increase in rigidity after expansion of the balloon.

ATTACHMENT / EXHIBIT

First, the stent is strengthened in its entirety by reorientation of the struts with respect to each other from an initial, predominantly axial orientation to a final, more circumferential position. Second, the deformable struts of the stents become embedded in the vessel wall after expansion on the balloon, and this increases the rigidity of the stent.

6. I have also adopted the conclusion of David Pope, Ph.D., who has written a report in this matter, in which he concludes that the Cordis stents increase in rigidity after expansion on the balloon due to plastic deformation.

7. My opinion that the Cordis stents increase in rigidity after expansion on the balloon due to reorientation of the struts and from being embedded in the vessel wall are supported by basic engineering principles: The mechanical elements of an unexpanded stent lie generally in the same direction as the axis of the blood vessel in which the stent has been placed. Compressive stresses directed inward along radii of the vessel thus tend to deflect these mechanical elements much like sideward loads applied along an edge of each element. The mechanical elements of an expanded stent lie more perpendicular to the axis of the blood vessel in which the stent has been placed. Compressive stresses directed inward along radii of the vessel thus tend to deflect the mechanical elements of the expanded stent much like coaxial, compressive loads applied at the ends of each element, and lead to much less deflection (much greater apparent rigidity) than elements loaded sidewise. Compression may, however, lead to "buckling" of loaded members. Embedment of members in a supporting medium, even when that medium is of substantially lower strength, enables compressed members to resist buckling and thus contributes further to the apparent rigidity of the members and of the structure comprised of these elements.

8. Attached as Exhibit "3" is an article entitled *Physical Properties of Endovascular Stents: Experimental Comparison.* This article is an example of numerous articles that follow the early studies of Flueckiger *et al.* (1994). These articles demonstrate that stent rigidity increases during inflation and subsequent imbedment in the vessel wall as a consequence of simultaneous

reorientation, plastic deformation, and reinforcement of stent elements in tissue. These articles, individually and in aggregate support my opinion that these factors act together to increase the rigidity of the stent upon expansion on the balloon. The relative importance of these factors varies from one stent design to the other, but all designs rely upon each of them.

9. Attached as Exhibit "4" is an article entitled *Mechanisms of Residual Lumen Stenosis After High - Pressure Stent Implantation*. My opinion with respect to the favorable role of imbedment is supported by this article, wherein the authors, in stated agreement with Flueckiger, assert (p. 116, marked), that " ... greater force is needed in vivo to compress than to expand the stent due to the favorable effects of vessel impaction ...".

10. Numerous technical articles address the role of stent geometry, and changes in geometry of stent elements during expansion, in determining the apparent rigidity of an expanded stent, Some are based on finite element methods, *e.g.* Stur and Hintner, "Validation and Appplication of Finite Element Analysis on Balloon-expandable Coronary Stents", others on engineering experimentation in vitro, *e.g.* Moeller *et al.* "Residual Stresses in Coronary Artery Stents". They combine to demonstrate that stent rigidity increases from a combination of plastic deformation and reorientation of stent elements.

EDWARD F. LEONARD, Ph.D.

DATE: September 29, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

ARLAINE & GINA ROCKEY, INC.                    :
                                               :
              Plaintiff,                       :        CASE NO. 02-22555-CIV-ALTONAGA
                                               :        MAGISTRATE JUDGE BANDSTRA
       v.                                      :
                                               :
CORDIS CORPORATION,                            :
                                               :
              Defendant.                       :

## SUPPLEMENTAL CERTIFICATION OF EDWARD F. LEONARD, Ph.D.

I, Edward F. Leonard, Ph.D., do state herein subject to the penalty of perjury the following:

1. I have provided a certification to Arlaine & Gina Rockey, Inc., which I understand has been used to oppose a motion by Cordis Corporation to exclude my testimony in this matter.

2. Attached are two additional articles in further support of my prior certification and opinion that Cordis' stents increase in rigidity after inflation and subsequent imbedment in the vessel wall as a consequence of simultaneous reorientation, plastic deformation, and reinforcement of stent elements in tissue.

3. The first article, attached as Exhibit 1, is co-authored by Dr. Julio Palmaz and is entitled *Normal and Stenotic Renal Arteries: Experimental Balloon-expandable Intraluminal Stenting*. The authors tested the response of Dr. Palmaz' stent to external pressure. The test results are set forth in Figure 4, which "shows that the fully expanded stent is stronger at maximum expansion than at smaller diameters." Consistent with my opinion, Dr. Palmaz himself provides the following explanation for these results: "This is because the force from the externally applied wall pressure



ATTACHMENT / EXHIBIT

can be resolved into two components, one directed along the struts of the stent and one perpendicular to them. The larger the stent diameter, the greater is the component of force along the struts; therefore, the stent resists circumferential force more effectively."

4. The second article, attached as Exhibit 2, is entitled *Comparison of Mechanical Deformation Properties of Metallic Stents with Use of Stress-Strain Analysis*. The authors of this article found that a "4-9 mm Palmaz stent is actually 30% more resistant to deformation than the larger 8-12-mm version when expanded to identical 8-mm diameters." The authors agreed with the explanation proposed by Dr. Palmaz in his earlier article, which is "that at the 8-mm diameter, the 4-9-mm stent is almost maximally expanded and the diamond-shaped struts are nearly vertically oriented, providing maximum structural support. On the other hand, at the 8-mm diameter, the 8-12 mm stent is minimally expanded, with the struts oriented more horizontally, providing weaker mechanical support."

5. I understand that another issue in this case is whether the stents sold by Cordis Corporation are in a "collapsed" position on the balloon before expansion. In Figure 1 of his article, *Normal and Stenotic Renal Arteries: Experimental Balloon-expandable Intraluminal Stenting*, Dr. Palmaz refers to the unexpanded stent as a "[c]ollapsed balloon-mounted stent." Dr. Palmaz also refers to the unexpanded stent as being in a "collapsed state" at page 705 of the article.

_____

EDWARD F. LEONARD, Ph.D.

DATE: <u>October 9, 2003</u>

COPY 1

GR03OC40





SEPTEMBER 1987

THE RADIOLOGICAL SOCIETY OF NORTH AMERICA

THOMAS JEFFERSON UN
AUG 1

73rd Scientific Assembly and Annual Meeting
Chicago, November 29 – December 4, 1987

SEPTEMBER 1987     Volume 164 Number 3

*A monthly journal devoted to clinical radiology and allied sciences owned and published by THE RADIOLOGICAL SOCIETY OF NORTH AMERICA, INC.*



## Stanley S. Siegelman, M.D. — Editor
THE JOHNS HOPKINS UNIVERSITY SCHOOL OF MEDICINE AND
THE JOHNS HOPKINS HOSPITAL

Olga M.B. Gatewood, M.D. — *Deputy Editor*     Donna Magid, M.D. — *Deputy Editor*
William R. Eyler, M.D. — *Editor Emeritus*

### ASSOCIATE EDITORS

**Body CT**
Michael E. Bernardino, M.D.
Michael P. Federle, M.D.
Elliot K. Fishman, M.D.
Thomas L. Lawson, M.D.

**Breast**
Daniel B. Kopans, M.D.
William A. Reynolds, M.D.
Edward A. Sickles, M.D.

**Cardiac**
Larry P. Elliott, M.D.
David C. Levin, M.D.
Renate L. Soulen, M.D.
James E. Youker, M.D.

**Chest**
Robert G. Levitt, M.D.
Theresa C. McLoud, M.D.
David P. Naidich, M.D.
Anthony V. Proto, Jr., M.D.
Elias A. Zerhouni, M.D.

**Computer Applications**
Laurens V. Ackerman, M.D., Ph.D.
Ronald L. Arenson, M.D.
Samuel J. Dwyer III, Ph.D.
C. Carl Jaffe, M.D.

**Contrast Media**
Harry W. Fischer, M.D.

**Gastrointestinal**
Dennis M. Balfe, M.D.
Joseph T. Ferrucci, Jr., M.D.
Bronwyn Jones, M.D.
Dean D.T. Maglinte, M.D.
Robert J. Stanley, M.D.

**Genitourinary**
Morton A. Bosniak, M.D.
N. Reed Dunnick, M.D.
Stanford M. Goldman, M.D.
Bruce L. McClennan, M.D.

**Head & Neck**
Hugh D. Curtin, M.D.
Bob W. Gayler, M.D.
Guy D. Potter, M.D.
Peter M. Som, M.D.

**Interventional-Cardiovascular**
Gary J. Becker, M.D.
William J. Casarella, M.D.
David W. Hunter, M.D.
Thomas A. Sos, M.D.
Robert I. White, Jr., M.D.

**Lymphatic**
Ronald A. Castellino, M.D.

**Magnetic Resonance Imaging**
Gary M. Glazer, M.D.
Hedvig Hricak, M.D.
Herbert Y. Kressel, M.D.
Joseph K.T. Lee, M.D.
Albert A. Moss, M.D.
Jeffrey H. Newhouse, M.D.

**Musculoskeletal**
Murray K. Dalinka, M.D.
Robert H. Freiberger, M.D.
William A. Murphy, M.D.
William W. Scott, Jr., M.D.

**Neuroradiology**
Michael N. Brant-Zawadzki, M.D.
R. Nick Bryan, M.D., Ph.D.
Burton P. Drayer, M.D.
Victor M. Haughton, M.D.
Michael T. Modic, M.D.

**Nuclear Medicine**
Philip O. Alderson, M.D.
Fred A. Mettler, Jr., M.D.
Heidi S. Weissmann, M.D.
Dennis M. Welch, M.D.

**Oncology/Radiotherapy**
Jay S. Cooper, M.D.
James D. Cox, M.D.
Robert H. Sagerman, M.D.
Moody D. Wharam, M.D.

**Pediatric**
Walter E. Berdon, M.D.
N. Thorne Griscom, M.D.
Donald R. Kirks, M.D.
John H. Miller, M.D.
Hervey D. Segall, M.D.
   (Neuroradiology)

**Physics**
Gary T. Barnes, Ph.D.
Leon Kaufman, Ph.D.
Edwin C. McCullough, Ph.D.

**Socioeconomic-Medicolegal**
Ronald G. Evens, M.D.
A. Everette James, Jr., Sc.M.,
   J.D., M.D.
Otha W. Linton

**Statistics-Efficacy Studies**
Barbara J. McNeil, M.D., Ph.D.
Charles E. Metz, Ph.D.

**Ultrasound**
Barbara A. Carroll, M.D.
Catherine M. Cole-Beuglet, M.D.
Roy A. Filly, M.D.
Christopher R.B. Merritt, M.D.
Roger C. Sanders, M.D.
Thomas L. Slovis, M.D.

### BOOK REVIEW EDITOR
Harry J. Griffiths, M.D.

*Foreign Books*
Alan E. Oestreich, M.D.

### CONSULTANTS TO THE EDITOR

David H. Baker, M.D.
Hillier L. Baker, Jr., M.D.
Stanley Baum, M.D.
H. Joachim Burhenne, M.D.
Andrew B. Crummy, Jr., M.D.
Gerald D. Dodd, M.D.
John P. Dorst, M.D.
Milton Elkin, M.D.

Joel E. Gray, Ph.D.
Reginald E. Greene, M.D.
William N. Hanafee, M.D.
E. Robert Heitzman, M.D.
Stephen A. Kieffer, M.D.
John A. Kirkpatrick, Jr., M.D.
Irvin I. Kricheff, M.D.
Erich K. Lang, M.D.

Richard G. Lester, M.D.
Gwilym S. Lodwick, M.D.
Alexander R. Margulis, M.D.
James J. McCort, M.D.
Thomas S. Meaney, M.D.
William T. Moss, M.D.
E. James Potchen, M.D.
Barry A. Siegel, M.D.

http://

September 1987     Volume 164 Number 3

# Radiology

A monthly journal devoted to clinical radiology and allied sciences owned and published by THE RADIOLOGICAL SOCIETY OF NORTH AMERICA, INC.

## State of the Art

Breast Cancer: Considerations in Local and Regional Treatment — 593
Samuel Hellman and Jay R. Harris

## Therapeutic Radiology

Regression of Mediastinal Hodgkin Disease after Therapy: Evaluation of Time Interval — 599
Luciel B. North, Lillian M. Fuller, Jane A. Sullivan-Halley, and Fredrick B. Hagemeister

Esophageal Carcinoma: Modest Benefits from Combined Modality Therapy — 603
Steven L. Hancock, Don R. Goffinet, Robert W. Carlson, and James B. D. Mark

Malignant Melanoma: Analysis of Dose Fractionation in Radiation Therapy — 607
John B. Konefal, Bahman Emami, and Miljenko V. Pilepich

## Abdominal and Gastrointestinal Radiology

Perforated Colorectal Neoplasms: Correlation of Clinical, Contrast Enema, and CT Examinations — 611
Donald H. Hulnick, Alec J. Megibow, Emil J. Balthazar, Richard B. Gordon, Rajani Surapenini, and Morton A. Bosniak

Colorectal Carcinoma: Detection with Indium-111 Anticarcinoembryonic-Antigen Monoclonal Antibody ZCE-025 — 617
Hani H. Abdel-Nabi, Alan N. Schwartz, Celestia S. Higano, Debra G. Wechter, and Michael W. Unger

Esophageal Malignancy: Imaging Results and Complications of Combined Endoscopic-Radiologic Palliation — 623
Mark H. Jaffe, David Fleischer, Robert K. Zeman, Stanley B. Benjamin, Peter L. Choyke, and Letitia R. Clark

Lymphangiography and CT in the Follow-up of Patients with Lymphoma — 631
Abraham Pera, Michael Capek, and Ali Shirkhoda

Treatment of Blunt Hepatic Injuries: Role of CT — 635
W. Dennis Foley, James D. Cates, Gary M. Kellman, Tom Langdon, Charles Aprahamian, Thomas L. Lawson, and William D. Middleton

Agenesis of the Right Lobe of the Liver — 639
D. Randall Radin, Patrick M. Colletti, Philip W. Ralls, William D. Boswell, Jr., and James H. Halls

Focal Liver Masses: Differential Diagnosis with Pulsed Doppler US — 643
Kenneth J. W. Taylor, Isabel Ramos, Steven S. Morse, Karen L. Fortune, Lynwood Hammers, and Caroline R. Taylor

Normal Anatomy and Pathologic Changes of the Small Bowel Mesentery: US Appearance — 649
Lorenzo E. Derchi, Luigi Solbiati, Giorgio Rizzatto, and Luigi De Pra

Fat-Density Oral Contrast Agent for Abdominal CT — 653
Vassilios Raptopoulos, Michael A. Davis, Ashley Davidoff, Andrew Karellas, Dennis Hays, Carl J. D'Orsi, and Edward H. Smith

## Genitourinary Radiology

Perirenal Spaces: CT Evidence for Communication across the Midline — 657
J. Bruce Kneeland, Yong Ho Auh, William A. Rubenstein, Kenneth Zirinsky, Harvey Morrison, Jospeh P. Whalen, and Elias Kazam

Pelvic Exenteration: Role of CT in Follow-up — 665
Golden Pan and Ali Shirkhoda

Stage I Nonseminomatous Germ Cell Tumors of the Testis: Radiologic Follow-up after Orchidectomy — 671
Michael P. Williams, Janet E. Husband, and Christine W. Heron

## Cardiovascular Radiology

Complex and Simple Coronary Artery Stenoses: A New Way to Interpret Coronary Angiograms Based on Morphologic Features of Lesions — 675
David G. Levin and Geoffrey A. Gardiner, Jr.

Coronary Artery Bypass Graft Patency: Noninvasive Evaluation with MR Imaging — 681
Richard D. White, Gary R. Caputo, Alexander S. Mark, Gunnard W. Modin, and Charles B. Higgins

Nonbronchial Systemic Collateral Arteries: Significance in Percutaneous Embolotherapy for Hemoptysis — 687
Frederick S. Keller, Josef Rosch, Thomas G. Loflin, P. H. Nath, and Richard B. McElvein

## Interventional Radiology

Stenoses in Dialysis Fistulas: Treatment with Percutaneous Angioplasty — 693
Mohsin Saeed, Glenn E. Newman, Richard L. McCann, Steven K. Sussman, Simon D. Braun, and N. Reed Dunnick

Percutaneous Transluminal Angioplasty of Subclavian Arteries — 699
Dana R. Burke, Roy L. Gordon, Jonathan D. Mishkin, Gordon K. McLean, and Steven G. Meranze

Normal and Stenotic Renal Arteries: Experimental Balloon-expandable Intraluminal Stenting — 705
Julio C. Palmaz, David T. Kopp, Howard Hayashi, Richard A. Schatz, Glenn Hunter, Fermin O. Tio, Oscar Garcia, Rudolph Alvarado, Chet Rees, and Stephen C. Thomas

Julio C. Palmaz, MD • David T. Kopp, PhD • Howard Hayashi, MD • Richard A. Schatz, MD
• Glenn Hunter, MD • Fermin O. Tio, MD • Oscar Garcia, MD • Rudolph Alvarado, MD
• Chet Rees, MD • Stephen C. Thomas

# Normal and Stenotic Renal Arteries: Experimental Balloon-expandable Intraluminal Stenting[1]

Elastic recoil of the vessel wall is a common cause of failure of percutaneous transluminal angioplasty in renal arteries. To oppose such recoil, balloon-expandable metal stents were implanted in artificially stenotic renal arteries in pigs and normal renal arteries in dogs and pigs. The stents were then examined angiographically and histologically at regular intervals. All stents were completely covered with endothelialized neointima in 3 weeks. There was no difference in intimal thickness between the stenotic and nonstenotic renal arteries. A large stent diameter and a large open or nonmetal surface may cause less intimal hyperplasia, but nonturbulent, fast arterial flow is probably the most important factor in ensuring long-term patency of the vessel.

Index terms: Arteries, grafts and prostheses, 961.128 • Arteries, interventional procedure, 961.128 • Arteries, stenosis, 961.721 • Catheters and catheterization, technology • Renal arteries, interventional procedure, 961.128 • Renal arteries, stenosis, 961.721

Radiology 1987; 164:705–708

[1] From the Departments of Radiology (J.C.P., D.T.K., O.G., R.A., C.R., S.C.T.), Medicine (R.A.S.), and Pathology (F.O.T.), University of Texas Health Science Center at San Antonio, 7703 Floyd Curl Dr., San Antonio, TX 78284-7800, and Audie Murphy Veterans Administration Hospital, San Antonio; and the Department of Surgery, Veterans Administration Hospital, Martinez, Calif. (H.H., G.H.). From the 1986 RSNA annual meeting. Received December 17, 1986; revision requested March 11, 1987; revision received March 23; accepted March 26. Address reprint requests to J.C.P.
© RSNA, 1987

See also the article by Rousseau et al. (pp. 709–714) in this issue.



Figure 1. Collapsed balloon-mounted stent (top), expanded stent (center), and stent in place while deflated balloon is withdrawn (bottom).

**A**LTHOUGH percutaneous transluminal angioplasty (PTA) for renal artery stenosis is widely used clinically, its efficacy is limited in certain types of renal artery lesions. Atherosclerosis, the most common cause of renal artery stenosis, does not respond well to angioplasty. In general, for hypertension caused by atherosclerotic renal artery stenosis, cures 1–2 years after PTA average only 21%. Improvement without cure in the same period nears 60% (1–3). PTA is usually not successful in patients with atherosclerotic stenosis at the renal artery ostium and in those with bilateral renal artery disease (4, 5). Only two-thirds of patients with anastomotic renal artery stenoses occurring after renal transplant receive long-term benefit from angioplasty, and frequently there is residual stenosis at the angioplasty site (6).

A renal PTA leaving significant residual stenosis often fails (4); this emphasizes the need for adequate dilation. The use of balloons with larger diameters to overdilate the stenotic area has been proposed (7), but this increases the risk of renal artery rupture (8).

As a method of opposing elastic recoil after balloon dilation without overdilating, we investigated the application of balloon-expandable metal stents in pigs with artificial renal artery stenoses. We compared the results with those obtained after stent placement in normal renal arteries of pigs and dogs. This research focused on the mechanics of simultaneous dilation of the stent and the artery and on the long-term effects of the implanted device on the renal artery and the renal parenchyma, determined with histologic and morphometric analysis.

## MATERIALS AND METHODS

### Characteristics of the Stent

The stent is a modified version of the same meshlike design used previously (9) (Fig. 1). It still has a nonexpanded diameter of 1.67 mm, a length of 15 mm, and a wall thickness of 0.076 mm. The new stent, however, has six double rows of staggered slots, instead of eight, and has narrower struts. These modifications reduce the total metal surface, while maintaining critical physical properties:

1. Free area and dimensional changes. The free or open area of the stent ranges from 69% in the collapsed state to a maximum of 88% at 6 mm in diameter. With expansion, the slots in the wall assume a diamond shape; thus the open area increases until all four corners of the diamonds have equal angle. Expansion beyond this point results in a decrease of the open area. The length of the stent decreases as the diameter increases. Figure 2 shows that for a given stent configuration, there is an optimal range of expansion.

2. Balloon and stent expansion characteristics. When a carrier balloon requiring 10 atm of pressure to achieve its nominal diameter is used, 88% of total stent expansion occurs at 4.5 atm. Beyond that point, no significant increase in pressure is needed to produce complete expansion of the balloon-stent assembly, compared with the balloon alone. Therefore, the additional stress imposed on the balloon by the coaxially mounted stent occurs at the low end of the pressure curve, far from the bursting limit of the balloon (Fig. 3).

3. Response of the stent to external pressure. This was tested by applying a collarlike device, constructed to allow a uniform pressure to be generated over the surface of the stent by suspending weights from the free end of the device.





**3.**

Figures 2, 3. (2) Percentage change in free area and decrease in length as a function of stent diameter (e.g., from 3 to 5 mm in diameter, open area increases 5.7% while length decreases 12.1%). (3) Pressure and diameter changes in 6-mm angioplasty balloon, alone (solid line) and in combination with a coaxially mounted stent (broken line).

Figure 4.   Change in stent diameter as a function of circumferential pressure. The arrows indicate the direction of force applied to the diamond-shaped spaces of the mesh.

The weights created a circumferential stress in the collar and an external pressure on the expanded stent. The stress developed in the collar wall by the weights is given by $S = W/(t \cdot L)$, where $S$ is the circumferential or hoop stress, $W$ is the suspended weight (in grams), $t$ is the thickness of the collar wall (in centimeters), and $L$ is the length of the collar (in centimeters).

The relationship (10) between the circumferential stress $S$ and the pressure $P$ for thin-walled cylinders of radius $R$ (in centimeters) is $S = (P \cdot R)/t$. From these equations the relationship sought is $P = W/(R \cdot L) = (2 \cdot W)/(D \cdot L)$, where $D$ is the stent diameter (in centimeters). This relationship was used to calculate wall pressure for a series of suspended weights ranging from 0 to 1,500 g. All pressures were expressed in millimeters of mercury for easy comparison with intraluminal vascular pressures. Figure 4 shows that the fully expanded stent is stronger at maximum expansion than at smaller diameters. This is because the force from the externally applied wall pressure can be resolved into two components, one directed along the struts of the stent and one perpendicular to them. The larger the stent diameter, the greater is the component of force along the struts; therefore, the stent resists circumferential force more effectively.

## Experimental Methods

*Preparation of the renal artery stenosis model.*—Eleven adult minipigs weighing 75–180 lb (34–81 kg) underwent midline laparotomy under general gaseous anesthesia. Suboclusive stenosis was created in the right mid-renal artery by placing a 1-0 polydioxanone suture (Ethicon, Somerville, N.J.) around the artery and a piece of 6-F Teflon tubing alongside the artery. The tubing served as a tool to achieve a uniform slack in the suture. After the ligature was tied and the tubing removed, renal artery patency was confirmed by the presence of pulsations distal to the ligature. The pigs were fed a diet that kept them at a steady weight after surgery. In 6 months, renal artery stenosis had developed in all the pigs. Ischemic atrophy of the kidney developed in three pigs, but the renal arteries remained patent. In two of the three, the degree of atrophy was severe; the renal arteries were thready and therefore unsuitable for stenting. The stenoses resulting from the resorbable sutures were focal and ranged from 13% to 50% of the proximal renal artery lumen (Fig. 5a). In three animals, the stenoses were minimal, ranging from 13% to 17%. In animals with the stent placed in the opposite normal renal artery, histologic examination of the stenotic area showed an organized thrombus at the site of suture placement, overlying a folded and interrupted internal elastic lamina (Fig. 5b). This thrombus, with focal myointimal proliferation and adventitial fibrosis, caused the focal narrowing of the renal artery.

*Stenting procedure.*—Six months after ligature, general gaseous anesthesia was administered to each pig, the right femoral artery was exposed, and an introducer sheath was placed in it. The stents were coaxially mounted over angioplasty balloon catheters with a 5-mm-diameter balloon and were manually crimped in place. The catheters with the mounted stent were steered to the target over a 0.016-inch steerable guide wire after the initial placement of a selective 6-F catheter in the ostium of the renal artery. A Y connector (USCI, Billerica, Mass.) allowed test injections of contrast material during manipulation of the catheter and wire.

One hundred seventy-five milligrams of aspirin and 25 mg of dipyridamole were given the day before and up to 3 months after the procedure. Fifty units of heparin per kilogram and 250 ml of 40% low-molecular-weight dextran were given intravenously during the procedure. The stenotic artery was not stented in the two pigs that had atrophic, shrunken kidneys as a result of the ligature placement; in two in which severe arterial spasm developed during catheter manipulation; and in one that had a narrow angle between the renal artery and the aorta. Rather, the stent was placed in the contralateral renal artery, and these five animals were used as controls.

Eight dogs weighing 35–55 lb (16–25 kg) underwent left carotid arteriotomy while under general gaseous anesthesia. After placement of a 9-F introducer sheath in the carotid artery, a baseline abdominal aortogram was obtained. Insertion of the expandable stent was accomplished with materials and methods similar to those used in pigs.

Dogs and pigs were killed in groups and at intervals indicated in Table 1. The methods used for the histopathologic preparation of the stented arteries was the same as reported previously (9). Factor VIII–related antigen was assayed in the endothelial surface of the stents with the immunoperoxidase method (11).




**a.**   **b.**

Figure 5.   (a) Abdominal aortogram in a pig, 6 months after suboclusive ligature of the right renal artery. (b) Cross section of a pressure-fixed, stenotic renal artery in a pig 6 months after suboclusive ligation. Internal elastic lamina (arrows) appears folded and redundant as a result of the peripheral constrictive adventitial fibrosis. Intimal thickening probably represents organized thrombus. (Hematoxylin and eosin; original magnification ×58.)



7.

Figures 6, 7.   (6) Gross specimen of pig kidneys 24 weeks after stent placement in the experimental stenosis of the right renal artery. Kidneys, renal arteries, and aorta were coronally sectioned. (7) Scanning electron micrograph of the inner surface of a renal artery stent 24 weeks after placement (original magnification ×40). The central circle indicates high-power microscope insert site (original magnification ×240).

**Table 1**
**Maximum Follow-up of Stented Renal Arteries**

|        | Pigs | | | |
|--------|---------------|------------------|------|
| Weeks  | with Stenosis | without Stenosis | Dogs |
| 1      | 2             | 2                | 2    |
| 3      | 2             | 1                | 2    |
| 8      | 1             | 1                | 2    |
| 24     | 1             | 1                | 2    |

## RESULTS

### Pig

Six renal artery stenoses were successfully stented and the lumen diameter completely restored (Fig. 6). At 1 week, low-power microscopic examination of the inner surface of the stented renal arteries showed partial coverage of the inner stent lumen with endothelialized neointima. Specimens 3 weeks and older were completely covered with intimal tissue. Cross-sectional specimens taken at 1 week and prepared with hematoxylin and eosin and metachromatic stain showed an accumulation of red cells in the troughs formed between the struts and the depressed inner arterial surface. By 3 weeks the clot had almost completely disappeared, and the struts were covered with endothelialized neointima. In specimens 8 weeks and older, complete resorption of the red cells and pigments under the thin neointima caused the inner surface of the stent to look like a bas-relief of the stent (Fig. 7). A 5-mm stent placed in a 3-mm renal artery with moderate ischemic atrophy of the corresponding kidney had a neointimal thickness of 917 μm. This narrowed the lumen of the overdilated stent to the diameter proximal and distal to the stented area. In other words, the neointimal formation modeled the arterial wall, resulting in a uniform lumen diameter. In the five pigs with stented renal artery stenoses and an angiographically normal ipsilateral kidney before stenting, the placed stents had a mean intimal thickness of 58 μm ± 15. In the remaining five pigs with stents placed in the opposite normal renal artery, the stented lumen remained patent and had a mean intimal thickness of 86 μm ± 66.

In the six pigs with stented renal artery stenosis, histologic examination of the renal parenchyma showed no abnormality in five. Mild interstitial fibrosis was present in the single kidney that showed a moderate degree of atrophy on angiography done before stenting. The two small, scarred kidneys that were unsuitable for stent placement had severe diffuse parenchymal fibrosis, resulting from severe ischemia at the time of the ligature placement.

### Dog

All previously normal stented arteries were patent on radiographic and histopathologic examination. In one instance, a week after placement of a stent in the ostium of a renal artery, the stent partially migrated into the aortic lumen. However, it caused no narrowing of the renal artery lumen, and it did not damage the kidney. The healing pattern of the stent in canine renal arteries was identical to that observed in pigs at each observation. Intimal hyperplasia in the canine stents averaged 63 μm ± 58. Histologic examination of the canine kidneys yielded normal results in all specimens.

Factor VIII-related antigen was identified in all canine and porcine preparations, with the oldest specimens having the strongest staining.

## DISCUSSION

Pigs have been used to test the results of balloon angioplasty on artificially induced renal artery stenoses. Stridbeck et al. (12) produced stenoses in renal arteries of pigs by dividing and then suturing renal arteries to create a stenotic anastomosis. Since the results of the procedure depend heavily on the skills of the surgeon, we attempted to simplify the model by tying a slack suture of absorbable material around the renal artery. Polydioxanone was chosen as suture material, because it is slowly absorbed over a period of 6 months in pigs (13). By the end of this time, the adventitial scar tissue should be strong enough to maintain the focal constriction. Our model of renal artery stenosis was only moderately successful, since significant stenotic lesions developed in about half the animals, the rest having no significant stenosis or a small, scarred kidney resulting from severe ischemia.

Neither pigs nor dogs are ideal models for catheter manipulation in the renal arteries, because they have a relatively narrow abdominal aorta. In most of the animals, however, we encountered no difficulties placing the stents when the catheter entry location was chosen according to the angle between the renal artery and the aorta, that is, a carotid approach in dogs and a femoral approach in pigs.

Migration of the stent placed at the ostium of a normal canine renal artery may have been caused by the lack of a stenotic lesion "hugging" it in place. Also, dogs have very mobile kidneys, and movement of the renal artery at the ostium may have caused the migration. Stents for renal artery ostial lesions will have to be longer to give a larger stabilizing surface.

Despite possible differences between canine and porcine clotting and healing mechanisms, the patterns of stent incorporation in the ar-

terial wall were remarkably similar in both species for stents of equal size. All 5-mm stents, at 3 weeks or greater after implantation, were covered with essentially the same degree of intimal hyperplasia in all the animals, the only exception being the stent placed in a small renal artery with a low rate of blood flow. Myointimal thickening occurred only over the struts of the stent, and it was quantitatively minimal.

Healing around the 3-mm and 3.5-mm stents placed in the coronary arteries of dogs (14) was different from that around the 5-mm renal stents. In coronary stents, although lumen patency was excellent, the intimal tissue covered the struts and the spaces between adjacent struts in a continuous fashion. Although the free surface difference between the 3-mm and 5-mm stents is only 6%, it may be at least partially responsible for the differences observed. Unfavorable volume-surface relationships of the blood circulating through smaller stents, increased turbulence, higher shear rates, or the presence of wave reflections related to compliance mismatch (10) may also influence the healing process; the relative importance of these factors remains to be demonstrated. It has been previously noted that arterial flow affects the degree of intimal proliferation in the stents; intimal thickness was more prominent in low-flow situations (15). When the expanded stent diameter exceeded that of the target vessel, intimal growth narrowed the stent lumen to match the inflow and outflow portions of the vessel. Whether this will occur in humans remains unknown, but a similar phenomenon has been observed in surgically placed bypass grafts. When a synthetic bypass conduit is exposed to circulating blood, the amount of thrombus deposition is also inversely related to the blood-flow velocity (16). This tends to be a self-limiting process; at low flow rates, thrombus

grows until narrowing of the graft lumen results in an increase of the flow velocity to a level above the thrombogenic threshold. From these observations, we believe that the placement of metallic stents in human vessels with low flow rates will have to be approached with caution because of the risk of thrombotic occlusion or excessive intimal growth.

Endothelial cells were identified morphologically with scanning electron microscopy and by the presence of intracytoplasmic factor VIII–related antigen, which is a tissue-specific marker for vascular endothelium (11). Complete endothelialization of the expandable stents at 3 weeks is the reason for the small amount of intimal hyperplasia. Valuable experience in the use of metallic arterial stents in humans has been accumulated in Europe; Sigwart et al. (17) have placed a number of woven stainless steel wire stents in coronary arteries and in peripheral vessels with good short-term follow-up results. Growing interest in this therapeutic approach will undoubtedly result in more human trials. ∎

Acknowledgments: We thank Evelyn N. Hilbert, Lee Leija, Cono Farias, Joanne Murray, and John Martini for their valuable assistance.

References
1. Martin EC, Mattern RF, Baer L, Fancuchen EI, Casarella WJ. Renal angioplasty for hypertension: predictive factors for long term success. AJR 1981; 137:921–924.
2. Colapinto RF, Stronell RD, Harries-Jones EP, et al. Percutaneous transluminal dilatation of the renal artery: follow-up studies on renovascular hypertension. AJR 1982; 139:727–732.
3. Tegtmeyer CJ, Kellum CD, Ayers C. Percutaneous transluminal angioplasty of the renal artery: results and long-term follow-up. Radiology 1984; 153:77–84.
4. Sos TA, Pickering TG, Phil D, et al. Percutaneous transluminal renal angioplasty in renovascular hypertension due to atheroma or fibromuscular dysplasia. N Engl J Med 1983; 309:274–279.
5. Cicutto KP, McLean GK, Oleaga JA, Freiman DB, Grossman RA, Ring EJ. Renal artery stenosis: anatomic classification for percutaneous transluminal angioplasty. AJR 1981; 137:599–601.
6. Raynaud A, Bedrossian J, Remy P, Brisset JM, Angel CY, Gaux JC. Percutaneous transluminal angioplasty of renal transplant arterial stenoses. AJR 1986; 146:853–857.
7. Saddekni S, Sos TA, Srur M, Cohn D. Redefining technical success of angioplasty: the importance of balloon size and characteristics, inflation and deflation profiles and achieving a cosmetically attractive result. Presented at the 70th Scientific Assembly and Annual Meeting of the Radiological Society of North America, Washington, D.C., November 25–30, 1984.
8. Puijlaert CBAJ, Mali WPThM, Rosenbusch G, et al. Delayed rupture of renal artery after renal percutaneous transluminal angioplasty. Radiology 1986; 159:635–637.
9. Palmaz JC, Windeler SA, Garcia F, Tio FO, Sibbitt RR, Reuter SR. Atherosclerotic rabbit aortas: expandable intraluminal grafting. Radiology 1986; 160:723–726.
10. Strandness ED, Sumner DS. Hemodynamics for surgeons. New York: Grune & Stratton, 1975.
11. Mukai K, Rosai J, Burgdorf WHC. Localization of factor VIII–related antigen in vascular endothelial cells using an immunoperoxidase method. Am J Surg Pathol 1980; 4:273–276.
12. Stridbeck H, Holmin T, Jonsson N, Lindstedt E, Ekelund L. Balloon catheter dilatation of stenotic renal artery anastomoses: experiments in the pig. Acta Radiol Diagn 1982; 23:373–380.
13. Myers JL, Waldhausen JA, Pae WE, Abt AB, Prophet GA, Pierce WS. Vascular anastomoses in growing vessels: the use of absorbable sutures. Ann Thorac Surg 1982; 34:529–537.
14. Schatz RA, Palmaz JC, Garcia F, Tio FO, Reuter SR. Balloon expandable intracoronary stents in dogs. Presented at the 59th Scientific Sessions of the American Heart Association, Dallas, November 17–20, 1986.
15. Palmaz JC, Sibbitt RR, Tio FO, Reuter SR, Peters JE, Garcia F. Expandable intraluminal vascular graft: a feasibility study. Surgery 1986; 99:199–205.
16. Sauvage LR. In: Wright CB, Hobson RW, Hiratzka LF, Lynch TG, eds. Vascular grafting: clinical applications and techniques. Littleton, Mass.: Wright, 1983.
17. Sigwart U, Puel J, Mirkowitch V, Joffre F, Imbert C. Intravascular stents to prevent occlusion and restenosis after transluminal angioplasty. N Engl J Med 1987; 316:701–706.

# Comparison of Mechanical Deformation Properties of Metallic Stents with Use of Stress-Strain Analysis[1]

Steven V. Lossef, MD
Robert J. Lutz, PhD
Julie Mundorf
Klemens H. Barth, MD

Index term:  Stents and prostheses

JVIR 1994; 5:341–349

PURPOSE: Elastic and plastic deformation properties of the Wallstent, Palmaz stent, and Strecker stent were evaluated quantitatively with an in vitro model simulating forces exerted by an eccentric lesion.
MATERIALS AND METHODS: A miniaturized compression testing device was constructed. Stress-strain graphs were obtained for each stent, and the elastic moduli and yield points were calculated.
RESULTS: There is a 21-fold range in the elastic modulus among the Wallstent, Palmaz stent, and Strecker stent. The Palmaz stent was the only device to exhibit permanent plastic deformation. The 10-mm Palmaz stent will undergo 15% focal eccentric narrowing at 0.75 atm of pressure; the "standard braid" and "less shortening braid" 10-mm Wallstents at 0.55 and 0.25 atm, respectively; and the 10-mm tantalum Strecker stent at 0.08 atm. Overlapping of stents doubles the stiffness of the Wallstent and the Strecker stent and doubles the yield point of the Palmaz stent. The 4–9-mm Palmaz stent is 30% more resistant to deformation than the larger 8–12-mm version when expanded to identical 8-mm diameters.
CONCLUSIONS: The "standard braid" version of the 10-mm Wallstent provides 2.3-fold additional strength for resistant stenoses compared with the "less shortening braid." Overlapping or nesting of stents may permit full expansion should there be incomplete expansion or recoil of a single stent. The 4–9-mm Palmaz stent is preferable from the standpoint of allowing the use of a smaller (7-F instead of 9-F) introducer sheath and also for providing superior resistance to deformation. A purely elastic stent such as the Wallstent is preferable in locations where permanent plastic deformation may occur, such as the thoracic outlet.

T HERE are wide differences in the mechanical properties of various endoluminal metallic stents, based on their structural designs and alloy compositions. Since the purpose of a stent is to counteract inward forces exerted by fixed lesions, the fundamental requirement is the ability to resist mechanical deformation.

Stress-strain analysis has been used to quantitate the elastic and plastic deformation that occurs when a force is applied to a material or device (1). It has traditionally been performed by materials engineers using large-scale compression testing machines unsuitable for studying relatively fragile devices. Because of the need for a standardized testing method to compare experimental and commercially available stents used by interventional radiologists, we have designed a miniaturized compression testing device.

The purpose of this investigation was to quantitate the elastic and plastic deformation properties of the Wallstent, the Palmaz stent, and

[1] From the Department of Radiology (S.V.L., K.R.B.), Georgetown University Hospital, 3800 Reservoir Rd NW, Washington, DC 20007, and the Biomechanical Engineering Branch, National Institutes of Health, Bethesda, Md (R.J.L., J.M.). From the 1993 SCVIR annual meeting. Received July 16, 1993; revision requested September 21; revision received November 8; accepted November 12. Address reprint requests to S.V.L.

© SCVIR, 1994

ATTACHMENT / EXHIBIT

342 · Journal of Vascular and Interventional Radiology

March–April 1994



a.                                                                b.

Figure 1.   (a) Idealized stress-strain graph of two purely elastic devices. The modulus of elasticity (slope) for device A is greater than that for device B, indicating greater resistance to elastic deformation (stiffness). (b) Idealized stress-strain graph of two devices exhibiting both elastic and permanent plastic deformation. The transition to the nonlinear portion of the curve (yield point) is higher for device C than for device D, indicating greater resistance to plastic deformation.

the Strecker stent by using an in vitro model simulating forces exerted by a fixed eccentric lesion. The model allowed us to answer questions about the effect of incomplete expansion of the Wallstent and the Palmaz stent, the effect of embedding stent ends within a vessel wall, and the effect of overlap on stent strength.

## OVERVIEW OF STRESS-STRAIN ANALYSIS

Analysis of mechanical deformation is performed by generating stress-strain diagrams for a given device (1). Stress is a measure of force per unit area and may be expressed as grams per square centimeter or atmospheres of pressure. Strain is a measure of fractional deformation and may be calculated by dividing the change in the stent diameter after incremental compression by the initial stent diameter. Plotting experimentally derived data of force per unit area exerted at each degree of fractional compression provides a graphical representation of the elastic and plastic deformation properties of a given device.

Elastic deformation is a reversible process with a linearly propor-

tional relationship between stress and strain. An example would be compression of a rubber block or spring. A hypothetical stress-strain diagram of two purely elastic devices is shown in Figure 1a. The slope of each straight line is called the modulus of elasticity (Young's modulus) and is a quantification of stiffness. In the example, device A has a larger modulus of elasticity (steeper slope) than device B, and is therefore stiffer, or more resistant to elastic deformation.

Plastic deformation is an irreversible process resulting in permanent remodeling and is due to reorganization of the atoms within the metallic members of a device. An example would be bending a malleable wire. A hypothetical stress-strain diagram of two plastically deformed devices is shown in Figure 1b. There is an initial linear relationship between stress and strain (elastic phase), which is quantified by the modulus of elasticity. The transition to a nonlinear portion of the curve (plastic phase) is marked by the yield point, which is the stress at which permanent, irreversible, plastic deformation begins. In the example, device C has a higher yield point than device D, signifying a greater resistance to plastic deformation.

## MATERIALS AND METHODS

A miniaturized compression testing device was constructed (Fig 2) with use of a precision digital micrometer head (LS Starrett, Athol, Mass) with a 0.25-inch-diameter (6.35-mm) cylindrical contacting surface, producing an eccentric deformation on the wall of each stent. The inferior surfaces of the ends of each stent were constrained by two clips in an adjustable immobilizing jig that prevented elongation. The micrometer head was firmly clamped directly over the midpoint of each stent to maintain firm contact. Each stent was incrementally compressed (0.1–0.4-mm increments) to a maximum of 50% of the initial diameter. At each level of deformation, the fractional force was measured with a digital scale (Sartorius, Gottingen, Germany). Stress was calculated by dividing the measured force by the area of the 0.25-inch-diameter micrometer head. Pressure in atmospheres was calculated by using standard conversion factors. Strain was calculated by dividing the distance of downward displacement at each level of compression by the initial stent diameter. Testing trials of each stent design and size were repeated with



**Figure 2.** Diagram of miniaturized compression testing device. Components include a precision digital micrometer head (*a*), which is clamped over the midportion of each stent (*b*). Force is measured with a digital scale (*c*). The inferior surfaces of the ends of each stent are constrained by two adjustable clips (*d*).



**Figure 3.** Standard braid 10-mm Wallstent (left), less shortening braid 10-mm Wallstent (middle), and standard braid 8-mm Wallstent (right).

three separate stents, and the stress-strain data were plotted by using a computerized graphing program (Kaleidograph; Synergy, Reading, Pa). The modulus of elasticity of each stent type and size was calculated by using a curve fitting algorithm, which averaged the three trials. The yield point was determined for those devices exhibiting permanent plastic deformation by graphically determining the transition between the initial linear and the nonlinear portions of the curves. Palmaz stents (Johnson & Johnson, Warren, NJ), Wallstents (Schneider, Minneapolis, Minn), and Strecker stents (Medi-tech/Boston Scientific, Watertown, Mass) were compared.

The following sizes (diameter) and types of stents were evaluated: Palmaz 8–12-mm stent (PS30) ex-

panded to 10 mm, Palmaz 8–12-mm stent (PS30) expanded to 8 mm, Palmaz 4–9-mm stent (P294M) expanded to 8 mm; Strecker 8-mm tantalum stent, Strecker 8-mm nitinol stent, Strecker 10-mm tantalum stent, Strecker 10-mm nitinol stent; and Wallstent 10-mm (model BTU7-1042-110) "less shortening braid" device, Wallstent 10-mm (model BTU7-1020-110) "standard braid" device, Wallstent 8-mm (model BTU7-0820-110) "standard braid" device.

Two different designs of the commercially available Wallstent were examined. The standard braid version of the 10-mm Wallstent (Fig 3, left) has a greater pitch of its braided wire elements (ie, more perpendicular orientation of the wire elements relative to the longitudinal axis) but shortens to a greater

degree when fully expanded when compared with the less shortening braid version (Fig 3, middle). The 8-mm-diameter Wallstent (Fig 3, right) is only available in the standard braid version.

The Palmaz and Strecker stents were expanded to the appropriate diameters with use of either an 8- or 10-mm angioplasty balloon. The self-expanding Wallstents did not require balloon expansion.

Stress-strain diagrams were generated during compression for each of these stents. Relaxation stress values were also recorded during decompression of 10-mm-diameter Wallstent, Palmaz, and Strecker stents.

To evaluate the properties of the 10-mm Wallstent when it is expanded in an undersized (8-mm diameter) vessel, a 10-mm-diameter Wallstent was constrained to an 8-mm diameter with circumferential loops of fine 5-0 silk thread spaced at 5-mm intervals along the axis of the stent. This modified stent was then immobilized at its ends and was tested in the standardized manner.

Evaluation of embedding of stent ends within the wall of a vessel was performed by compressing 10-mm stents. (*a*) with the ends immobilized with clips (our standard testing method, as indicated in Fig 2), (*b*) with the clips removed (unconstrained ends), and (*c*) with the ends circumferentially constrained within a closed segment of 10-mm (internal diameter) pliable, paper-thin, plastic tubing (0.0023-mm thickness), which did not exert any appreciable effect on deformation of the middle portion of the stent.

In a separate series of tests, pairs of the 10-mm standard braid Wallstent, Palmaz, and Strecker stents were overlapped by 50% of the overall individual stent length, and compression was performed at the midpoint of the overlap. The lengths of overlap for the Wallstent, Palmaz, and Strecker stents measured 10, 13.9, and 15 mm, respectively.

## RESULTS

The stress-strain diagrams for 10- and 8-mm-diameter stents are shown in Figures 4 and 5. Only the ends of these stents were immobilized, and the Wallstents were completely expanded. The elastic modulus of each 10-mm and 8-mm stent is listed in the Table. The modulus of elasticity is greatest for the Palmaz stents, intermediate for the Wallstent devices, and lowest for the Strecker stents. The Palmaz stent was the only device exhibiting any degree of permanent plastic deformation, with a nonlinear plateau evident on stress-strain diagrams. The yield point for the 8–12-mm Palmaz stent is 750 g/cm² when expanded to both 8- and 10-mm diameters. The 4–9-mm Palmaz stent expanded to an 8-mm diameter has a yield point of 900 g/cm².

Compression and relaxation stress-strain diagrams confirm that the 10-mm-diameter Wallstent (Fig 6a) and 10-mm-diameter nitinol Strecker stent (Fig 6b) behave elastically, with no appreciable plastic deformation even when compressed by 70% of their initial diameter. The slight differences between the relaxation and compression curves for the Wallstent (Fig 6a) and Strecker stent (Fig 6b) may be due to small instantaneous rearrangements in the orientation of the braided and woven wire elements as the contacting surface is slowly retracted. However, at the fully re-expanded state there is no appreciable permanent deformation. This is clearly different from the compression-relaxation curve for the Palmaz stent (Fig 6c), in which there is complete divergence of the curves due to appreciable permanent plastic deformation. The 10-mm Palmaz stent showed appreciable permanent plastic deformation (Fig 6c) when compressed by a stress greater than 750 g/cm² (0.75 atm). The 10-mm Palmaz stent returned to its original diameter only when subjected to stresses less than



**Figures 4, 5.** (4) Stress-strain graph: comparison of all 10-mm stents. Arrow indicates the yield point for the Palmaz stent. Thin solid line indicates 8–12-mm Palmaz stent expanded to 10 mm. Dotted and dashed line indicates standard braid Wallstent; dashed line, less shortening Wallstent; dotted line, tantalum Strecker; and thick solid line, nitinol Strecker. (5) Stress-strain graph: comparison of all 8-mm stents. Arrows indicate the yield points for the Palmaz stents. Thin solid line indicates 4–9-mm Palmaz stent expanded to 8 mm; dashed line, 8–12-mm Palmaz stent expanded to 8 mm; dotted line, standard braid Wallstent; thick solid line, nitinol Strecker; dotted and dashed line, tantalum Strecker.

the 750-g/cm² yield point (Fig 6d).

Comparison of the standard braid and less shortening braid versions of the 10-mm-diameter Wallstent showed that use of the standard braid design increases the modulus of elasticity by a factor of 2.3 (Fig 7).

Comparison of 4–9-mm and 8–12-mm Palmaz stents expanded to identical 8-mm diameters showed that the modulus of elasticity for the 4–9-mm device is 30% higher than that for the 8–12-mm stent (Fig 8).

Evaluation of the Strecker stents showed that use of a nitinol alloy did not produce sufficient stiffening of the stent to make it comparable to the Palmaz and Wallstents. For the 8-mm-diameter Strecker stent, use of the nitinol alloy resulted in a 46% increase in the modulus of

elasticity compared with the tantalum version; however, the modulus of elasticity for the nitinol Strecker stent was still lower than that for the Wallstent and 4–9-mm Palmaz stent by factors of 6.1 and 14.8, respectively. For the 10-mm-diameter Strecker stent, use of the nitinol alloy instead of tantalum decreased the modulus of elasticity by 42%.

Overlapping of the 10-mm Wallstent and Strecker stent resulted in doubling of the modulus of elasticity (Fig 9a, 9b). Overlapping of the 10-mm Palmaz stent increased the yield point from 750 to 1,500 g/cm² (Fig 9c).

Partial expansion of the 10-mm Wallstent to only 8 mm by using fine silk suture loops resulted in a 30% increase in the modulus of elasticity (Fig 10). Partial expan-

OCT. 6.2003   9:12AM   DBEPS                                                        NO.713   P.6



a.                                                    b.

c.                                                    d.

Figure 6.   Compression and relaxation stress-strain graphs. The 10-mm Wallstent (a) and Strecker stents (b) are purely elastic with no appreciable permanent deformation. The 10-mm Palmaz stent (c) showed appreciable permanent plastic deformation when compressed by a stress greater than 750 g/cm³ (0.75 atm). The 10-mm Palmaz stent returned to its original diameter only when subjected to stresses less than the 750-g/cm³ yield point (d).

sion of the 8–12-mm Palmaz stent to 8 mm instead of 10 mm resulted in a 3% decrease in the modulus of elasticity (Table).

Constraint of the ends of the 10-mm Wallstent to simulate embedding within the wall of a vessel resulted in a 50% increase in the modulus of elasticity (Fig 11). Constraint of the ends of the Palmaz stent did not appreciably alter the modulus of elasticity.

## DISCUSSION

The ability of the metallic stents that were tested in this study to resist deformation imposed by eccentric stresses varied enormously, with a 21-fold range. Subjecting stents to such standardized testing allows us to draw several practical conclusions. By using the graphs in Figures 4 and 5, the stress (in at-

mospheres) required to produce a given fractional narrowing of each stent can be predicted. If we are willing to tolerate a maximum of 15% residual luminal narrowing of a stent as an acceptable (although, perhaps suboptimal) threshold, the Strecker stents would fail at 0.06–0.08 atm. This may be sufficient for low-stress clinical situations such as placement in relatively compliant vessels containing a focal eccentric

Case 1:02-cv-22555-CMA   Document 155   Entered on FLSD Docket 11/14/2003   Page 120 of 145

346 · Journal of Vascular and Interventional Radiology

March–April 1994



7.                                                    8.

Figures 7, 8.   (7) Stress-strain graph comparing the 10-mm standard braid and less shortening braid Wallstent. Use of the standard braid design increases the modulus of elasticity by a factor of 2.3. (8) Stress-strain graph comparing the 4–9-mm-diameter and 8–12-mm-diameter Palmaz stents when expanded to identical 8-mm diameters. The modulus of elasticity for the 4–9-mm device is 30% higher than that for the 8–12-mm device.

lesion, or for tacking up an intimal flap. However, incomplete expansion of the Strecker stent despite repeated balloon inflations would be expected in the presence of hard or calcified mural plaques. Furthermore, our results indicate that the use of a nitinol alloy did not appreciably stiffen the Strecker stent.

With the same 15% diameter threshold, the less shortening braid version of the 10-mm Wallstent would fail at 0.25 atm and the standard braid version of the 10-mm Wallstent at 0.55 atm. Although the less shortening braid Wallstent is probably sufficient for most clinical applications, our data indicate that the standard braid design effectively doubles the ability to withstand eccentric stresses, and may be necessary for fibrotic or calcified lesions. This is not surprising, since the standard braid contains approximately twice the number of structural metallic elements per unit area.

The Palmaz stent has the greatest ability to withstand initial elas-

tic deformation. The various diameter Palmaz stents would require 0.75–1.15 atm of pressure to be radially compressed by 15%. This stress resistance should suffice for most clinical stent placement situations. However, the Palmaz stent is the only one exhibiting any degree of permanent plastic deformation. Greater stresses than these result in permanent plastic deformation of the Palmaz device. Use of the Palmaz stent in a location such as the thoracic outlet would be inadvisable, since intermittent stresses generated by compression between the clavicle and the first rib may be sufficient to produce permanent plastic deformation, a case of which has been reported by Bjarnason et al (2). Purely elastic stents, such as the Wallstent or Strecker stent, would be preferable in such a location even though their modulus of elasticity may be lower.

When the 4–9-mm Palmaz stent and the 8–12-mm Palmaz stent are expanded to identical 8-mm diameters, the 4–9-mm stent has a 30%

higher modulus of elasticity. This may be partly due to the fact that the 4–9-mm Palmaz stent has a slightly thicker strut (0.0055 inch) compared to the 8–12-mm Palmaz stent (0.0050 inch). A second explanation, proposed by Palmaz et al (3), is that at the 8-mm diameter, the 4–9-mm stent is almost maximally expanded and the diamond-shaped struts are nearly vertically oriented, providing maximal structural support. On the other hand, at the 8-mm diameter, the 8–12-mm stent is minimally expanded, with the struts oriented more horizontally, providing weaker mechanical support (Fig 12). This is fortuitous, since the 4–9-mm stent is preferable not only from the standpoint of allowing the use of a smaller (7-F instead of 9-F) introducer sheath, but also for providing superior resistance to deformation.

To answer the question of how well a 10-mm Wallstent functions when placed in an 8-mm-diameter vessel, we modified our testing protocol by constraining the 10-mm

Case 1:02-cv-22555-CMA   Document 155   Entered on FLSD Docket 11/14/2003   Page 121 of 145



Figures 9, 10.  (9) Stress-strain graphs demonstrate the effect of overlapping the 10-mm Wallstent (a), Strecker stent (b), and Palmaz stent (c). Overlapping or nesting of stents doubles the stiffness of the Wallstent and Strecker stent and doubles the yield point of the Palmaz stent. Solid lines indicate overlapping stents, and broken lines indicate nonoverlapping stents. (10) Stress-strain graph shows the effect of incomplete expansion of the 10-mm Wallstent to only 8 mm (broken line). Partial expansion resulted in a 30% increase in the modulus of elasticity. Solid line indicates the fully expanded Wallstent.

stent to an 8-mm diameter with 5-0 circumferential silk threads. The results show that the stiffness actually increases by 30% (Fig 10). An explanation is that incomplete expansion of the Wallstent has the same effect as precompression of a spring before applying an additional load.

Overlapping of purely elastic stents such as the Wallstent and Strecker stent was found to have the effect of doubling the modulus of elasticity (stiffness). Overlapping the Palmaz stent doubles the yield point (stress at which permanent plastic deformation occurs). This suggests that in cases where there is incomplete expansion of a single stent due to a resistant lesion, insertion of a second, nested stent may permit more complete expansion. Double stent placement may be preferable to overinflation of a single stent especially in the case of the Wallstent, since overdilation may lead to deleterious stent shortening and unnecessary stretching of the vessel wall.

By using the two clips to immobilize the inferior surfaces of the ends of each stent in our model, we attempted to provide only enough constraint to prevent stent elongation without restricting motion of metallic elements in any other direction. All parts of the stent except for the ends are allowed freedom of motion. Graphs for Figures 4–10 were generated by using this immobilization technique. While our model was designed to simulated embedding of the ends in vessel, it by no means is equivalent to embedding of the entire stent in a rigid or elastic arterial wall.

Fallone et al (4) described a circumferential, belt-like device used to measure the coefficient of stiffness of Gianturco stents designed for insertion in the superior vena

348 · Journal of Vascular and Interventional Radiology

March–April 1994



| Elastic Modulus for Tested Stents | |
|---|---|
| Stent | Elastic Modulus (g/cm²) |
| **8-mm stents** | |
| 4–9-mm Palmaz | 9,338 |
| 8–12-mm Palmaz | 7,195 |
| SB Wallstent | 3,395 |
| Nitinol Strecker | 629 |
| Tantalum Strecker | 432 |
| **10-mm stents** | |
| 8-12-mm Palmaz | 7,410 |
| SB Wallstent | 4,019 |
| LSB Wallstent | 1,717 |
| Tantalum Strecker | 605 |
| Nitinol Strecker | 353 |

Note.—LSB = less shortening braid, SB = standard braid.

Figure 11. Effect of various end constraints on the stress-strain graphs for the 10-mm standard braid Wallstent. Embedding of the ends of the Wallstent results in a 50% increase in the modulus of elasticity.

cava. Agrawal et al (5) used the same device to study experimental bioabsorbable polymeric stents. Palmaz et al (3) also used such a device to determine the effect of stent diameter on stent strength. Although this testing method provides information about the circumferential hoop strength of stents, a limitation of their measurement technique is that the stent ends are unconstrained. The method of Fallone et al (4), although appropriate for the Gianturco stent, which does not significantly change in length when compressed, may not be applicable to the Wallstent, which lengthens when compressed. Using our technique, we found that mechanical constraint of the ends of the Wallstent to simulate embedding within the vessel wall appreciably increases the measured modulus of elasticity, since it prevents elongation of the stent, which dissipates stress. The actual stiffness of the Wallstent in a vessel would be underestimated when using the method of Fallone et al. Lammer et al (6) included a graph of hoop strengths in Newtons versus millimeters of compression for various biliary metallic stents, but they do not elaborate on their measurement techniques nor quantitate the strength of their stents. The minimal differences between the hoop

strengths of the Wallstent and Strecker stent shown on the graph may be due to lack of constraint of the ends of the Wallstent. There may also be differences between comparison of resistance to eccentric deformation and circumferential hoop strength. We purposely used an eccentric model to more accurately predict responses of stents to eccentric arterial plaques and to more precisely simulate the behavior of an embedded stent within the wall of a vessel.

A limitation of our model is that it does not assess the amount of force required to resist a progressive eccentric lesion such as neoplasia. The model also does not take into account gradual tissue changes that permit self-expanding stents to continue to expand after placement. Finally, this model expresses the pressure component exerted by a focal eccentric plaque but cannot take into account the circumferential or hoop component of the rest of the arterial wall. Despite these limitations, the model does provide a standardized method for comparing the initial ability of a stent to expand in response to a fixed eccentric lesion.



Figure 12. Left: The 4–9-mm Palmaz stent expanded to 8-mm diameter. Note the more vertical orientation of the diamond shaped struts. Right: The 8–12-mm Palmaz stent expanded to identical 8-mm diameter. There is a more horizontal orientation of the metallic struts, providing less support.

## CONCLUSIONS

According to our results, the resistance to stent compression can be measured for a fixed, eccentric lesion.

1. The 10-mm Palmaz stent will undergo 15% focal eccentric narrowing at 0.75 atm; the standard braid and less shortening braid 10-mm Wallstents at 0.55 and 0.25 atm, respectively; and the 10-mm tantalum Strecker stent at 0.08 atm.

2. Overlapping or nesting of stents doubles the stiffness of the

Wallstent and Strecker stent and doubles the yield point of the Palmaz stent. This may permit full expansion should there be incomplete expansion or recoil of a single stent.

3. The 4–9-mm Palmaz stent is actually 30% more resistant to deformation than the larger 8–12-mm version when expanded to identical 8-mm diameters.

4. The standard braid version of the Wallstent provides 2.3-fold additional strength for resistant stenoses compared with the less shortening braid.

5. A purely elastic stent such as the Wallstent is preferable in locations where permanent plastic deformation may occur, such as the thoracic outlet.

References

1. Van Lack, Lawrence H.  Elements of materials science and engineering. 4th ed. Reading, Mass: Addison Wesley, 1980.

2. Bjarnason H, Hunter DW, Crain MR, Ferral H, Miltz-Miller SE, Wegryn SA.  Collapse of a Palmaz stent in the subclavian vein. AJR 1993; 160:1123–1124.

3. Palmaz JC, Kopp DT, Hayashi H, et al.  Normal and stenotic renal arteries: experimental balloon-expandable intraluminal stenting. Radiology 1987; 164:705–708.

4. Fallone BG, Wallace S, Gianturco C.  Elastic characteristics of the self-expanding metallic stents. Invest Radiol 1988; 23:370–376.

5. Argrawal CM, Clark HG. Deformation characteristics of a bioabsorbable intravascular stent. Invest Radiol 1992; 27:1020–1024.

6. Lammer J, Flueckiger F, Hausegger KA, Klein GE, Aschauer M. Biliary expandable metal stents. Semin Intervent Radiol 1991; 8:233–241.

# Patterson, Belknap, Webb & Tyler LLP

1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
Fax (212) 336-2222

Eugene M. Gelernter                                                                                Direct Phone

November 4, 2003

**By Fax and U.S. Mail**

Frederick A. Tecce, Esq.
McShea/Tecce, P.C.
The Mellon Bank Center - 16th Floor
1735 Market Street
Philadelphia, PA 19103

Re:    **Arlaine & Gina Rockey, Inc. v. Cordis Corporation**

Dear Fred:

As you know, Cordis has moved, *inter alia*: (i) for summary judgment, (ii) to strike Dr. Leonard's Supplemental Report on the doctrine of equivalents, and (iii) to bar AGRI's experts from offering opinions on infringement under the doctrine of equivalents.

If the Court does not grant those pending motions, then Cordis intends to present expert testimony from Dr. Nigel Buller on the issue of whether Cordis' balloon-expandable stents infringe claim 2 of the Rockey '1,653 patent under the doctrine of equivalents. Dr. Buller is an interventional cardiologist at the Royal Brompton National Heart and Lung Hospital in Birmingham, England.

Very truly yours,

Eugene M. Gelernter

cc:    Rudy Aragon, Esq. (by fax)
       Harvey W. Gurland, Esq. (by fax)
       Thomas J. Duffy, Esq. (by fax)

949939v1

ATTACHMENT / EXHIBIT ____

3 of 42 DOCUMENTS

**JEFFERY SAAD, Plaintiff, vs. SHIMANO AMERICAN CORP., Defendant.**

No. 98 C 1204

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2000 U.S. Dist. LEXIS 10974*

**July 21, 2000, Decided
July 24, 2000, Docketed**

**DISPOSITION:** [*1] Plaintiff's motion no. 2 GRANTED in part and DENIED in part; plaintiff's motion nos. 3, 8, 28, 29 and 30 GRANTED; plaintiff's motion nos. 1, 5, 20, 23, 24, 25-27 and 31 DENIED. Defendant's motion nos. 5, 8, and 11 GRANTED; defendant's motion nos. 4, 7 and 10 DENIED; defendant's motion no. 12 GRANTED in part and DENIED in part with respect to 12(d) and DENIED with respect to 12(a), (b) and (j).

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For JEFFERY SAAD, plaintiff: Paul Robert Borth, James D. Montgomery & Associates, Ltd., Chicago, IL.

For JEFFERY SAAD, plaintiff: Peter Michael Trobe, Trobe & Dudley, Waukegan, IL.

For SHIMANO AMERICAN CORPORATION, defendant: John Patrick McGahey, Thomas F. Murray, Rebecca Marie Burkett, Wilson, Elser, Moskowitz, Edelman & Dicker, Chicago, IL.

For SHIMANO AMERICAN CORPORATION, defendant: Loren Scott Cohen, Law Office of Loren S. Cohen, Chicago, IL.

**JUDGES:** SIDNEY I. SCHENKIER, United States Magistrate Judge.

**OPINIONBY:** SIDNEY I. SCHENKIER

**OPINION:**

### MEMORANDUM OPINION AND ORDER

This products liability case is set for a jury trial on August 28, 2000. In anticipation of trial, the plaintiff, Jeffery Saad ("plaintiff"), and the defendant, Shimano American Corporation ("defendant" or [*2] "Shimano"), have filed various motions in limine.

The plaintiff has filed thirty-one motions in limine [doc. # 18-1 through 18-31], but since that filing, the parties have stipulated to sixteen of the motions: Nos. 2 (with respect to contributory negligence) 4, 6, 7, 9-19, 21, and 22. Pursuant to an order dated March 29, 2000, this Court granted those sixteen motions in limine, leaving fifteen for resolution by the Court: nos. 1, 2 (with respect to assumption of risk and misuse), 3, 5, 8, 20, and 23-31.

For its part, Shimano has filed twelve motions in limine [doc. # 19-1 through 19-12]. The parties have stipulated to three of those motions and part of another (nos. 1, 2, 3 and 12(c), (e), (f), (g), (h), and (i)); Shimano has withdrawn two other motions (nos. 6 and 9). Those stipulations and withdrawals also were memorialized in the Court's March 29, 2000 order. Thus, Shimano now seeks a ruling on the remaining seven defense motions: nos. 4, 5, 7, 8, 10, 11, and 12(a), (b), (d), and (j).

After careful review of these motions and the materials filed in connection with them, the Court rules as follows:

**Plaintiff's Motions.**

> A. Motion no. 1, which seeks to bar [*3] defendant's expert testimony, is denied;

> B. Motion no. 2, which seeks to strike and bar evidence of the defenses of assumption of risk and misuse, is granted in part and denied in part;



ATTACHMENT / EXHIBIT

2000 U.S. Dist. LEXIS 10974, *

C. Motion no. 3, which seeks to bar defendant from arguing that plaintiff has the burden of proving feasible alternative design, is granted;

D. Motion no. 5, which seeks to bar a jury instruction on compliance with industry standards, is denied;

E. Motion no. 8, which seeks to bar argument regarding the effect of a large damage award on the public, is granted;

F. Motion no. 20, which seeks exclusion of certain defense witnesses, is denied;

G. Motion no. 23, which seeks to bar argument and comment regarding any alleged unavoidable unsafe condition and/or open and obvious danger of defendant's product, is denied;

H. Motion no. 24, which seeks to bar argument and comment regarding substantial change or alteration of the defendant's product, is denied;

I. Motion nos. 25-27, which seek to allow questioning of potential jurors on issues related to insurance, are denied;

J. Motion no. 28, which seeks to allow questioning of potential jurors on issues related to [*4] large damage awards, is granted;

K. Motion no. 29, which seeks to bar assertion of a state of the art defense, is granted;

L. Motion no. 30, which seeks exclusion of evidence concerning pedal designs and clip devices used by other manufacturers, is granted; and

M. Motion no. 31, which seeks to bar argument and comment regarding the safety of defendant's product as compared to clipless pedal products of other manufacturers, is denied as moot.

**Defendant's Motions.**

A. Motion no. 4, which seeks to exclude evidence regarding plaintiff's loss of future earnings and/or earnings capacity, is denied;

B. Motion no. 5, which seeks to exclude evidence that the warnings and instructions that accompanied the product were inadequate, is granted;

C. Motion no. 7, which seeks to bar expert opinions other than those expressed at the deposition of plaintiff's expert, is denied;

D. Motion no. 8, which seeks to bar references to defendant as a Japanese corporation, is granted;

E. Motion no. 10, which seeks to bar plaintiff's expert from testifying, is denied;

F. Motion no. 11, which seeks to bar evidence and argument regarding the feasibility [*5] of alternative designs, is granted; and

G. Motion no. 12, which seeks to bar "various . . . inflammatory and prejudicial remarks[,]" is granted in part and denied in part.

I.

The uncontested facts, as set forth in the final pretrial order, are as follows. In 1995, the plaintiff purchased a Shimano "clipless pedal" (Model PD-M 737) and installed it on his bicycle. The Shimano "clipless pedal" is designed to be used with a shoe that has a cleat which fits into the pedal. The plaintiff purchased compatible bicycle shoes with cleats ("multiple release" SH55 cleats). The defendant, Shimano, advertised, distributed and sold the pedal, shoes and cleats ("clipless pedal system") through a string of distributors.

The plaintiff purchased his clipless pedal system through one of these non-party distributors, replaced the standard toeclip pedals that were sold with his Trek bicycle, and installed the clipless pedal system on his bicycle in a proper manner. The tension on the pedal was properly adjusted. In fact, for at least six months before the date of the accident, the plaintiff used the clipless pedal system without incident, riding at least 50-100 miles prior to the accident. [*6] During this six month period, the plaintiff sustained one fall where he fell sideways off the bicycle; at that time, his feet released from the pedals. During normal use, the plaintiff also had no problem releasing his feet from the pedals when he stopped the bicycle.

On April 20, 1996, the plaintiff injured his right ankle when he fell off of his bicycle in a backward direction. To avoid the fall, the plaintiff attempted to

"pop out" of the fall by attempting a "pogo-like maneuver" which caused plaintiff and his bicycle to flip backward, contacting the road. During the fall, the plaintiff's left foot "clicked out" of the bicycle pedals, but his right foot did not release from the pedal until he sat up on the ground after the fall. The plaintiff received immediate and ongoing medical treatment for injuries to his right ankle which included surgery and physical therapy. The Shimano bicycle pedals used by the plaintiff on the day of his accident are the product at issue in this case.

II.

The plaintiff has filed fifteen motions in limine that require resolution by the Court (nos. 1, 2 -- with respect to assumption of risk and misuse -- 3, 5, 8, 20, and 23-31). By those motions,  [*7]  the plaintiff seeks to: bar certain testimony of defendant's expert (no. 1); strike and bar certain defenses (nos. 2 (with respect to assumption of risk and misuse) and 23); bar evidence and arguments relating to alternative designs (nos. 3, 29-30); allow certain voir dire questions to be asked of prospective jurors (nos. 25-28); and bar what plaintiff considers to be prejudicial comments, arguments, instructions, and witnesses (nos. 5, 8, 20, 24 and 31). We will address each motion by grouping the requests under the broader subject matter categories to which they relate.

*A. Defendant's Expert Testimony (Plaintiff's Motion No. 1).*

In motion in limine no. 1, the plaintiff seeks to bar defendant's expert, David A. Mitchell, from testifying that:

(a) In the majority of the possible foot positions within the normal pedal rotation, the foot or leg of the rider will contact the bicycle frame and be prevented from achieving the necessary conditions for foot release.

(b) Clipless pedals are not specifically designed to release in the event of a fall.

(c) The forces exerted on the pedal system in falling backward are generally perpendicular to the fall and [*8] the pedals are not intended to release in that direction.

(d) That plaintiff's right foot contacted the bicycle and did not rotate sufficiently to result in a release.

The Supreme Court has made it clear that the courts must take seriously their "gatekeeper" function under Fed.R.Evid. 702, and allow into evidence only expert

testimony that meets certain threshold standards of reliability and usefulness. *Kumho Tire Co, Ltd. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* The Seventh Circuit has recently explained the standards for discharging that gatekeeper function under Rule 702, in light of *Kumho* and *Daubert. See, e.g., Smith v. Ford Motor Co., 215 F.3d 713, 2000 WL 709895* (7th Cir., 2000). Because *Smith* is the Seventh Circuit's most recent teaching on this subject, we quote from the opinion at length:

The admission of expert testimony is specifically governed by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).* [*9] Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Supreme Court in *Daubert* interpreted this rule to require that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *509 U.S. at 589.* In other words, as a threshold matter "a district court is required to determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue." *Walker v. Soo Line R.R. Co., 208 F.3d 581, 586 (7th Cir. 2000).* When making these determinations, the district court functions as a "gatekeeper" whose role is "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *See DePaepe v. General Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998).*

In analyzing the [*10] reliability of proposed expert testimony, the role of the

2000 U.S. Dist. LEXIS 10974, *

court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. *See Kumho, 526 U.S. at 153.* An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. While "extensive academic and practical expertise" in an area is certainly sufficient to qualify a potential witness as an expert, *Bryant v. City of Chicago, 200 F.3d 1092, 1098 (7th Cir. 2000),* "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience," *Walker, 208 F.3d at 591...* Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.

A court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based [*11] upon some recognized scientific method." *Clark v. Takata Corp., 192 F.3d 750, 759 n.5 (7th Cir. 1999).* However, we emphasize that the court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment. *See Daubert, 509 U.S. at 595* ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate"); *Walker, 208 F.3d at 587* (stating that when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "it was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed").

\* \* \*

The *Daubert* standard applies to all

expert testimony, whether it relates to areas of traditional scientific competence or whether it is founded on engineering principles or other technical or [*12] specialized expertise. *See Kumho, 526 U.S. at 141.* In *Daubert,* the Supreme Court outlined four factors that may be pertinent to the district court's analysis of expert testimony. Those traditional factors are: 1) "whether [the expert's theory] can be (and has been) tested"; 2) "whether the theory or technique has been subjected to peer review and publication"; 3) "the known or potential rate of error"; and 4) "general acceptance" among the relevant scientific community, *Daubert, 509 U.S. at 593-94.* However, as the Supreme Court has repeatedly emphasized, the Rule 702 test is a flexible one, and no single factor is either required in the analysis or dispositive as to its outcome. *See Kumho, 526 U.S. at 141* ("The test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."); *Daubert, 509 U.S. at 594* ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."). The trial court must use the criteria relevant to a particular kind of expertise in a specific case to "make certain that an expert, whether basing [*13] testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Id.* at \*\*2-4.

In this case, plaintiff does not challenge Mr. Mitchell's qualifications to testify about the clipless pedal system used by the plaintiff at the time of his accident. Nor does the plaintiff challenge the relevancy of the proposed expert testimony; indeed, there is no question that these opinions (if reliable) would assist the jury in understanding and resolving the disputed claims in this case. Rather, the plaintiff challenges the reliability of Mr. Mitchell's opinions. Therefore, the Court focuses on whether, based on the methodology he employed to reach them, each of Mr. Mitchell's opinions is sufficiently reliable, to meet the threshold standard for admissibility.

### 1. Inward Pedal Release

In his expert report, Mr. Mitchell opined that,

. . . as a practical matter, attempted foot

2000 U.S. Dist. LEXIS 10974, *

release by heel rotation toward the bicycle frame is not a desirable means of foot removal from the pedals. This is because for the majority of the possible foot positions within [*14] the normal pedal rotation, the foot or leg of the rider will contact the bicycle frame and be prevented from achieving the necessary conditions for foot release. It is the outward, away from the frame, rotation that is the standard and accepted release means.

(Pl.'s Mem., Ex. A at 4). Mr. Mitchell further opined that it is likely that plaintiff's right foot "contacted the bicycle and did not rotate sufficiently to result in a release" (Id.).

The plaintiff contends that Mr. Mitchell did not perform the tests necessary to render these opinions reliable:

he never tested the release of the cleat in the inward position nor did he make any measurements concerning the distance between a rider's foot or leg and the frame of the bicycle. He also did not make any measurements concerning the amount of distance a foot would have to be rotated to release from the cleat.

(Pl.'s Mem. at 3). The plaintiff also argues that these opinions "are not based on personalized experience or any specialized knowledge in the area" of bicycle riding (Pl.'s Mem. at 4). According to plaintiff, although an expert "can tie observations to conclusions through the use of specialized experience, [*15] " Mr. Mitchell did not "even attempt[] to release the pedal in the inward mode during his inspection or in his bicycle riding experience" (Pl.'s Mem. at 4).

Having reviewed Mr. Mitchell's expert report (Pl.'s Mem., Ex. A), and Mr. Mitchell's excerpted deposition testimony (Pl.'s Mem., Ex. B), the Court finds that Mr. Mitchell's opinion regarding inward pedal release and the contact of a bicycle user's foot with the bicycle frame during "normal pedal rotation" has sufficient indicia of reliability to be admissible under Rule 702 and the controlling case law. Mr. Mitchell's opinion is based on knowledge derived both from specialized engineering principles and practical experience. The expert report prepared by Mr. Mitchell examines the factual data regarding the accident; the components of the bicycle and pedal system used by the plaintiff; results from the tests he performed on the Shimano clipless pedal system used by the plaintiff at the time of the accident; and the product history of the clipless pedal system, in general, and the Shimano clipless pedal system, in particular.

The first Daubert factor, "whether [the expert's

theory] can be (and has been) tested" is satisfied [*16] by the tests Mr. Mitchell performed on the plaintiff's bicycle. These tests incorporate both his specialized knowledge and his practical experience with the clipless pedal system. Mr. Mitchell's tests measured the force necessary to accomplish both outward and inward pedal release with the clipless pedal system used by the plaintiff at the time of the accident, using standards promulgated by the American Society for Testing and Materials ("A.S.T.M. standards") (Pl.'s Mem., Ex. A at 2-4). While those tests revealed that inward and outward release from the clipless pedal system required similar degrees of force within the normal pedal rotation, Mr. Mitchell opined that an outward motion for release is "essentially universal" because it does not correspond to the normal pedaling motion and thus minimizes inadvertent release (Pl.'s Mem., Ex. A at 4). That opinion is not terribly different from the testimony of plaintiff's own expert, who stated that "a normal release outward is definitely more natural for a rider," and that bicycle riders "always release outward, unless...messing around with a cleat for some other reason" (Def.'s Mem., Ex. B, Green Dep. at 51-52).

The fourth Daubert [*17] factor, "general acceptance" among the relevant scientific community, is also satisfied by Mr. Mitchell's expert report and deposition testimony. Mr. Mitchell's opinion is that the clipless pedal system is designed in a way that allows a cyclist to gain release from the pedals by an outward rotation of the rider's heels (Pl.'s Mem., Ex. A at 2), but is not

specifically designed to release in the event of a fall . . . due to the complexity and variability of the forces involved in the myriad of potential accidents. Rather, the pedals are designed to permit the rider to free himself when confronted with a potential fall.

(Pl.'s Mem., Ex. A at 4). We note that although plaintiff's expert has opined that the shoe should release inwardly during a fall without any conscious effort by the rider, he also has offered the following testimony that is consistent with certain aspects of Mr. Mitchell's opinion: "You cannot disengage during a fall because it happens too fast, there's not enough reaction time, but prior to the fall, sure, he [the rider] has a decision to disengage" (Def.'s Mem., Ex. B, Green Dep. at 61).

Mr. Mitchell's opinion is supported by his discussion regarding [*18] the history of the clipless pedal system, in general, and the design and intended function of the Shimano clipless system, in particular. This historical overview incorporates generally accepted knowledge of such systems in the relevant "scientific community" and reflects a sufficient level of intellectual rigor to render

2000 U.S. Dist. LEXIS 10974, *

the opinion admissible under Rule 702. Mr. Mitchell's explanation regarding the rationale for outward as opposed to inward release is also helpful in clarifying the issues in this case, and thus assisting the trier of fact.

Mr. Mitchell's analysis thus satisfies two of the four *Daubert* factors. The presence or absence of any one *Daubert* factor in an expert analysis is not invariably necessary or dispositive. *Kumho, 526 U.S. at 141; see also Smith, 215 F.3d 713, 2000 WL 709895,* at * 4 (reversing trial court exclusion of expert testimony that had been based on the absence of peer review). However, in this case, the fact that two of the *Daubert* factors are met is, in the Court's view, sufficient to render Mr. Mitchell's opinion regarding inward pedal release reliable enough to be admissible under Rule 702. Whether Mr. Mitchell's opinion [*19] or, instead, Mr. Green's opinion as to what inward release properties the pedal should possess when a bicycle falls carries the day will be for the jury to decide.

Plaintiff's arguments about Mr. Mitchell's failure to conduct measurement tests in connection with his opinion that there would not "necessarily" be room to perform an inward release without striking the bicycle frame (Pl.'s Mem., Ex. B, at 65) goes more to the persuasiveness of Mr. Mitchell's opinion than to its admissibility. At the threshold, the Court notes that while testing is often important, it is not "an absolute prerequisite to the admissibility of expert testimony." *Cummins v. Lyle Indus., 93 F.3d 362, 369 (7th Cir. 1996).* Here, Mr. Mitchell has opined that "measurements aren't necessary[,]" because the distance in an inward rotation is "essentially the same distance as outward rotation" or approximately "an inch and a half" which is "a standard amount" (Pl.'s Mem., Ex. B at 66). Here, Mr. Mitchell testified that the opinions also could be verified without measurements: "you just have to get on the bicycle and, I mean, you would see it immediately" (*Id.* at 65). Mr. Mitchell further testified [*20] that, in his view, the important factor "is the force, not the distance[,]" because "the leg is at least as important a factor as the . . . heel" when determining whether the leg or foot would strike the bicycle on an inward release (*Id.* at 66). The correctness of Mr. Mitchell's opinions concerning the likelihood of impact with the bicycle frame from an inward release, including the importance placed on the factor of force rather than distance, turn on the resolution of factual questions that are for the jury to decide. *See Smith, 215 F.3d 713, 718, 2000 WL 709895, *3 (citing Daubert, 509 U.S. at 595).*

### 2. The Pedal Rotation Forces During A Backward Fall.

The plaintiff also challenges the reliability of Mr. Mitchell's conclusion that the "forces exerted on the pedal system in falling backward are generally perpendicular to the pedal" and "the pedals are not

intended to release in [a perpendicular] direction as they routinely permit the rider to pedal with an alternation of one foot pushing downward while the other foot pulls upward" (Pl.'s Mem., Ex. A at 4). The plaintiff bases this challenge on his perception of a conflict between Mr. Mitchell's expert [*21] report and his deposition testimony.

The expert report utilizes the same tests described above in relation to the inward and outward release of the foot from the pedal. As noted, these tests employed A.S.T.M. standards to specifically measure the degree of force necessary to release the foot in both the inward and the outward positions (Pl.'s Mem., Ex. A at 2-3). Concluding that outward rather than inward release is the intended use for clipless pedals, Mr. Mitchell states that the type of force exerted by a cyclist during a backward fall is "generally perpendicular to the pedal," and "the pedals are not intended to release in that direction as they routinely permit the rider to pedal with an alternation of one foot pushing downward while the other foot pulls upward" (Pl.'s Mem., Ex. A at 4).

The plaintiff argues that while Mr. Mitchell's report stated that perpendicular forces would be exerted on the pedal during a backward fall, he admitted in his deposition that rotational forces also would be applied to the pedal during a fall (Pl.'s Mem. at 4-5, Ex. B at 78-79). Plaintiff argues that this alleged conflict between the expert report and the deposition testimony regarding the type [*22] of force exerted on the pedal during a fall renders Mr. Mitchell's opinion unreliable (Pl.'s Mem. at 5).

We disagree. The Court does not view Mr. Mitchell's deposition testimony that "rotational forces" would be exerted to be so in conflict with the statement in his expert report that the forces "generally" would be perpendicular (a statement that contemplates other forces -- including rotational forces -- might also be at play) that it renders the opinion inadmissible. Once again, plaintiff's arguments are better directed to the weight to be given to Mr. Mitchell's opinions-a factual determination for the trier of fact-rather than the admissibility of such opinions-a legal question for the Court.

In sum, the Court finds that the methodology used by Mr. Mitchell to arrive at the challenged opinions is sufficiently reliable to admit at trial. Of course, we express no view as to what weight, if any, will be assigned to those opinions; that will be for the jury to decide. Plaintiff's motion in limine no. 1 is denied.

### B. Limits on Defendant's Liability (Motions Nos. 2 and 23).

In motion nos. 2 and 23, the plaintiff seeks to bar the defendant from making certain arguments [*23] that, if successful, could allow the defendant to limit or avoid its

2000 U.S. Dist. LEXIS 10974, *

liability in this action. The parties have stipulated to motion no. 2 with respect to contributory negligence, and as a result, Shimano will not assert at trial that affirmative defense. For the reasons stated below, motion no. 2 is granted in part and denied in part with respect to the defenses of assumption of risk and misuse; motion no. 23 is denied.

### 1. Assumption of Risk

The plaintiff seeks to "bar Shimano from either arguing, intimating, or questioning witnesses on the issue of whether or not Jeffrey Saad assumed the risk of injury" from use of the Shimano clipless pedal system (Pl.'s Mem. at 5). In *Williams v. Brown Manufacturing Co., Inc.,* 45 Ill. 2d 418, 261 N.E.2d 305 (1970), the Supreme Court of Illinois recognized that a plaintiff's conduct can bar recovery in a strict products liability action, stating, ". . . a plaintiff who knows a product is in a dangerous condition and proceeds in disregard of this known danger (often termed 'assumption of risk') may not recover for resulting injuries." *Id. at 426.* The Court there stated that only conduct rising to the level [*24] of assumption of risk or misuse of the product would bar a plaintiff's recovery. *Id. at 425-26.*

The *Williams* Court explained that whether a user assumed the risk of injury is "fundamentally a subjective test," the determination of which is ordinarily for the jury. *Id. at 430.* The user's testimony denying any knowledge of the danger is only one factor to be considered. *Id.* The other relevant factors are ". . . the user's age, experience, knowledge and understanding, as well as the obviousness of the defect and the danger it poses." *Id. at 431.*

In 1980, the Supreme Court of Illinois elaborated on the elements of the defense of assumption of risk. *Thomas v. Kaiser Agricultural Chemicals, 81 Ill. 2d 206, 40 Ill. Dec. 801, 407 N.E.2d 32 (1980).* The Court stated: "[a] plaintiff assumes the risk of a defective product only if he is actually aware of the defective nature of the product and appreciates its unreasonably dangerous character, but chooses voluntarily to act in disregard of such known danger." *Id. at 213, See also Walsh v. Emergency One, Inc., 26 F.3d 1417, 1422 (7th Cir. 1994)* [*25] ("in order to 'assume the risk' the plaintiff must have voluntarily and unreasonably used that aspect of the product that was alleged (and proven) to be unreasonably dangerous" and [this] rule "requires us only to ask whether the risk assumed was the same risk as allegedly caused the injuries") (*citing Varilek v. Mitchell Engineering Co., 200 Ill. App. 3d 649, 146 Ill. Dec. 402, 558 N.E.2d 365 (4th Dist. 1990); and Cleveringa v. J.I. Case Co., 230 Ill. App. 3d 831, 851, 172 Ill. Dec. 523, 595 N.E.2d 1193 (1st Dist. 1992)). Walsh* reaffirmed that the test is a subjective one, and that mere negligence by the user does not amount to an assumption of the risk. *26 F.3d at 1422.* This test requires the Court to determine

whether the plaintiff made a "conscious decision to encounter an appreciated risk of harm[,]" and "requires us only to ask whether the risk assumed was the same risk as allegedly caused the injuries." *Id.* (*citing* W. Page Keeton *et al.,* Prosser and Keeton on Torts § 79, at 566 (5th ed. 1984)).

Here, the plaintiff asserts that the defendant cannot prove the elements of the defense of assumption of risk (Pl.'s Mem. [*26] at 5-6). *First,* the plaintiff notes that the defendant has not conceded that the product was defective (*Id.* at 5). *Second,* the plaintiff states that the defendant "cannot present evidence that Jeffrey Saad subjectively knew that the pedal system possessed latent design and manufacturing defects that would manifest themselves in a fall" (*Id.*). Finally, the plaintiff states, "there is no evidence that Jeffrey Saad used the Shimano [sic] in blatant disregard of a dangerous condition" (*Id.* at 6). For these reasons, the plaintiff argues, the defense should be stricken.

The defendant responds that "at trial, Defendant will show, based upon Plaintiff's own testimony, that he was an experienced and avid bicyclist who understood and appreciated any alleged dangerous propensities of the clipless pedal system to keep the shoe on the pedal while riding" (Def.'s Opp. Mem. at 4). The defendant then directs this Court's attention to portions of the plaintiff's deposition testimony that assertedly support this conclusion (*Id.* at 4-5), arguing that certain statements allegedly show that plaintiff's injuries were the result of voluntary and intentional assumption of risk, [*27] in particular, statements showing that: (1) plaintiff is an experienced bicyclist who has used clipless pedal systems in the past and is familiar with any alleged dangerous propensities of the clipless pedal system (Def.'s Ex. A, Saad Dep. at 10-11); (2) plaintiff had fallen from his bicycle in low-speed conditions while using the Shimano clipless pedal system, and he knew how to and did release both feet from the pedals (*Id.* at 46-47); and (3) despite the low speed of travel at the time of the accident, the plaintiff tried to pop out of the fall by using a pogo-like maneuver, "overcompensated," and ended up going over backward with his bike (*Id.* at 56). The defendant argues that the pogo-like maneuver with his bicycle amounts to a voluntary disregard of any dangerous propensities of the defendant's clipless pedal system (*Id.* at 5).

The defendant denies that a lack of inward release capability renders the pedals unreasonably dangerous. But even if plaintiff proves otherwise, that does not establish that plaintiff, at the time of the accident, knew that an inward release was dangerous. The cited portions of plaintiff's deposition do not contain an admission that he knew [*28] the pedals had dangerous propensities. Moreover, the fact that plaintiff was an "avid" bicyclist who previously had accomplished *outward* releases does

2000 U.S. Dist. LEXIS 10974, *

not necessarily mean that he knew an *inward* release would be dangerous; defendant has not pointed to any evidence that plaintiff previously had attempted an inward release and was unable to effectuate one.

Moreover, the plaintiff testified that he read the service and installation instructions that accompanied the defendant's clipless pedal system before his accident (Def.'s Mem., Ex. A, Saad Dep. Tr. at 25-26; Ex. B, Green Ex. 3), and those instructions state that with use of the "multiple release" SH55 cleats, such as those purchased by plaintiff and worn on the day of the accident, the rider may "disengage the cleat from a pedal by twisting [the] heel in any direction"(*Id.*). A diagram of a pedal and right foot accompanies this language and depicts three arrows indicating motion upward and to the right (or away from the bicycle) (*Id.*). Although the diagram does not include an arrow inward, the language clearly states that release "in any direction" is possible. n1

> n1 There are also some written instructions, attached to Mr. Green's deposition transcript, which appear on an internet site, explaining:
>
> > Now that the shoe cleat is attached to the pedal, how do we get it off so we don't twist our limbs into spaghetti? The exit method is not one that comes naturally to a novice. Exit techniques are soon learned after one too many low speed fall overs as the rider strains to remove the foot from the pedal before the rider hits the ground in an embarrassed lump.
> >
> > The design of the pedal dictates that the easiest exit is a sideways rotation of the foot to release the rear part of the cleat from the heel retaining clip. This is simply achieved by kicking your foot to the side. The rotation should be in the plane of the pedal (see graphic). During the above mentioned action what happens is the rear part of the shoe cleat rides over the heel retaining posts, while the heel clip is being forced backward as the cleat tries to clear the retaining post.
>
> (*Id.* at 5). There is no evidence that plaintiff read these instructions before the fall. Plaintiff only testified that he read the entire set of service

instructions that came with pedals, which is the first two pages of Def.'s Ex. B, Green Ex. 3. *See* Def.'s Ex. A, Saad Dep. Tr. at 25-26.

[*29]

Thus, although the plaintiff was not a novice bicyclist (Def.'s Mem., Ex. A, Saad Dep. Tr. at 11, 13, 18-20), there is no evidence that the plaintiff had a special appreciation for the particular danger he alleges caused his injury here, namely, that the clipless pedals might not release on an inward rotation of his heel during a backward fall. n2 This special appreciation is the key to this defense, because the issue is not whether plaintiff knew that during a fall his feet might not always release from the pedal before he hit the ground -- such knowledge, if it constituted assumption of the risk, would mean that every user of the pedals, once they read the service instructions and rode a bike, assumed the risk of non-release no matter how the failure to release occurred. That cannot be the standard here. Rather, to assume the risk, the plaintiff would have had to know that a particular condition or defect rendered the Shimano clipless pedal design unreasonably dangerous, and then attempted to knowingly and voluntarily use the pedal in disregard of that condition or defect.

> n2 Although the plaintiff never offered direct testimony on how he attempted to extricate his right foot from the pedal before the fall (Def.'s Mem., Ex. A: Saad Dep. Tr. 58-59), his expert's theory is that the defendant's pedal is unreasonably dangerous, as designed, because it does not permit inward release of the pedal at a sufficiently low level of force when above the lateral plane. The plaintiff also argues in his trial brief, included in the Final Pretrial Order, that "the pedal system did not release inwardly in such a manner that would have enabled a rider to release his foot to avoid serious injury" (Pl.'s Trial Brief at 18).

[*30]

Thus, Shimano must be able to offer evidence that would reasonably allow a jury to conclude that the risk allegedly assumed (here, attempting to release from the pedal by an inward rotation) is a risk that plaintiff knew of and that caused the injury. *Walsh, 26 F.3d at 1422.* However, Shimano does not specifically criticize plaintiff's use of the pedal, but instead attacks the use of the "pogo-stick" maneuver. Even if plaintiff's admitted use of the pogo-stick maneuver to avoid a fall was deemed inappropriate, that would not mean that he knowingly and voluntarily assumed an unreasonably dangerous risk of non-pedal release on an inward rotation of his heel.

2000 U.S. Dist. LEXIS 10974, *

The evidence submitted on this motion is not sufficient to persuade the Court that a jury reasonably could find that plaintiff assumed any risks inherent in the defendant's clipless pedal system. However, because the defendant may have additional evidence not now before the Court that would support such a defense at trial, the Court will not strike the affirmative defense altogether. Plaintiff's motion is granted with respect to his request to bar argument or intimation that the assumption of risk defense is an [*31] issue in this case during opening arguments and during trial; the motion is denied with respect to plaintiff's request to bar questioning of witnesses or submission of evidence relevant to this issue. The defendant will be allowed to question witnesses and introduce other relevant and admissible evidence to attempt to prove such a defense (without making use of the phrase "assumption of risk"). If the evidence supports such a defense, the Court will allow the defendant to argue the defense at closing and to submit an instruction to the jury on it.

**2. Misuse.**

In motion no. 2, the plaintiff argues that "any mention, evidence or reference or jury instruction on Jeffrey Saad's alleged misuse of the Shimano clipless pedal system . . . should be barred" because his use of the defendant's product was foreseeable and, under Illinois law, a foreseeable use cannot be found to be misuse (Pl.'s Mem. at 6-7). The defendant responds that the plaintiff's attempt to "'pop out' of the fall in a pogo-like maneuver is clearly a misuse of the bicycle and the clipless pedal system" (Def.'s Opp. Mem. at 5). In particular, the defendant's theory is that popping out of the fall would apply perpendicular [*32] force to the pedals, and the pedals are not designed to release in a perpendicular direction. Consequently, any attempt to release the pedals while applying a perpendicular force to them would be misuse. The defendant argues that the plaintiff's motion in limine should be denied, because the issue of whether the plaintiff's use of the pedal system in this way was foreseeable is a question of fact for the jury (Id.).

In Illinois, misuse is an affirmative defense to a strict products liability action that can bar all or part of a recovery for the plaintiff. *Coney v. J.L.G. Industries, Inc., 97 Ill. 2d 104, 111, 73 Ill. Dec. 337, 454 N.E.2d 197 (1983)* (adopting pure comparative negligence in strict products liability actions); 735 ILCS 5/2-1116 (West 1999) (enacting modified comparative negligence in strict products liability actions). *See also Varilek v. Mitchell Eng'g Co., 200 Ill. App. 3d 649, 666, 558 N.E.2d 365, 146 Ill. Dec. 402 (1st Dist. 1990); Suich v. H & B Printing Mach., Inc., 185 Ill. App. 3d 863, 872-73, 133 Ill. Dec. 768, 541 N.E.2d 1206 (1st Dist. 1989).* Misuse is defined as use "for a purpose neither intended nor 'foreseeable' (objectively reasonable) [*33] by the defendant." *Williams v. Brown Manufacturing Co., Inc.,*

*45 Ill. 2d 418, 425, 261 N.E.2d 305 (1970).* While the issue of misuse was once considered an aspect of the plaintiff's case, *id. at 431,* misuse is now an affirmative defense in Illinois. *Coney, 97 Ill. 2d at 119; Varilek, 200 Ill. App. 3d at 666-67; Suich, 185 Ill. App. 3d at 872-73.*

A defendant must prove misuse by demonstrating that the product was used for a purpose neither intended nor foreseeable. *Varilek, 200 Ill. App. 3d at 666-67.* In *Varilek,* the Court stated that "the manner in which the particular purpose was being accomplished is not an issue under a theory of misuse." *Id.* Moreover, a defendant may not defend against a products liability suit "on the basis of a misuse that he invited." *Welge v. Planters Lifesavers Co., 17 F.3d 209 (7th Cir. 1994).*

The question of foreseeability is generally one of fact. *Kerns v. Engelke, 76 Ill. 2d 154, 165, 28 Ill. Dec. 500, 390 N.E.2d 859 (1979); King v. Am. Food Equip. Co., 160 Ill. App. 3d 898, 909, 112 Ill. Dec. 349, 513 N.E.2d 958 (1st Dist. 1987).* [*34] Although misuse is an affirmative defense for which the defendant normally bears the burden of production and proof, *see Varilek, 200 Ill. App. 3d at 666-67,* the plaintiff has filed a motion in limine seeking to bar this defense as a matter of law; it is therefore plaintiff's burden to prove that there is no evidence showing the plaintiff used the bicycle pedals for a purpose that was unintended or unforeseeable by the defendant.

The defendant's theory of misuse is that the plaintiff misused his bicycle and the Shimano clipless pedal system when he attempted to pop out of his fall by using the bicycle he was riding like a pogo stick, thereby causing injury to himself because the pedals did not release in either a perpendicular or an inward direction. The defendant's theory is based on the defendant's expert report, the plaintiff's deposition testimony, and the medical evidence. We address these categories of evidence in reverse order.

*First,* the medical evidence indicates that plaintiff's ankle twisted as the bicycle fell backward (Def.'s Mem., Ex. C, Dr. Brna Dep. Tr. at 19, lines 13-17). Although that evidence may support an inference that the plaintiff's leg [*35] or foot twisted inward, contacting the bicycle frame and preventing release of his right foot from the pedal, standing alone it does not support an inference of misuse.

*Second,* the plaintiff testified that he is an experienced bicyclist who has used clipless pedal systems in the past and is familiar with any alleged dangerous propensities of the clipless pedal system (Def.'s Mem., Ex. A, Saad Dep. Tr. at 10-11); he had fallen off of his bicycle in low-speed conditions while using the Shimano clipless pedal system, and he knew how to and did release both feet from the pedals (Id. at 46-47); and, despite the low speed of travel at the time of

2000 U.S. Dist. LEXIS 10974, *

the accident, he tried to pop out of the fall by using a pogo stick like maneuver, "overcompensated," and ended up going over backward with his bicycle (*Id.* at 56). This testimony, while relevant to the functioning of the pedal system on the day of the accident, also does not support an inference of misuse. It does not tell us why plaintiff's maneuver (much less his manner of release from the pedal) was either not intended or foreseeable by defendant.

*Third,* according to the defendant's expert, a backward fall results in perpendicular [*36] forces against the pedals that do not permit the "intended release" of the foot from the pedal in an outward direction (Pl.'s Mem., Ex. A, Mitchell Report at 4 ("the pedals are not intended to release in that direction as they routinely permit the rider to pedal with an alternation of one foot pushing downward while the other foot pulls upward"). This expert opinion sets up a critical issue in the case, namely, whether the Shimano clipless pedal is unreasonably dangerous because it may not permit release of the foot during a backward fall. But, this is not an issue of misuse, which does not ask whether this design was unreasonably dangerous, but instead whether the plaintiff used the pedal for a reasonably foreseeable purpose.

Thus, in the Court's view, none of the cited evidence would support a jury conclusion that the plaintiff's use of the pedal on the day of the accident was unforeseeable. For instance, there is no evidence that the plaintiff installed the pedals in a way different than the defendant intended, or tied his feet to the pedals, rather than inserting them in the proper way. The defendant has failed to identify any evidence that attempting to disengage from the pedal [*37] by an inward motion was unforeseeable. Conversely, there is evidence that could support a contrary conclusion, such as the written directions stating that the rider can disengage from the pedal by twisting the feet "in any direction."

However, because there may be evidence of unforeseeable use of the pedal by the plaintiff that is not before the Court, the Court would rather err on the side of caution and wait until all the evidence is in before deciding whether to strike the defense. Therefore, plaintiff's motion no. 2 is granted in part, and defendant will be barred from mention or reference to the misuse defense in opening statements and during trial. The motion is denied with respect to plaintiff's attempt to bar evidence of the defense and a jury instruction on misuse. Defendant will be allowed to offer admissible evidence of alleged misuse (although defendant may not use the phrase "misuse"), and the Court will determine after that evidence is in whether the defendant is entitled to a jury instruction on the defense. If there is insufficient evidence of misuse at the close of the case, the Court will strike the defense and will not permit a jury instruction

on it. *See Varilek, 200 Ill. App. 3d 649, 666-67, 146 Ill. Dec. 402, 558 N.E.2d 365 (1st Dist. 1990)* [*38] (trial court should have stricken misuse defense because there was no evidence of misuse). n3

n3 The Court wishes to make clear that at trial, the parties will be permitted to offer evidence as to the accident sequence. The Court agrees that whatever the ultimate viability of the assumption of risk and misuse defenses, evidence concerning the events leading to the fall as well as the "mechanics of the fall" (Def.'s Opp. at 6) will be relevant to the jury's consideration of causation.

### 3. Unavoidably Unsafe or Obviously Dangerous Products.

Motion no. 23 asks the Court to bar any comment or argument that the defendant's product was unavoidably unsafe or posed an open and obvious danger (Pl.'s Mem. at 5). In *Cunningham v. MacNeal Memorial Hospital, 47 Ill. 2d 443, 266 N.E.2d 897 (1970),* the Illinois Supreme Court stated that a product cannot be found to be unreasonably dangerous if it is unavoidably unsafe and accompanied by adequate warnings. *Id. at 455-56* (basing the exception [*39] on § 402A, comment k, of the Restatement Second of Torts). Thus, a jury conclusion that the Shimano clipless pedal system is unavoidably unsafe could result in plaintiff failing to establish his strict liability claim.

Similarly, a finding that the defendant's product posed an open and obvious danger could allow the defendant to avoid liability in one of two ways. *First,* the Supreme Court of Illinois has established that "injuries are not compensable in products liability if they derive merely from those inherent properties of a product which are obvious to all who come in contact with the product." *Hunt v. Blasius, 74 Ill. 2d 203, 211, 23 Ill. Dec. 574, 384 N.E.2d 368 (1978).* The Illinois courts and the Seventh Circuit have followed this approach. *See, e.g. First National Bank of Dwight v. Regent Sports Corp., 803 F.2d 1431, 1436 (7th Cir. 1986); Smith v. Am. Motors Sales Corp., 215 Ill. App. 3d 951, 956, 159 Ill. Dec. 477, 576 N.E.2d 146 (1st Dist. 1991). Second,* the open and/or obvious nature of the danger could restrict the methods available to a plaintiff to prove that a product is unreasonably dangerous due to a design [*40] defect. In *Lamkin v. Towner, 138 Ill. 2d 510, 529, 150 Ill. Dec. 562, 563 N.E.2d 449 (1990),* the Illinois Supreme Court has established two methods to prove a product to be unreasonably dangerous due to a design defect -- the "risk-utility" and "consumer contemplation" tests. While a plaintiff cannot succeed in proving a product to be unreasonably dangerous by means of the risk-utility test

2000 U.S. Dist. LEXIS 10974, *

to a simple product that is obviously dangerous, *see Haddix v. Playtex Family Products Corp., 138 F.3d 681, 686 (7th Cir. 1998); Todd v. Societe BIC, 21 F.3d 1402, 1412 (7th Cir. 1993); Scoby v. Vulcan-Hart Corp., 211 Ill. App. 3d 106, 112, 155 Ill. Dec. 536, 569 N.E.2d 1147 (4th Dist. 1991)*, that is not a bar to use of the consumer contemplation test, *See Haddix, 138 F.3d at 685-86.* Therefore, a finding that the defendant's product posed an unavoidable or open and obvious danger could allow the defendant in this action to avoid liability under Illinois law. Plaintiff has offered no argument or authority to show why defendant should be barred from attempting to lay the factual predicate for these arguments. Accordingly, [*41] motion no. 23 is denied.

### C. Evidence of Alternative Designs (Motions Nos. 3, 29, and 30).

In motion nos. 3, 29 and 30, the plaintiff seeks to bar evidence and arguments related to the existence of alternative designs of clipless pedal systems. For the reasons stated below, those motions are granted.

#### 1. Existence of Feasible Alternative Design.

Plaintiff's motion no. 3 requests that the defendant be barred from arguing that the plaintiff has the "burden of proving the existence of feasible design alternatives." The plaintiff argues that while evidence of alternative designs is often considered, the existence of such alternatives is not an essential element of a products liability action (Pl.'s Mem. at 7). Plaintiff argues that because he does not bear the burden of proving that alternate designs exist, the defendant should be barred from arguing that such a burden exists (*Id.* at 8). The defendant did not respond to this motion.

Substantive issues in this case are governed by state rather than federal case law. *Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087, 1090 (7th Cir. 1999).* To succeed in a strict products liability claim: "the [*42] plaintiff[] must prove that . . . injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control." *Suvada v. White Motor Co., 32 Ill. 2d 612, 623, 210 N.E.2d 182 (1965) (overruled on other grounds).* In *Lamkin, 138 Ill. 2d at 529*, the Illinois Supreme Court set forth the methods available to prove that a product is unreasonably dangerous due to a design defect.

A plaintiff may demonstrate that a product is defective in design, so as to subject a retailer and a manufacturer to strict liability for resulting injuries, in one of two ways: (1) by introducing evidence that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably

foreseeable manner or (2) by introducing evidence that the product's design proximately caused his injury and the defendant fails to prove that on balance the benefits of the challenged design outweigh the risk of danger inherent in such designs.

The *Lamkin* decision made it clear that in an appropriate case, the consumer contemplation [*43] test and/or the risk-utility test are available to plaintiffs attempting to prove a product to be unreasonably dangerous due to a design defect. *Id.* Thus, while the elements of proof are governed by *Suvada*, the methods of proof are governed by *Lamkin. See also Faucett v. Ingersoll-Rand Mining & Machinery Co., 960 F.2d 653, 656 (7th Cir. 1992).* An instructive statement regarding the relationship of the plaintiff's burden of proof and evidence of alternative designs may be found in *Ogg v. City of Springfield, 121 Ill. App. 3d 25, 76 Ill. Dec. 531, 458 N.E.2d 1331 (4th Dist. 1984)*:

Our supreme court has repeatedly stated that in order to prove a prima facie products liability case, the plaintiff must prove three elements....Our supreme court has never included the existence of a feasible alternative design as one of the elements a plaintiff must prove in order to succeed in a products liability case....Thus, *the existence of an alternative design becomes not an element of proof but instead merely one method of proving one of the elements of proof* - - that the product was unreasonably dangerous.

*Id. at 36-37* (citations [*44] omitted) (emphasis added), *See also Wyant v. J.I. Case Co., Inc., 633 F.2d 1254, 1256-57 (7th Cir. 1980)* ("proof of the availability of an alternative design which is practical, economical and effective in preventing the injury in question *may be used* to establish the dangerousness of the condition" (emphasis added)).

The Illinois case law regarding the plaintiff's three elements in a products liability action is clear. Those elements do not include the existence of an alternative design. Because Illinois law does not require that a plaintiff prove the existence of a feasible alternative design, motion no. 3 is granted.

#### 2. State of the Art Defense and Evidence.

In motion no. 29, plaintiff requests that the defendant be barred from "asserting a state of the art defense to Plaintiff's strict liability action." The plaintiff argues that the defendant has not affirmatively pled the

2000 U.S. Dist. LEXIS 10974, *

defense, and that the defense is not allowed in Illinois (Pl.'s Mot. at 6 (no. 29)). The plaintiff is correct. In 1992, the Supreme Court refused to recognize a state of the art defense. *Jackson v. Nestle-Beich, Inc., 147 Ill. 2d 408, 413, 168 Ill. Dec. 147, 589 N.E.2d 547 (1992)* [*45] ("...in Illinois the state of the art defense has never been a defense to strict products liability") (citations omitted). *See also Cunningham v. MacNeal Mem'l Hosp., 47 Ill. 2d 443, 453-55, 266 N.E.2d 897 (1970).* The Court therefore grants motion no. 29.

Motion no. 30 requests that the defendant be barred "from presenting or eluding [sic] to evidence regarding the types of pedals, designs or pedals and clip devices used by manufacturers other than Shimano American Corporation." The plaintiff cites no case law and provides no argument in support of this motion; defendant offers nothing in opposition.

Although the state of the art defense is not allowed, evidence that would support that theory of defense is admissible in certain circumstances. The Seventh Circuit briefly addressed this issue in *Walker v. Trico Manufacturing Co., Inc., 487 F.2d 595, 600 (7th Cir. 1973).* In *Walker,* the defendant was permitted to offer evidence of alternative designs, even though the state of the art defense was unavailable, because the plaintiff opened the door by presenting evidence of alternative designs used by other manufacturers. *Id. at 600.* [*46] Similarly, in *Murphy v. Chestnut Mountain Lodge, Inc., 124 Ill. App. 3d 508, 79 Ill. Dec. 914, 464 N.E.2d 818 (1st Dist. 1984),* the court admitted the defendant's expert testimony, even though it was state of the art evidence, because the plaintiff had presented expert testimony that the product at issue had an unreasonably dangerous design because alternative designs would have operated more safely. *Id. at 511, 515. See also Connelly v. General Motors Corp., 184 Ill. App. 3d 378, 386-87, 132 Ill. Dec. 630, 540 N.E.2d 370 (1st Dist. 1989).*

For the reasons stated at pp. 39-40, *infra,* of this opinion, the Court will bar plaintiff from offering evidence at trial of feasible alternative designs. As a result, there will be no occasion for defendant to offer "state of the art" rebuttal evidence. Therefore, motion no. 30 is granted.

## D. Voir Dire Questions (Motions Nos. 25-28).

In motion nos. 25-27, the plaintiff seeks a ruling that would allow prospective jurors to be asked certain questions regarding insurance during voir dire. In motion no. 28, the plaintiff seeks a ruling that would allow potential jurors to be asked whether [*47] they could award substantial damages for the plaintiff if warranted by the evidence. The plaintiff's only argument regarding these motions is in the form of a case citation to Illinois law, appended at the end of each one-sentence motion in limine. Beyond that, the parties have not made any argument regarding these motions in their written memoranda in support of and in opposition to the motions. The Court denies plaintiff's motion nos. 25-27, and grants motion no. 28.

### 2. Insurance Questions.

In motion no. 25, the plaintiff seeks a ruling that would allow questioning of the venire as to whether they or any of their close relatives or friends currently work or have worked in the insurance claims business or claims-handling business. Similarly, in motion no. 26, the plaintiff seeks a ruling that would allow questioning prospective jurors about whether they were ever involved in lawsuits or insurance claims as the result of an automobile collision. And, in motion no. 27, plaintiff seeks a ruling that would allow counsel to ask prospective jurors about their interest and relationship to insurance companies.

"From beginning to end, diversity litigation is conducted under federal [*48] rules of procedure." *Mayer v. Gary Partners and Co., Ltd., 29 F.3d 330, 333 (7th Cir. 1994).* This is true with respect to the procedure for voir dire, although it appears that the substance of the voir dire questions in a diversity case is controlled by state law. *See, e.g., Lentner v. Lieberstein, 279 F.2d 385 (7th Cir. 1960)* (applying Illinois law on voir dire question regarding insurance); *Samos v. United Exposition Service Co., 1993 U.S. Dist. LEXIS 16866,* No. 90 C 5911, *1993 WL 498192 (N.D. Ill. 1993)* (same).

The seminal case in Illinois on this issue, *Wheeler v. Rudek, 397 Ill. 438, 74 N.E.2d 601 (1947),* held that voir dire questions directed to prospective jurors on the issue of insurance are permitted so long as the examination was "made in good faith." *Id. at 441-442.* Good faith is required, according to the Illinois Supreme Court, to avoid questions based on mere surmise, and to avoid creating a suspicion in the jurors' minds that the defendant is insured. *Id. at 441-42* (a good faith basis for insurance questions is required "to protect the defendant against the inclination of jurors to cast the burden [*49] of damages, where there is insurance, upon the common whose business it is to insure against such risks"). The "determination of the question of good faith is for the trial court[.]" *Id. at 442.* To ensure good faith for the questions, the trial court is required to hold a hearing, outside the presence of the jury, in which the party seeking to ask the questions presents an affidavit or testimony of witnesses or a combination of both. *Id.* If good faith is established, the questions must be framed in such a way as to avoid the risks identified above. *Id. See also Samos, 1993 U.S. Dist. LEXIS 16866, 1993 WL 498192, * 2* (following *Wheeler,* "no question shall be asked that implies, or in any way indicates, that the Defendant has insurance").

Here, the plaintiff has not offered an affidavit or

2000 U.S. Dist. LEXIS 10974, *

testimony of witnesses to support his request to ask the insurance related questions identified in motion nos. 25-27. Moreover, the Court believes that the proposed questions likely would suggest to jurors the presence of insurance coverage, and thus would circumvent the parties' agreement and this Court's order barring any reference to Shimano being insured (Def.'s Motion No. 1, [*50] *granted* in Court's 03/29/00 order). Thus, plaintiff's motions are denied under the rationale of *Wheeler*. In any event, the standard voir dire questioning into the employment experience and involvement in lawsuits by prospective jurors and their close family members will likely uncover much of the information plaintiff seeks, without needlessly raising the specter of insurance coverage.

### 2. Substantial Damages Questions.

In motion no. 28, the plaintiff seeks a ruling that would permit questioning prospective jurors as to whether they could award substantial damages if the evidence warranted such a verdict. The plaintiff cites *Kinsey v. Kolber, 103 Ill. App. 3d 933, 59 Ill. Dec. 559, 431 N.E.2d 1316 (1st Dist. 1982)*, in support of this motion; defendant offers no response.

In *Kinsey*, as in many Illinois decisions, courts have found such a question permissible. *See also DeYoung v. Alpha Const. Co., 186 Ill. App. 3d 758, 763, 134 Ill. Dec. 513, 542 N.E.2d 859 (1st Dist. 1989)* ("it is proper to inquire whether jurors have fixed ideas about awards of specific sums of money,"); *Scully v. Otis Elevator Co., 2 Ill. App. 3d 185, 198, 275 N.E.2d 905 (1971)* [*51] (court held that questions designed to expose any latent prejudice of jurors against large verdicts were proper); *Geehan v. Monahan, 382 F.2d 111, 115 (7th Cir. 1967)* (plaintiff's counsel permitted to ask potential jurors whether they "would have any hesitancy . . . returning a verdict commensurate with the injuries [plaintiff] has, even though it might run many thousands of dollars"). Because the defendant has not cited, and the Court has not found, any case law to the contrary, plaintiff's motion no. 28 will be granted.

### E. Miscellaneous (Motions Nos. 5, 8, 20, 24, and 31).

In motions nos. 5, 8, 20, 24, and 31, the plaintiff generally seeks to bar what he claims to be prejudicial comments, arguments, instructions, and witnesses. For the reasons stated below, motion nos. 5 and 24 are denied without prejudice; motion no. 8 is granted; and motion nos. 20 and 31 are denied.

### 1. Industry Standards Jury Instruction.

The plaintiff's motion no. 5 requests that "the use of a jury instruction that relates to compliance with standards" be barred (Pl.'s Mem. at 2). Neither party cites case law or provides argument in connection with this motion.

The [*52] standard for determining whether a party is entitled to a jury instruction is virtually the same in the Seventh Circuit and under Illinois substantive law: it turns upon the evidence that has been presented. The Seventh Circuit has stated that "[a] party, upon proper request, is generally entitled to have its theory of the case presented to the jury, if it is within the issues contested and *if there was evidence to support it.*" *Rogers v. ACF Indus., Inc., 774 F.2d 814, 818 (7th Cir. 1985)* (citation omitted) (emphasis added). Similarly, the rule in Illinois is that, ". . . each party has the right to have the jury instructed on his or her theory of the case and the trial court must instruct the jury on all issues which it finds, in the exercise of its discretion, have been *raised by the evidence presented.*" *Rios v. Navistar Int'l Transp. Corp., 200 Ill. App. 3d 526, 535, 146 Ill. Dec. 289, 558 N.E.2d 252 (1st Dist. 1990)* (citation omitted) (emphasis added).

In *Rios*, the court held that a jury instruction permitting the jury to consider compliance with industry standards was properly given. *Id. at 535.* It would therefore [*53] be inappropriate to foreclose the possibility of such an instruction in the present case at this time. Plaintiff's motion no. 5 is denied, without prejudice to plaintiff raising the issue at the instruction conference.

### 2. Burden on the Public.

Plaintiff's motion no. 8 seeks to bar "any comment or reference that the plaintiffs case, damage request, or verdict [sic] places a burden upon the public as a whole and/or is responsible for a high cost of living for the public." In support of this motion, the plaintiff states, "this type of argument was found improper as an unfair prejudice to the plaintiff that does not comport with the 'fair leeway' to be provided an attorney during argument."

The plaintiff cites *Lukich v. Angeli, 31 Ill. App. 2d 20, 175 N.E.2d 796 (1st Dist. 1961)*, for the proposition that comments and references regarding the effect of a high damage award on the public are barred because they prejudice the jury. The *Lukich* court stated:

> Counsel told the jury, "I feel that it is unfortunately the type of thing that places a burden upon us all. It is the type of thing that . . . causes the increase in the high cost of living." [Plaintiff's] [*54] counsel argues the fair leeway rule and cites cases. We do not consider these remarks within that rule and we think its effect was to prejudice the jury.

*Id. at 30.*

The Court agrees that the defendant should be prevented from indicating that the plaintiff's action places

2000 U.S. Dist. LEXIS 10974, *

a burden upon society or is connected to the high cost of living. Defendant has offered no authority or explanation to show why it should be allowed to make such an argument. Motion no. 8 is granted.

### 3. Exclusion of Defense Witnesses.

The plaintiff's motion no. 20 seeks to bar the testimony of "all defense witnesses who, while excluded from the courtroom during the proceedings, have been given access to portions of the written testimony of other witnesses" (Pl.'s Mot. at 5 (no. 20)). n4 The plaintiff makes no argument in support of this motion, citing only the Illinois case of *Gatto v. Curtis, 6 Ill. App. 3d 714, 286 N.E.2d 541 (1st Dist. 1972)* (*Id.*). The defendant did not respond to this motion.

> n4 Although the motion does not state that it is the testimony of the defense witnesses that plaintiff seeks to bar, this must be the case, since barring these witnesses is essentially a bar to their testimony.

[*55]

In *Gatto*, the trial court entered an order excluding witnesses at the beginning of the trial. *6 Ill. App. 3d at 736.* The trial court later excluded the testimony of a witness who had portions of previous testimony read to her. *Id.* The appellate court held that this decision was within the trial court's discretion in enforcing the original order to exclude witnesses. *Id.* Based upon the plaintiff's citation to this case, the Court concludes that 1993 study seeks preemptively to establish a punishment for any violation by the defendant of the stipulated exclusion of witnesses from the courtroom.

The plaintiffs reliance upon *Gatto* is misplaced. Illinois law governs the substantive issues in this diversity action, but the exclusion of witnesses is a procedural rather than substantive issue and, therefore, federal law controls the resolution of this motion. *Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087, 1090 (7th Cir. 1999).* The parties have stipulated to plaintiff's motion no. 19, and have thereby agreed to "exclude witnesses other than the parties to this action from the courtroom" (Pl.'s Mem. at 4). This exclusion of witnesses is [*56] based upon Federal Rule of Evidence 615, which permits the court to ". . . order witnesses excluded so that they cannot hear the testimony of other witnesses. . . ."

The Seventh Circuit has noted that it is within the discretion of a district court to allow a witness to testify despite that witness' knowledge of other testimony. *Hill v. Porter Memorial Hosp., 90 F.3d 220, 222-24 (7th Cir. 1996); see also United States v. Crabtree, 979 F.2d 1261, 1270 (7th Cir. 1992)* (if a witness has violated an

exclusion order, it is within the district court's discretion to allow the witness to testify). The question is whether the excluded witness has tailored his or her testimony to the testimony of another witness. If the answer is yes, Rule 615 is violated, and the testimony of the excluded witness should not come in. *Id. 90 F.3d at 223.* If there is no evidence of such tailoring, then *it is within the trial court's discretion to allow the testimony because there is no "evidence of prejudice, collusion or willful violation." See United States v. Gammon, 961 F.2d 103, 105 (7th Cir. 1992).*

In this case, revealing the trial testimony to excluded non-expert [*57] witnesses yet to testify would violate the Court's order excluding witnesses. n5 If testimony is revealed to excluded witnesses, the Court obviously will not look kindly on that violation, and will determine the appropriate response if and when such a violation occurs. Motion no. 20 is therefore denied without prejudice.

> n5 The Court presumes that neither party intended to bar their respective experts from knowing the trial testimony, as the particulars of that testimony may affect certain opinions. If the parties have a different view, they should bring that to the Court's attention at the pretrial conference.

### 4. Additional Defense Arguments.

Motion no. 24 requests the Court to bar "any comment or argument that any substantial change or alteration in the subject . . . pedal . . . occurred prior to the accident at issue." Plaintiff has failed to provide a factual basis for excluding such an argument. Accordingly, that motion is denied; however, we remind defendant of its obligation only to offer comment [*58] and argument that has evidentiary support. Thus, if defendant makes this argument, the Court expects defendant to offer evidence to support it.

Motion no. 31 seeks to bar the defendant from asserting that its product was "as safe [sic] or safer than clipless pedals produced by other manufacturers. . ." The Court views this argument as a reformulation of plaintiff's motions nos. 29 and 30. Accordingly, the Court denies motion no. 31 as moot.

### III.

The defendant, Shimano, seeks a ruling on seven motions in limine (nos. 4, 5, 7, 8, and 10-12). In general, the defendant seeks to bar: plaintiff's expert liability testimony (nos. 7, and 10); failure to warn evidence (no. 5); alternative design evidence (no. 11); certain damages testimony (no. 4); and what defendant considers to be other prejudicial evidence (nos. 8 and 12). Again, we will

2000 U.S. Dist. LEXIS 10974, *

address each motion by grouping the requests under the broader subject matter categories to which they relate.

### A. Plaintiff's Expert Testimony (Motions Nos. 7 and 10).

In motion no. 10, Shimano seeks to bar plaintiff's expert, James Green, from testifying at trial. Alternatively, if Mr. Green is not completely barred from testifying, [*59] in motion no. 7, Shimano seeks to bar him from testifying about any "opinions other than those expressed at [the] deposition." For the reasons discussed below, the Court denies both motions.

### 1. Motion To Bar Mr. Green's Entire Testimony.

Mr. Green's expert report contains the following opinions: *first*, Mr. Green states that "the causal factor of the injury to the cyclist was the failure of the shoe to release [from the pedal] when the shoe was twisted inward during the accident" (Def.'s Mem., Ex. B, Green Report at 1); *second*, Mr. Green states that the Shimano clipless pedal system was defective because the pedals do not release inwardly when subjected to force outside a perfectly lateral plane (*id.; see also* Ex. B, Green Dep., at 46); and *third*, Mr. Green opines that this "poor inward release mode of the Shimano . . . shoe platform system was a direct causal factor of the injury sustained by" the plaintiff (*Id.*).

As was the case with plaintiff's challenge to Mr. Mitchell's opinions, the defendant here does not claim that Mr. Green lacks the expertise necessary to form the opinions he offers, or that the opinions he offers would not assist the jury [*60] if the opinions are reliable. Rather, defendant focuses on the alleged lack of reliability of certain of Mr. Green's opinions. Thus, we begin with an explanation of those opinions and their bases.

Mr. Green testified that in 1993, he performed a study of the various clipless pedals to determine the force required to disengage the shoe from the pedal, as well as the distance the foot moved to achieve a release (Def.'s Mem., Ex. B, Green Dep. at 40-42 and Ex. 7 thereto). Mr. Green testified that the 1993 study assessed these measurements in an "absolute lateral plane" (*Id.* at 41), and generally found that the forces required for inward release were the same for each pedal as required for outward release (*Id.* at 42). Mr. Green explained the methodology and equipment used to conduct the 1993 study, and indicated that the mode of analysis was "peer reviewed" (Def.'s Mem., Ex. B, Green Dep. Ex. 8).

Mr. Green used the same equipment and same general methodology to test the release forces and displacement distances for the Shimano pedal involved in the accident in this case (Def.'s Mem., Green Dep. at 43 and Ex. 8). Mr. Green testified that the pedal involved in this case had the [*61] same -- and acceptable -- forces

for inward and outward release in the lateral plane (*Id.* at 50). However, Mr. Green testified that he also tested those forces with the pedal outside the lateral plane, which is what he believed more accurately would simulate a fall. In so doing, Mr. Green found that while the release force for an outward release remained in the acceptable range of 12 to 15 pounds, the release force for an inward release was much higher -- approximately 38 pounds -- and unacceptable (*Id.* at 50-51). Mr. Green opined that while a rider of a bicycle generally can exert a release force of 50 pounds in the lateral plane, the release force he found outside the lateral plane of 38 pounds was unacceptable because of the distinction between static force generally used to release from the pedal in the lateral plane and the instantaneous maximum force that would be required to release during an accident (*Id.* at 54-56). While Mr. Green did not perform testing to determine the precise forces that would be experienced during a fall, he explained in general terms the forces that would be at play during a fall (*id.* at 58-61) and during the deposition prepared a diagram [*62] that explained the engineering principles on which his analysis of this point was based (Def.'s Mem., Ex. B, Green Dep. Ex. 10).

Defendant argues that Mr. Green's opinion that the Shimano pedal fails to release at a sufficiently low force when the rider's foot is outside the lateral plane is untested and thus unreliable (Def.'s Mem. at 11). Defendant argues that the 1993 study fails to support that opinion, because that study only tested release forces within the lateral plane, and that Mr. Green performed no testing of his theory concerning the instantaneous maximum force that would be exerted during a fall (*Id.*). Defendant argues that even if Mr. Green's opinion is admissible, any reference to the 1993 study should be barred because it only tested pedal release forces inside the lateral plane, and is therefore irrelevant to the opinion that Mr. Green now expresses about the release forces outside the lateral plane (*Id.*). For the reasons set forth below, we reject each argument.

Mr. Green's challenged opinion meets the threshold level or reliability required for admissibility. The methodology Mr. Green used to determine the release forces was the same that was used in the [*63] 1993 study, which was peer reviewed and published. The equipment that Mr. Green used for the 1993 study was the same equipment that he used for his testing of the Shimano pedal in this case. Defendant has offered no argument that the methodology and equipment used to reliably measure pedal release forces within the lateral plane would fail to reliably measure the release forces outside the lateral plane.

It is true that Mr. Green did not perform testing to verify his analysis about what pedal release forces would be encountered on a bicycle during a fall (rather than on

2000 U.S. Dist. LEXIS 10974, *

a jig in a workroom), or how the effect of instantaneous maximum forces during a fall would render a pedal release force of 38 pounds unacceptable. However, the case law makes clear that no single factor is invariably applicable or dispositive in determining the threshold reliability of an opinion for admissibility purposes -- even testing. *Cummins, 93 F.3d at 369.* In this case, Mr. Green's instantaneous maximum force analysis derives from the application of accepted engineering principles, which he fully disclosed in his deposition. Shimano's motion does not challenge those principles, and does not [*64] disclose any testing that Shimano's expert has done to undermine the validity of Mr. Green's analysis.

Moreover, there is no dispute that Mr. Green possesses the qualifications and experience necessary to apply those principles in this analysis. As the Supreme Court has stated, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho, 119 S. Ct. at 1178.* In this case, Mr. Green's challenged opinion is based on an analysis that utilizes accepted engineering principles. We express no view as to what credibility or weight the jury should or will attach to Mr. Green's opinions. In the circumstances here, the Court finds that Mr. Green's failure to test certain aspects of this analysis is certainly ample fodder for cross examination, but that does not render his opinions inadmissible.

Nor do we find that Mr. Green should be precluded from referring to his 1993 study. The testing that Mr. Green performed to determine the release forces and distances for the Shimano pedal at issue here employed the same methodology and equipment used in the 1993 study, which was peer reviewed and published. Although [*65] the specific measurements achieved in the 1993 study are not relevant here, since they were conducted in the lateral plane while Mr. Green's opinions here are based on measurements from testing outside the lateral plane, the 1993 study is nonetheless relevant to show the reliability of the testing procedure Mr. Green employed in this case. Accordingly, defendant's motion no. 10 is denied. n6

n6 Based on Mr. Green's deposition testimony that the 1993 study did not test pedals outside the lateral plane, the Court will not permit Mr. Green to express an opinion that the other clipless pedals have an acceptable inward release mode while the pedal at issue here does not. While Mr. Green expressed that view in his report (Def.'s Mem., Ex. B, Green Dep., Ex. 8), his deposition testimony establishes that there is no basis for that opinion in the 1993 study. Indeed, the plaintiff represents that Mr. Green will not use the 1993 study as a basis for his view (*see* Pl.'s Opp. Mem. at 9), and neither Mr. Green's report nor his

deposition offers any other basis for that opinion.

[*66]

**2. Motion to Bar Non-Deposition Opinions (Motion No. 7).**

In motion no. 7, the defendant also argues that Mr. Green's testimony, if not barred altogether, should be limited to the opinions he expressed in his deposition pursuant to Fed.R.Civ.P. 26(e)(1). The Court disagrees. Rule 26(e)(1) states in relevant part:

> With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty [to supplement or correct previously disclosed information] extends both to information contained in the report and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due.

Rule 26 specifically contemplates that an expert will be able to testify at trial regarding the opinions expressed in both his expert report and his deposition. It would be inappropriate to allow the scope of an expert's trial testimony to turn on what opposing counsel chose to ask at a deposition. Indeed, the Advisory Committee Notes that in some cases an expert report may obviate the need for an expert deposition altogether. Thus, Mr. [*67] Green will not be limited solely to the opinions he expressed in his deposition. Mr. Green also may express opinions set forth in his expert report, even if those opinions were not explored in his deposition. Accordingly, the defendant's motion no. 7 is denied.

**B. Failure To Warn Evidence (Motion No. 5).**

In motion no. 5, the defendant seeks to bar any evidence that "the subject warning labels, technical manual and/or service instructions at issue in this case were insufficient or inadequate." The defendant's motion is premised on the absence of expert testimony from James Green regarding the defendant's failure to warn and/or any other evidence "that the warning labels, technical manual or service instructions were defective in any way or caused or contributed to cause plaintiff's injuries" (Def.'s Mem. at 5). The plaintiff, in response, asserts expert testimony is not a prerequisite for admissibility of failure to warn issues at trial (Pl.'s Opp. Mem. at 5-6).

The Court need not resolve this debate concerning the necessity of expert testimony, because the plaintiff did not include a failure to warn claim in the final pretrial order (*see* Final Pretrial Order, Ex. [*68] B (Agreed

2000 U.S. Dist. LEXIS 10974, *

*Statement of Contested Issues of Fact and Law*)). While a plaintiff may show that a product is unreasonably dangerous by proving either a design or manufacturing defect or a failure to warn, *Haddix, 138 F.3d at 683,* plaintiff's proposed jury instructions advance only a "defect" theory and not a failure to warn theory (*see* Final Pretrial Order, Ex. I-2 (Plaintiff's Proposed Issues Instruction on Count One)).

As a result, any failure to warn claim is waived. The final pretrial order supercedes the pleadings and controls the "subsequent course of the action unless modified by a subsequent order." Fed.R.Civ.P. 16(e). *See also Ryan v. Illinois Dept. of Children and Family Services, 185 F.3d 751, 763 (7th Cir. 1999) (citing Vaughn v. King, 167 F.3d 347, 352 (7th Cir. 1999)).* The defendant's motion no. 5 to bar evidence regarding an alleged failure to warn is granted. n7 This ruling, of course, will not bar plaintiff from offering evidence of the Shimano written materials that accompanied the pedal for other relevant purposes, such as to show that the pedals failed to perform as warranted.

n7 The plaintiff cites *Ford v. Nairn, 307 Ill. App. 3d 296, 298, 240 Ill. Dec. 432, 717 N.E.2d 525 (4th Dist. 1999),* for the proposition that expert testimony is not needed to show a failure to warn. Although the Illinois Appellate Court does not put as fine a point on the issue as does the plaintiff, it is true that the court relied primarily on the deposition testimony of the parties -- rather than experts -- to determine whether there were adequate warnings issued by the manufacturer defendant in that products liability case. Although we believe that expert testimony would be useful in such a case, given the need to provide evidence of the industry's knowledge of the product's dangerous propensity, the nature of the product, and the adequacy of the warning, *see Werckenthein v. Bucher Petrochem. Co., 248 Ill. App. 3d 282, 289, 188 Ill. Dec. 332, 618 N.E.2d 902 (1st Dist. 1993),* this Court need not resolve that issue for the reasons expressed above.

[*69]

### C. Alternative Design Evidence (Motion No. 11).

Motion no. 11 requests that the plaintiff be barred from making "any reference to the feasibility of an alternative design for the subject clipless pedal system." The defendant argues that "plaintiff's expert, James Green, makes no mention of a feasible alternative design in either his expert report or his deposition testimony" (Def.'s Mem. at 13). The defendant also states, "there is no evidence from the plaintiff as to a feasible alternative

design nor is there any testing to support an alternative design" (*Id.*). In particular, the defendant claims that Mr. Green's 1993 testing of various clipless pedal systems is irrelevant because "he only tested the displacement and force necessary to release the foot from the cleat in the *lateral* plane[,]" but Mr. Green's criticism of the Shimano clipless pedal system "pertains only to the force necessary to release the foot from the cleat *above* the lateral plane in the inward direction" (Def.'s Mem. at 9) (emphasis in original). Therefore, the defendant argues that any such evidence should be excluded at trial (*Id.*). We agree.

Under Illinois products liability [*70] law, evidence of feasible alternative designs is admissible "if the design alternative was available at the time the defendant's product was manufactured and sold." *Kerns v. Engelke, 76 Ill. 2d 154, 163, 28 Ill. Dec. 500, 390 N.E.2d 859 (1979). See also Mahoney v. Roper-Wright Manufacturing Co., Inc., 490 F.2d 229, 232 (7th Cir. 1973)* ("Illinois . . . permit[s] the introduction of evidence which consists of alternative design feasibility or post-accident design changes). Alternative designs must be feasible at the time the defendant's product was manufactured and sold. *Mahoney, 490 F.2d at 232.* In *Kerns,* the Court explained that evidence of "feasibility includes not only the elements of economy, effectiveness and practicality," but it also includes "technological possibilities under the state of the manufacturing art at the time the product was produced." *76 Ill. 2d at 164.* Such evidence may include lay and/or expert testimony regarding the feasibility of such designs. *Besse v. Deere & Co., 237 Ill. App. 3d 497, 499, 501-02, 178 Ill. Dec. 475, 604 N.E.2d 998 (3d Dist. 1992)* (holding that plaintiff's [*71] lay and expert testimony were sufficient to support the jury verdict for plaintiff). Expert testimony is not required unless necessary to assist the jury in understanding the issues presented by the parties. *Scaccianoce v. Hixon Mfg. & Supply Co., 57 F.3d 582, 587 (7th Cir. 1995)* ("while expert testimony is . . . common in such cases, it is not essential if the subject can be understood by the ordinary juror . . .").

The plaintiff has not responded to defendant's motion, and thus has pointed to no evidence in the discovery record. As we explained above, Mr. Green's 1993 study of release forces for various pedals in the lateral plane is not evidence of feasible alternative designs, since Mr. Green's criticisms of the Shimano pedal were not based on release forces in the lateral plane (which he found acceptable for both inward and outward release), but rather on the forces for inward release outside the lateral plane. While expert testimony on this subject is not invariably required, here plaintiff has offered no lay testimony or other evidence of alternative feasible design. n8 Motion no. 11 is therefore denied.

2000 U.S. Dist. LEXIS 10974, *

n8 Mr. Saad testified that a particular type of pedal system, the Look System, allows a rider "to slide in and out" of the pedal more easily than does the Shimano system (Def.'s Mem., Ex. A, Saad Dep. at 13). However, he did not indicate that the Look System provided an easier *inward* release *above* the lateral plane.

[*72]

### D. Loss of Future Earnings or Earning Capacity Evidence (Motion No. 4).

In motion no. 4, the defendant has moved to bar any evidence regarding plaintiff's alleged loss of future earnings or diminished earnings capacity on the basis that such evidence would be speculative and contrary to the evidence produced in the case (Def.'s Mem. at 3-4). The plaintiff disagrees; he argues that the evidence of his injuries, the medical testimony regarding his injuries, and the evidence of his past wages at Enterprise Rent-A-Car are sufficient evidence to award damages for loss of future earnings or diminished earnings capacity under Illinois law (Pl.'s Opp. Mem. at 3).

Under Illinois law, "impairment of earning capacity is calculated by deducting the amount plaintiff is capable of earning after his injury from the amount he was capable of earning prior to his injury, and awarding plaintiff the difference." *LaFever v. Kemlite Co., 185 Ill. 2d 380, 406, 235 Ill. Dec. 886, 706 N.E.2d 441 (Ill. 1998).* Expert testimony is not necessary to establish loss of future earning ability. *Id.* The plaintiff's testimony regarding the nature of his or her injuries and the expected [*73] permanent duration of these injuries can be sufficient to take "the question of impaired earning capacity to the jury." *Id. at 407.*

Defendant argues that evidence regarding lost future earnings capacity must be "based in fact" rather than on "speculation" (Def.'s Mem. at 4). True enough. *LaFever, 185 Ill. 2d at 407* ("while only 'some evidence' is needed to warrant an instruction, inherently that evidence must be reliable and grounded in more than mere possibilities"). *See also Christou v. Arlington Park-Washington Park Race Tracks Corp., 104 Ill. App. 3d 257, 60 Ill. Dec. 21, 432 N.E.2d 920 (1st Dist. 1982)* ("testimony as to loss of earnings which is merely speculative, remote or uncertain is improper"). However, in *LaFever,* the Illinois Supreme Court made clear that the standard for admissibility -- the same standard necessary to merit an instruction sending the issue to the jury -- is "some evidence probative of [the] claim," and not whether the loss of future earnings is "reasonably certain" to occur. *Id.* ("the quantum of proof necessary to prevail on a claim is different . . . from the measure of evidence needed merely [*74] to send an issue to the jury"). The trial court need not "be convinced of the

persuasiveness of that evidence" before that evidence is admitted for consideration by the jury vis-a-vis a jury instruction. *Id.*

Here, the defendant has not shown that the plaintiff's evidence on this issue is based on mere speculation. The plaintiff intends to offer his own testimony regarding his injuries, medical evidence to support this testimony, and data regarding his lost earnings potential at the job he held at the time of his injury but could not keep due to his injuries. Evidence of plaintiff's excellent work reviews and awards also provides "some evidence probative" of the plaintiff's claim concerning his promotion prospects opportunities at his former job. And, plaintiff's opposition to this motion in limine also refers to evidence that a manager at Enterprise told plaintiff he was next in line for a promotion to branch manager, a job that would have provided him with more income than he currently earns.

Assuming that this evidence is offered at trial in an admissible form, the evidence could support submission of the future lost earnings claim to the jury. Evidence that the plaintiff earned [*75] $ 40,000 per year at the time of his deposition certainly may be offered by defendant to challenge the lost earnings claim, but it is insufficient to bar that claim altogether. Accordingly, at this juncture, defendant's motion no. 4 is denied, but without prejudice; in addition plaintiff may not offer into evidence any lost future earnings calculations until the Court is satisfied that the evidence warrants submission of that claim to the jury.

### E. Allegedly Prejudicial Evidence (Motion Nos. 8 and 12).

#### 1. Defendant's Motion No. 8

In motion in limine no. 8, the defendant seeks to bar plaintiff "from any reference to the fact that the designer and manufacturer of the subject components at issue in this case is a Japanese corporation." The defendant argues that "plaintiff will seek to introduce such evidence for the sole purpose of prejudicing the defendant by attempting to conjure any bias which individual jurors may have against Japanese corporations" and the issue of the parent corporation's nationality "is wholly irrelevant to the issues in this case and not a material fact . . . ." (Def.'s Mem. at 8). The plaintiff offers no response to this motion.

Federal [*76] Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevancy and materiality are established by showing that the evidence sought to be admitted tends to prove a fact in controversy or makes a contested matter more or

2000 U.S. Dist. LEXIS 10974, *

less probable. *Berry v. Deloney, 28 F.3d 604, 607 (7th Cir. 1994)*. Even as to relevant evidence, Federal Rule of Evidence 403 requires the trial court to balance the probative value of the evidence against its inflammatory or prejudicial effect, and to exclude evidence where its probative value is substantially outweighed by unfair prejudice. *Needham v. White Labs., Inc., 847 F.2d 355, 360 (7th Cir. 1988)*. Like the defendant, the Court cannot see any possible relevance or materiality in the fact that defendant, while a California corporation, is a subsidiary of a Japanese corporation. Defendant's motion no. 8 is granted.

### 2. Defendant's Motion No. 12

In motion in limine no. 12, the defendant seeks to bar alleged "various other inflammatory [**77] and prejudicial remarks" by the plaintiff. The defendant requests the preclusion of argument and testimony on several topics and requests one cautionary jury instruction. The defendant's motion contains four sub-parts which remain unresolved, each of which will be addressed in turn.

### a. Motion 12(a)

The defendant seeks to preclude "statements or arguments intending to inflame or arouse feelings of hostility or resentment against the defendant" (Def.'s Mem. at 14). The Court denies this motion, but not because it intends to allow the types of statements defendant seeks to bar. The motion is denied because it seeks the obvious, without disclosing any particular risk defendant has in mind. Although a new trial was required in *Underwood v. Pennsylvania Railroad Co., 34 Ill. 2d 367, 215 N.E.2d 236 (1966)*, where the cumulative effect of improper questions, to which objections were sustained, prejudiced the jury, the Court is unwilling to assume at this point in the proceedings that plaintiff's counsel will engage in improper conduct during the trial. If inflammatory or improper conduct occurs, the Court will then determine the appropriate response. Motion no. 12(a) [**78] is denied without prejudice to raising the issue at trial if necessary.

### b. Motion 12(b).

The defendant next seeks to preclude "statements or arguments embellishing or inaccurately summarizing plaintiff's medical history" (Def.'s Mem. at 14). The defendant cites *Gabosch v. Tullman, 21 Ill. App. 3d 908, 316 N.E.2d 226 (1st Dist. 1974)*, in support of this motion. However, that decision contains no discussion of the plaintiff's medical history or any embellishments or inaccuracies by the plaintiff's counsel. *Gabosch, 21 Ill. App. 3d 908, 316 N.E.2d 226*. Again, the Court is unwilling to assume that plaintiff's counsel will behave improperly at trial. Nor has defendant identified what "embellishments" or "inaccuracies" it fears plaintiff might offer, or why vigorous cross-examination will not

be a sufficient antidote if that occurs. Motion no. 12(b) is denied without prejudice to raising this issue at trial.

### c. Motion 12(d).

The defendant next seeks to preclude "any statement or argument referencing the size of the corporate defendant, its corporate status or its power and wealth" (Def.'s Mem. at 14). Motion no. 12(d) is granted in part and denied [**79] in part. The motion is granted with respect to references to the defendant's wealth and power because the parties have stipulated to defendant's motion in limine no. 3, which bars testimony regarding "the pecuniary circumstances of the parties to this litigation" (Def.'s Motions in Limine at 1).

Motion no. 12(d) is denied with respect to the size and corporate status of the defendant because such facts are not prejudicial in and of themselves. It is fully appropriate for the jury to receive some background information about defendant. The case cited by the defendant, *Babcock v. Chesapeake & Ohio Railroad Co., 83 Ill. App. 3d 919, 38 Ill. Dec. 841, 404 N.E.2d 265 (1st Dist. 1979)*, does not require a different result. In that case, the court found that comments by plaintiff's counsel attempted to evoke a bias by emphasizing that every department of the defendant railroad company had been mobilized against the seven-year old child who had been injured. *Id. at 932*.

In the present case, the Court has already indicated that potentially inflammatory or prejudicial remarks should be challenged at trial. In particular, in providing any background information [**80] about defendant's size and corporate status, plaintiff must adhere to the Court's ruling on defendant's motion in limine no. 8 and may not disclose that defendant's parent is a Japanese corporation. Motion no. 12(d) is granted with respect to the defendant's wealth and power and denied with respect to the defendant's size and corporate status.

### d. Motion No. 12(j).

In motion no. 12(j), the defendant requests "a cautionary instruction that any dollar figure advanced by plaintiff's counsel does not constitute evidence but merely represents argument which the jury is entirely free to disregard." Motion no. 12(j) is denied without prejudice because the issue raised by this motion is sufficiently addressed in the plaintiff's proposed jury instruction no. 1, which states:

> Arguments, statements, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark.

2000 U.S. Dist. LEXIS 10974, *

(*See* Joint Final Pretrial Order, Ex. I-2.) The Court finds that the plaintiff's proposed instruction, or one like it, will [*81] cure any problems that motion no. 12(j) seeks to address. Given this instruction, the defendant can surely argue during its opening and closing statements that "any dollar figure advanced by counsel does not," by itself, "constitute evidence." The motion is therefore denied.

## CONCLUSION

IT IS THEREFORE ORDERED THAT plaintiff's motion no. 2 is GRANTED in part and DENIED in part; plaintiff's motion nos. 3, 8, 28, 29, and 30 are GRANTED; and plaintiff's motion nos. 1, 5, 20, 23, 24, 25-27, and 31 are DENIED. The defendant's motion nos. 5, 8, and 11 are GRANTED; defendant's motion nos. 4,

7, and 10 are DENIED; and defendant's motion no. 12 is GRANTED in part and DENIED in part with respect to 12(d), and DENIED with respect to 12(a), (b) and (j). The parties are directed to inform their trial witnesses of the matters barred from evidence under this order, and to admonish them to refrain from disclosing information that has been excluded.

ENTER

SIDNEY I. SCHENKIER

United States Magistrate Judge

Dated: July 21, 2000